E-filing

1   REED R. KATHREIN (139304)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
3   Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
4   reed@hbsslaw.com

5
    STEVE W. BERMAN
6   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
7   Seattle, WA 98101
    Telephone: (206) 623-7292
8   Facsimile: (206) 623-0594
    steve@hbsslaw.com
9
    Attorneys for Plaintiffs
10
    [Additional counsel listed on signature page]
11

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14  DEBORAH JANE JARRETT, NANCY          )   No.  C08-02376
    ISENHOWER, AND JEFFREY H. FRANKEL,   )
15                                       )   CLASS ACTION COMPLAINT
                              Plaintiffs,)   AND JURY DEMAND
16                                       )
            v.                           )
17                                       )
    INTERMUNE, INC., W. SCOTT HARKONEN   )
18  AND GENENTECH, INC.,                 )
                                         )
19                            Defendants.)
    _____)
20

21

22

23

24

25

26

27

28

ORIGINAL
FILED

MAY - 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

**TABLE OF CONTENTS**

CLASS ACTION COMPLAINT ............................................................................................. 1

NATURE OF THE ACTION ............................................................................................... 1

I.     PARTIES ........................................................................................................ 2

II.    JURISDICTION .......................................................................................... 3

III.   FACTS ........................................................................................................... 4

     A.     Genentech and ACTIMMUNE ............................................................... 4

     B.     InterMune's Acquisition of ACTIMMUNE .......................................... 6

     C.     InterMune Promoted ACTIMMUNE for the Treatment of IPF ................. 9

     D.     Flawed Science Served as a Springboard for InterMune's Unlawful
         Marketing ............................................................................................... 11

         1.     The 1999 Austrian Study ............................................................ 11

         2.     InterMune's October 2000 Study ............................................... 12

     E.     Defendants Misrepresented ACTIMMUNE in Promotional Information ................. 13

     F.     Defendants Fraudulently Misrepresented Medical Benefits of
         ACTIMMUNE for IPF ........................................................................... 15

     G.     InterMune Sales Representatives Promoted ACTIMMUNE for IPF ........... 17

         1.     InterMune Sales Representatives Used Other InterMune Drugs to
            Gain Access to Pulmonologists, and Provided them with Inaccurate
            and Unproven Information about the Efficacy of ACTIMMUNE for
            IPF .............................................................................................. 18

     H.     The "ASAP" Registry Wrongfully Increased Sales of ACTIMMUNE for the
         Treatment of IPF .................................................................................... 19

     I.      InterMune Sponsored Meetings Advocating Use of ACTIMMUNE for IPF ........... 19

     J.     Defendants Concealed the Fact That ACTIMMUNE Is Not Effective for IPF ........ 20

         1.     The 2004 New England Journal of Medicine Article ......................... 21

         2.     The 2006 Proceedings of the American Thoracic Society ................ 22

         3.     The 2007 Termination of INSPIRE ............................................ 22

     K.     Defendants' Repeated Misrepresentations Caused Consumers and Payors
         Injury ..................................................................................................... 22

     L.     Criminal Prosecution of InterMune ....................................................... 23

1          M.     Criminal Prosecution of Harkonen................................................................ 24

2   IV.    CLASS ACTION ALLEGATIONS ........................................................................ 25

3   V.     CAUSES OF ACTION ........................................................................................ 27

4   VI.    DEMAND FOR RELIEF ...................................................................................... 39

5   VII.   DEMAND FOR JURY TRIAL............................................................................. 40

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

010059-11 238353 V1

## CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and others similarly situated, for their complaint against InterMune, Inc., W. Scott Harkonen, and Genentech, Inc., alleges as follows based on (a) personal knowledge, (b) the investigation of counsel, including review of regulatory filings, other materials in the public record, and pleadings, agreements, and orders relating to other civil and criminal prosecutions, and (c) information and belief.

## NATURE OF THE ACTION

1.     This is a proposed nationwide class action on behalf of consumers and other end-payors of ACTIMMUNE, a bio-engineered form of interferon-gamma, alleging fraud and deception in the marketing and sale of ACTIMMUNE for scientifically unproven purposes, primarily the treatment of idiopathic pulmonary fibrosis (or "IPF"). Three companies and one individual are the co-conspirators: InterMune, Inc. (the marketing and selling arm); W. Scott Harkonen (the former CEO of InterMune); and Genentech, Inc. (a licensor, monitor of InterMune marketing activities, and manufacturer of ACTIMMUNE).

2.     IPF, a subtype of interstitial lung disease, is a deadly disease with no known cause or cure marked by scar tissue or fibrosis which develops in a sufferers lungs as a byproduct of inflammation causing alveolar tissue to become thick and stiff retarding lung expansion during breathing and decreasing the availability of oxygen in the bloodstream.  Once considered a relatively rare disease, IPF is now recognized as the most common interstitial lung disease with more than 80,000 people in the United States having been diagnosed.  IPF is untreatable and usually fatal..

3.     Defendants' fraudulent and deceptive marketing of ACTIMMUNE exploited the desperation of thousands of Americans suffering from IPF.  For their wrongdoing, both InterMune and Harkonen were charged by the United States Attorney for the Northern District of California with federal criminal felony misconduct.  InterMune paid restitution in the amount of $37 million to federal and state third-party payors to resolve the criminal charges pending against the company. Criminal charges against Harkonen are pending.

1      4.     Defendants' defrauded not only the federal and state governments, but also

2  consumers and third-party payors who paid for ACTIMMUNE. The federal settlement addressed

3  the economic harm to governmental payors, but it did not address the harm to consumers and non-

4  governmental third-party payors. This action seeks relief for consumers and private payors.

5      5.     Counts I and II allege substantive and conspiracy violations of the Racketeer

6  Influenced and Corrupt Organizations Act ("RICO") as prohibited by 18 U.S.C. §§ 1962(c) and

7  (d). Count III alleges violation of the California Business and Professions Code §§ 17200. Count

8  IV alleges a violation of various state consumer protection acts. Count V alleges unjust

9  enrichment.

10     6.     As a direct result of Defendants' willful and knowingly deceptive, unfair,

11 unconscionable, and fraudulent conduct, consumers and third-party payors paid unnecessarily for

12 prescriptions of ACTIMMUNE, thus suffering a loss. These losses were a foreseeable

13 consequence of Defendants' conduct. Plaintiff seeks certification of a nationwide class and

14 damages on behalf of that class.

## I.      PARTIES

16     7.     Plaintiff Deborah Jane Jarrett resides at 1404 Rosewood Circle, Dalton, Georgia

17 30720 and was administered ACTIMMUNE by self-injection, paying insurance co-payments from

18 her own funds.

19     8.     Plaintiff Nancy Isenhower resides at 350 South Indiana, Atlanta, Indiana 46031 and

20 was administered ACTIMMUNE by self-injection, paying insurance co-payments from her own

21 funds.

22     9.     Plaintiff Jeffrey H. Frankel resides at 1205 Avenel Boulevard, North Wales,

23 Pennsylvania 19454 and was administered ACTIMMUNE by self-injection, incurring cash

24 payment obligations from his own funds.

25     10.    Defendant InterMune, Inc. ("InterMune") was incorporated in 1998 as a California

26 company and began operations in the State of California in May of 1998. The company

27 reincorporated as a publicly traded Delaware corporation in 2000, but the principal place of

28

CLASS ACTION COMPLAINT

- 2 -

010059-11 238353 V1

business has been Brisbane, California.  In March 2000, InterMune became a publicly traded company.

11.     Defendant W. Scott Harkonen ("Harkonen") was the chief executive officer of InterMune and an employee of Connetics Corp.  Harkonen holds a medical degree from the University of Minnesota and was a medical doctor licensed to practice in California.  At all relevant times, he has been a resident of the State of California.

12.     Defendant Genentech, Inc. ("Genentech") is a Delaware corporation with a principal place of business at 1 DNA Way, San Francisco, California.  Genentech is a publicly traded company.

13.     Connetics Corporation  ("Connetics") is a Delaware corporation with principal place of business at 3400 West Bayshore Road, Palo Alto, California.  Connetics is a publicly traded company.  Connetics participated in the scheme alleged in this complaint but is not named as a defendant.

14.     Express Scripts, Inc., formerly Priority Healthcare Corporation ("Priority"), is a Missouri corporation with principal place of business at One Express Way, Saint Louis, Missouri 63121.  Priority participated in the marketing, promotion and distribution of ACTIMMUNE and received significant revenue from the sale of ACTIMMUNE, but is not named as a defendant.

## II.    JURISDICTION

15.     Plaintiff invokes jurisdiction pursuant to 28 U.S.C. § 1332 (d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds $5,000,000, exclusive of interests and costs, and is a class action in which "any member of a class of plaintiff is a citizen of a state different from any Defendants." See 28 U.S.C. § 1332 (d)(2)(A).    Jurisdiction also rests under 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States, and under 28 U.S.C. § 1367 because the state law claims are supplemental to the federal causes of action.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) and (c), and 18 U.S.C. § 1965(a), because one of more Defendants transact business, are found, or have agents

1    in this district, and because a substantial portion of part or all of the alleged improper conduct took

2    place in this district.    See 28 U.S.C. § 1391; 18 U.S.C. § 1965(a).

3                                         **III.    FACTS**

4    **A.    Genentech and ACTIMMUNE**

5            17.    Genentech was founded in California in 1976 as the self-styled "first biotechnology

6    company." Genentech develops and sells therapeutics created from genetically engineered copies

7    of naturally occurring molecules, ostensibly to provide clinical benefits to patients.

8            18.    In the years leading up to 1990, Genentech developed a bio-engineered form of

9    interferon-gamma, a protein that acts as a biologic response modifier through stimulation of the

10   human immune system. Genentech conducted a randomized double-blind, placebo-controlled

11   study of ACTIMMUNE in patients with chronic granulomatous disease ("CGD") to determine

12   whether three times weekly subcutaneous injections of ACTIMMUNE decreased the incidence of

13   serious infectious episodes and improve infectious and inflammatory conditions in patients with

14   CGD.

15           19.    CGD is a rare inherited disorder of leukocyte function affecting no more than 400

16   people in the United States.

17           20.    In 1990, the FDA granted approval to Genentech to market and sell interferon-

18   gamma 1-b, to be sold under the brand name ACTIMMUNE.

19           21.    Because the scientific evidence presented to the FDA on the issues of efficacy and

20   safety only justified a narrow purpose for which ACTIMMUNE might be sold, the FDA's approval

21   of ACTIMMUNE was limited to reducing the frequency and severity of serious infections

22   associated with CGD. If sold only to patients with CGD, ACTIMMUNE would yield potential

23   sales of no more than $10 million annually.

24           22.    Later, Genentech sought and received approval for a second indication, viz.,

25   delaying time to disease progression in patients with severe, malignant osteopetrosis.

26   Osteopetrosis is an inherited disorder in which bone and cartilage, especially in long bones,

27   become dense and hardened to an extent that marrow is obliterated, and anemia, spleen and liver

28   enlargement, along with other consequences, occurs. Severe, malignant osteopetrosis, like CGD, is

CLASS ACTION COMPLAINT

010059-11 238353 V1

extraordinarily rare, affecting approximately 400 people in the United States annually. The approval for this additional indication did not, as a result, significantly widen the approved market for ACTIMMUNE.

23.    In the 1990s, Genentech marketed and sold ACTIMMUNE for its two, very limited indications of CGD and severe, malignant osteopetrosis.

24.    During these years, Genentech explored the potential use of ACTIMMUNE for other, far larger markets with significantly higher profit potentials. It was unsuccessful in doing so. For example, in 1996, Genentech announced termination of study for application for renal cancer after the ACTIMMUNE did not show efficacy on the study's primary endpoint.

25.    By 1998, things did not look well for Genentech and ACTIMMUNE. Genentech knew that, on the basis of all scientific efforts to date, the only proven clinical uses of ACTIMMUNE were for CGD; it knew that, when limited to this indication, ACTIMMUNE had no significant financial future, and that its market exclusivity was nearing an end. As a result, Genentech sought to expand the markets for ACTIMMUNE into more profitable areas, and to do so it entered into contractual relationships with other corporations. Genentech itself got out of the business of marketing ACTIMMUNE, although it would monitor others' marketing of the product, and would for several more years continue to manufacture the drug.

26.    On May 5, 1998, Genentech licensed the United States marketing and development rights to interferon gamma (including ACTIMMUNE) to Connetics. (Five years earlier, Connetics had been founded by Genentech executives as Connective Therapeutics, Inc., a spin off of Genentech that sought to focus on treating connective tissue disorders.) Defendant Harkonen served as Senior Vice President of Product Development and Operations of Connetics during the time period when Connetics held the license to market ACTIMMUNE.

27.    Under the agreement between Genentech and Connetics, "Genentech grants to Connetics an exclusive license ... to use, sell, offer for sale and import (but not to make or have made) Licensed Products in the Field of Use" within the United States. The term "Field of Use" is defined as, "the administration to humans of [interferon gamma] for the treatment or prevention of [various disease states]," including CGD, severe, malignant osteopetrosis, and pulmonary fibrosis.

CLASS ACTION COMPLAINT

- 5 -

28. The agreement included provisions for annual reporting by Connetics to Genentech:

> On or about each August 1 during the term of this Agreement, Connetics shall supply Genentech with a report on Connetics' development and marketing programs for Licensed Products in the Field of Use in the Territory. The report shall include the following: (i) a description of Connetics' progress in such programs during the twelve (12) months prior to the date of each such report, (ii) *a description of Connetics' planned development and marketing programs for the twelve (12) months after the date of each such report,* (iii) a copy of the most recent version of the Clinical Development Milestones (if not previously provided to Genentech), (iv) a copy of all previous versions of the Clinical Development Milestones (if not previously provided to Genentech), (v) an explanation of any discrepancies between Connetics' progress during the prior twelve (12) months and the Clinical Development Milestones and (vi) a proposal to address such discrepancies, as contemplated under Section 3.2. Genentech shall have the right to comment on the Clinical Development Milestones and the development and marketing programs, and at Genentech's discretion, the Parties shall meet to discuss and agree upon changes to the Clinical Development Milestones. (Emphasis added.)

29. Genentech subsequently announced that following "a transition period ending January 1999, the Company will no longer market ACTIMMUNE, and has agreed to supply bulk materials to Connetics at cost plus a mark-up and a royalty."

**B. InterMune's Acquisition of ACTIMMUNE**

30. The 1998 agreement between Genentech and Connetics contemplated a sublicense to the newly created and wholly owned subsidiary InterMune "to conduct development and commercialization of Licensed Products [including ACTIMMUNE] in the Field of Use pursuant to an appropriate sublicense from Connetics to InterMune." The agreement also provides, "Connetics may grant one sublicense to InterMune ... under any or all of the rights granted ... above without Genentech's prior written approval," and makes specific provisions relating to the intended sublicense to InterMune:

> Genentech agrees to permit InterMune to perform Connetics' rights and obligations under [certain sections] of this Agreement (excluding matters related to any alleged breach of the Agreement, or dispute between the Parties concerning the performance of this Agreement, under such enumerated Sections and Article), to the extent such rights and obligations are sublicensed to InterMune by Connetics, and Genentech agrees to deal with InterMune in lieu of Connetics as if it were Connetics hereunder for purposes of performance under such enumerated Sections and Article, provided that Connetics shall

remain liable and responsible for performance of all of the obligations of Connetics and InterMune under this Agreement.

31.    InterMune is a pharmaceutical product marketing company. Its business consists of acquiring the rights to pharmaceutical products, and commercializing them for new indications. InterMune does not engage in pharmaceutical product research and development. Nor does InterMune manufacture any of the medications it markets. Rather, it contracts with pharmaceutical manufacturers to manufacture its licensed products. Generally, InterMune distributes its products through specialty pharmacies, who then resell to hospitals, general pharmacies, and physicians.

32.    Defendant Harkonen, an employee of Connetics, served as InterMune's CEO from February 1998 through at least June 30, 2003. After June 30, 2003, Harkonen assumed the position of Vice President of Sales and Marketing. Harkonen was also a member of InterMune's Board of Directors from February 1998 through September 2003. Harkonen directed all aspects of InterMune's operations, including research, marketing, and investor relations.

33.    On August 21, 1998, three months after Connetics acquired a license to market ACTIMMUNE from Genentech, InterMune obtained an exclusive sublicense of Connetics' rights to market interferon gamma 1-b, and agreed to assume many of Connetics obligations to Genentech under that license agreement. On April 27, 1999, Connetics and InterMune entered into an amended and restated exclusive sublicense agreement that sublicensed additional rights to InterMune that Connetics had acquired (with the intent of sublicensing these additional rights to InterMune) through amendment of their license agreement with Genentech. Finally, in June 2000, Connetics assigned all of its rights under the Genentech license, as modified by agreements effective December 28, 1998, January 15, 1999, and April 27, 1999, to InterMune through 2018. Per the terms of the assignment, InterMune was obligated to pay Connetics a royalty of 0.25% of net U.S. ACTIMMUNE sales until "our cumulative U.S. net sales surpass $1 billion. Thereafter, we are obligated to pay a royalty of 0.5% of our U.S. net sales." InterMune was also obligated to make substantial "milestone" payments to Connetics.

34.    Thus, InterMune had exclusive rights "to commercialize ACTIMMUNE in the United States for the treatment and prevention of all human diseases and conditions, including

CLASS ACTION COMPLAINT

- 7 -

infectious diseases, ***pulmonary fibrosis*** and cancer, but excluding arthritis and cardiac and cardiovascular diseases and conditions." (emphasis added). Under the Genentech license, InterMune paid Genentech royalties on the sales of ACTIMMUNE, and made one-time payments to Genentech upon the occurrence of specified milestone events. InterMune was also obligated "to develop and commercialize ACTIMMUNE for a number of diseases." InterMune was also required to send Genentech annual reports detailing their marketing plans for the next twelve months. InterMune acknowledged, "if we breach our agreement with Genentech, Genentech could terminate the license, and we could lose our rights to develop and market ACTIMMUNE."

35.     In addition to granting a license to market ACTIMMUNE in the United States, Genentech agreed to supply InterMune with ACTIMMUNE through May 2001: "We expect that the supply of commercial product that we will be receiving from Genentech will meet our needs for commercial supply through March 2002. Genentech has an option to extend the term of this agreement. We are negotiating such an extension of the supply agreement with Genentech to obtain additional commercial supply through a later date, if necessary."

36.     While InterMune and Connetics knew that the approved market for ACTIMMUNE in 2000 included only 800 CGD and severe, malignant osteopetrosis patients, both watched their sales of ACTIMMUNE to InterMune soar. Genentech saw their sales of ACTIMMUNE to InterMune increase 37% from 1999 to 2000, and then more than double between 2000 ($3.7 million) and 2001 ($7.4 million). The 2000 FDA approval for severe, malignant osteopetrosis could not explain this dramatic increase in sales, and Genentech should have known that this increase was the result of marketing for an unproven indication.

37.     As of January 1, 2002, Genentech no longer manufactured or sold ACTIMMUNE to InterMune, but continued to receive royalties from InterMune on ACTIMMUNE sales. As a replacement, InterMune entered into a supply agreement with Boehringer Ingelheim ("Boehringer") to manufacture both clinical and commercial supply of ACTIMMUNE. InterMune wanted Boehringer, who already manufactured ACTIMMUNE for clinical supply, to begin supplying ACTIMMUNE for commercial use after the Genentech supply agreement expired. Boehringer began the FDA process of receiving certification that it was allowed to manufacture

CLASS ACTION COMPLAINT

- 8 -

1   and supply the drug.  Genentech has received royalty payments from Boehringer from the sale of

2   interferon gamma in certain countries outside of the U.S. since at least 1998.

3   **C.    InterMune Promoted ACTIMMUNE for the Treatment of IPF**

4         38.    From the time InterMune acquired the license to ACTIMMUNE, Defendants knew

5   that the drug would not be profitable from sales for CGD and severe, malignant osteopetrosis

6   alone.  In a regulatory report from 2000, InterMune acknowledged that

> To date, we have generated revenues primarily through the sale of
> ACTIMMUNE for chronic granulomatous disease. After
> consideration of the direct costs of marketing ACTIMMUNE for
> chronic granulomatous disease and severe, malignant osteopetrosis,
> and royalties we must pay to Genentech on sales of ACTIMMUNE,
> we do not currently generate any significant operating profits on
> those sales. Even if we succeed in developing ACTIMMUNE and
> Amphotec for additional diseases, we expect to incur net losses for at
> least the next three to five years and expect that these net losses will
> increase as we expand our research and development activities. If the
> time required to achieve profitability is longer than we anticipate, we
> may not be able to continue our business.

        39.    Rather than limiting its marketing of ACTIMMUNE to its proven indication,

InterMune embarked on a campaign of deceit and fraud to promote ACTIMMUNE for the

treatment

        40.    The campaign was conducted at the direction of InterMune's California-based

executives, and orchestrated from its California offices.

        41.    In 2002, as part of its efforts to increase its sales of ACTIMMUNE for IPF,

InterMune reached a multi-year deal with Priority as its sole distributor and coordinator of

ACTIMMUNE.  Through this arrangement, Priority spearheaded efforts to promote

ACTIMMUNE for IPF.  In late 2004, the Department of Justice issued a subpoena to Priority.

However, even after receiving the subpoena and being apprised of the federal investigation,

Priority's own 2005 annual report reflects its unwavering public relations position that

ACTIMMUNE was appropriate for sale to suffers of IPF:

> *Other Pulmonary Diseases.* Idiopathic pulmonary fibrosis ("IPF") is
> a disease characterized by acute inflammation in the lung and
> progressive scarring that leads to a gradual loss of lung function.
> ACTIMMUNE, manufactured by InterMune, is self-administered via
> subcutaneous injection three times a week. According to the
> Pulmonary Fibrosis Foundation in 2005, there are approximately

CLASS ACTION COMPLAINT

010059-11 238353 V1

-9-

200,000 people in the United States suffering from IPF. The Company estimates that the market in the United States for the treatment of IPF exceeds $1 billion. Also, according to a 2003 article in the American Journal of Nursing, about 15,000 new cases of IPF are diagnosed annually in the United States.

42.     IPF is characterized by progressive scarring, or fibrosis, of the lungs, which leads to their deterioration and destruction.  In layman's terms, patients slowly and painfully suffocate to death.  The cause of IPF is unknown, and the survival rate is generally only two to three years. There are no medications to treat this disease, but a lung transplant may be effective as a last resort. Patients that receive transplant, when available, have a 60% chance of survival.

43.     Preying on this vulnerable population, Defendants InterMune and Harkonen falsely claimed benefits associated with ACTIMMUNE for IPF, suppressed evidence that ACTIMMUNE was ineffective, caused physicians to prescribe ACTIMMUNE to treat IPF, and caused consumers and third party payors to pay for these ACTIMMUNE prescriptions.  Defendants InterMune and Harkonen knew that ACTIMMUNE provided no medical benefit to IPF patients.

44.     Defendants' InterMune and Harkonen fraudulent marketing scheme was successful. ACTIMMUNE sales rose from less than one million dollars in 1999, when ACTIMMUNE was promoted for only indicated uses, to a total of over $600 million, for the period 2000 to 2006, as follows:

| Year | Total ACTIMMUNE Sales |
|------|----------------------|
| 1999 | $ 556,000 |
| 2000 | $ 11.2 million |
| 2001 | $ 36.3 million |
| 2002 | $ 105.8 million |
| 2003 | $ 141.4 million |
| 2004 | $124.9 million |
| 2005 | $ 107.6 million |
| 2006 | $ 90.3 million |

CLASS ACTION COMPLAINT

010059-11 238353 V1

- 10 -

45.     InterMune admits that substantially all ACTIMMUNE sales from 2000 to the present are attributable to prescriptions for the treatment of IPF. InterMune's sales of ACTIMMUNE included sales to California purchasers and generated revenues for InterMune's operations in California. In fact, by 2002, InterMune's sale of ACTIMMUNE represented approximately 94% of the company's total revenues.

**D.     Flawed Science Served as a Springboard for InterMune's Unlawful Marketing**

46.     Defendants InterMune and Harkonen knew that ACTIMMUNE was unproven and medically unnecessary and ineffective for the treatment of IPF. The study that InterMune cited as showing positive results in treating IPF with ACTIMMUNE is untrue. Medical studies have been overwhelmingly negative, showing either no benefit from treatment with ACTIMMUNE, or a worse outcome in patients who received ACTIMMUNE than in those who did not. InterMune purported to "study" treatment of IPF in patients with ACTIMMUNE in order to create a smokescreen for the lack of medical support for their contention that ACTIMMUNE was beneficial in treating IPF. Defendants InterMune and Harkonen had no scientific proof of ACTIMMUNE's effectiveness for IPF. Defendants InterMune and Harkonen fraudulently marketed ACTIMMUNE.

**1.     The 1999 Austrian Study**

47.     In 1999, physicians at the University of Vienna conducted tests on 18 patients that provided some indication that ACTIMMUNE might benefit pulmonary fibrosis patients. Patients were given either ACTIMMUNE and corticosteroids, or just corticosteroids. The study purported to conclude that patients who received ACTIMMUNE showed some improvement in their lung capacity and blood oxygen level at the end of 12 months. *See* Rolfe Ziesche et al., *Preliminary Study of Long-Term Treatment with Interferon Gamma-1b and Low-Dose Prednisolone in Patients with Idiopathic Pulmonary Fibrosis*, 341(17) New England J. Medicine 1264 (1999).

48.     InterMune's and Harkonen's use of this study to market ACTIMMUNE for the treatment of IPF was improper and misleading. First, the number of participants in the study was so small that no meaningful conclusion could be inferred from the findings. *See* Nicholas Walter et al., *Current Perspectives on the Treatment of Idiopathic Pulmonary Fibrosis*, 3 Pros. Am. Thor. Soc. 330, 333-34 (2006). The study included just 18 participants, only eight of whom received

CLASS ACTION COMPLAINT

010059-11 238353 V1

interferon gamma 1-b. *See* Ziesche at 1265. Second, the study patients suffered from a less advanced stage of pulmonary disease that was not clearly defined as IPF. *See* Nicholas Walter et al., *Current Perspectives on the Treatment of Idiopathic Pulmonary Fibrosis*, 3 Pros. Am. Thor. Soc. 330, 333-34 (2006). The study excluded patients with "end-stage idiopathic pulmonary fibrosis, as identified on the basis of a total lung capacity of less than 45 percent of the predicted normal value," and thus provided no insight into whether ACTIMMUNE would improve the conditions of people with advanced idiopathic pulmonary fibrosis. *See* Ziesche at 1265. As such, the study was, in effect, not one conducted on patients with IPF. This small study on non-IPF patients failed to prove that ACTIMMUNE was effective for the treatment of pulmonary fibrosis.

49.    Nevertheless, Defendants InterMune and Harkonen formulated a strategy to "uniquely brand ACTIMMUNE as the treatment of choice for IPF," and to "create dissatisfaction with other treatment options" by pointing out their poor-results. InterMune stated falsely in its SEC filings from 2000 that, "The results of a clinical trial published in October 1999 in THE NEW ENGLAND JOURNAL OF MEDICINE showed statistically significant evidence that interferon gamma-1b can halt and reverse the progression of idiopathic pulmonary fibrosis."

**2.    InterMune's October 2000 Study**

50.    In October of 2000, InterMune sponsored a global Phase III clinical trial of ACTIMMUNE that purported to seek to determine whether treating patients with ACTIMMUNE resulted in a significant decrease in disease progression and death as compared to IPF patients receiving a placebo. The study involved 330 IPF patients over a median of 58 weeks in the United States and Europe. Participants received either 200 micrograms of ACTIMMUNE by injection or a placebo three times weekly for an average duration of 60 weeks. This dosage is twice the suggested dosage recommended for the treatment of CGD and severe, malignant osteopetrosis. The primary endpoint, or the pre-determined indicator of success, was progression-free survival.

51.    In mid-August 2002, Defendants InterMune and Harkonen received data from the clinical trial that showed the trial had *failed to show statistical significance in the rates of progression-free survival*. The study also failed to show statistical significance as to any agreed upon secondary endpoint, including overall survival rates. On August 27, 2002, Defendants

CLASS ACTION COMPLAINT

010059-11 238353 V1

InterMune and Harkonen discussed the results of the trial with the FDA during a telephone conference. During the call, the FDA told InterMune that "the study failed to demonstrate efficacy on its primary endpoint." The representative also advised that "the FDA was unlikely to approve the use of ACTIMMUNE for the treatment of IPF without further rigorous clinical testing." Nonetheless, InterMune and Harkonen disseminated misleading and false information about the study results to patients and physicians that indicated InterMune was effective in treating IPF.

**E.    Defendants Misrepresented ACTIMMUNE in Promotional Information**

52.    Pharmaceutical marketing depends upon saturating the market for a particular drug with favorable information. Pharmaceutical sales promotion methods include "detailing" physicians (meeting face to face where physicians are given promotional materials and samples), sponsoring continuing medical education events, advertising in journals, and direct-to-consumer advertising.

53.    Physicians and patients value the information they obtain from marketing because it reduces the cost of obtaining this information themselves. However, pharmaceutical companies have the advantage of framing the information they provide to physicians through detailers, conferences, and other promotional materials in a way that is less than accurate. While false or misleading statements may be used in pharmaceutical promotion efforts and company-sponsored continuing medical education, such activities nonetheless have a positive effect on the number of prescriptions written for the specific product being promoted.

54.    Physicians rely on the information obtained from sales representatives, even though the information may be misleading, premature, or outright false. This positive (though false) information about a drug can lead to an increase in the number of prescriptions written. An increase in the number of prescriptions written for a particular drug can further suggest that the drug has proven benefits. The widespread use of a drug may suggest confidence (whether accurate or not) about its safety and efficacy, and, for physicians, may imply accepted practice, thus providing an additional reason to prescribe the drug.

55.    The goal of pharmaceutical marketing is to maximize sales of products. Even with the advent of direct-to-consumer marketing, drug companies focus their efforts on physicians

CLASS ACTION COMPLAINT

010059-11 238353 V1

- 13 -

because physicians control access.  A patient can ask a physician about a drug seen advertised on television, but the physician must prescribe the drug for the pharmaceutical company to make a sale.

56.    Physicians may not recognize their vulnerability to pharmaceutical marketing influences, but studies show promotional influence over physicians is strong, even when the promotional messages are flawed or contradicted by scientific evidence.  One study found that physicians were more influenced by promotional materials than scientific publications.  Another study revealed that physicians' beliefs about the benefit of a drug were consistent with the detailing message, even where scientific evidence had clearly shown that the drug had little or no benefit; the same physicians reported that commercial sources had little influence on their prescribing.

57.    These studies and others demonstrate that, as much as physicians believe they are and would like to be, they are not adept at distinguishing scientific evidence-based information from misleading pharmaceutical promotion, and therefore, are not impervious against fraudulent product claims.  As a result, if pharmaceutical companies promote the use of a drug for unnecessary, and unbeneficial purposes, physicians are nevertheless likely to prescribe the drug for the purpose promoted, particularly when there is no other proven treatment for a fatal disease (as is the case with IPF).

58.    In the face of a disease that is always fatal, physicians may be more willing to accept the information as presented by a sales representative in order to give their patients hope.  A new treatment option brings with it a general sense of optimism.   This initial surge of optimism on the part of physicians is fed by product promotion.  The extremely positive information saturating physicians and patients combines with the optimism of prescribing doctors to put tremendous pressure on payors and insurers to cover "cutting edge" treatments.

59.    Through its well-constructed campaign of deception, Defendants InterMune and Harkonen caused physicians to prescribe ACTIMMUNE, and caused consumers and third-party payors to pay for ACTIMMUNE, despite an absence of scientific proof to support its effectiveness.

**F.    Defendants Fraudulently Misrepresented Medical Benefits of ACTIMMUNE for IPF**

60.    Despite an absence of evidence of proven effectiveness, and in the face of overwhelming medical evidence that the studies defendants purported to rely upon had failed to demonstrate efficacy, defendants created and distributed materials that falsely claimed ACTIMMUNE had been shown to extend the lives of IPF patients and was effective.

61.    On August 28, 2002 , from their Brisbane, California corporate offices, Defendants InterMune and Harkonen publicly announced the results of the October 2000 trial with the headline, "InterMune Announces Phase III Data Demonstrating Survival Benefit of ACTIMMUNE in IPF," and a subheading stating, "*reduces mortality by 70% in Patients with Mild to Moderate Disease*" (emphasis in original). Defendant Harkonen stated that "*ACTIMMUNE may extend the lives of patients suffering from this debilitating disease,*" and that "*ACTIMMUNE is the only available treatment demonstrated to have clinical benefit in IPF, with improved survival data in two controlled clinical trials.*" Defendants also represented that ACTIMMUNE improved breathing, and reduced the need for supplemental oxygen. A physician whose work was paid for by InterMune is quoted in defendants' announcement as saying, "*The mortality benefit is very compelling and represents a major breakthrough in this difficult disease.*"

62.    The clinical trial data did not support defendants' claims. The chairman of the Data Monitoring Committee ("DMC"), an independent group of experts who monitor patient safety and treatment efficacy data while a clinical trial is ongoing, analyzed the clinical trial data and condemned the defendants' announcement, stating that "the trial had failed to establish benefit on the primary endpoint" and that "there was no statistically significant evidence of benefit for any of the secondary endpoints." The DMC also stated that InterMune's statements constituted a "serious misrepresentation of results obtained from exploratory data subgroup analysis," referring specifically to the subheading and other statements concerning a survival benefit in the mild to moderate subgroup.

63.    In mid-October 2002, over a month after receiving the letter from the DMC and almost two months after receiving the FDA's feedback, Defendants InterMune and Harkonen caused an announcement to be sent to over 2000 pulmonologists that falsely claimed

CLASS ACTION COMPLAINT

010059-11 238353 V1

ACTIMMUNE was proven to be effective for reducing mortality in IPF patients. The announcement, provided by InterMune from its California offices, and sent by fax by the specialty pharmacy that distributed ACTIMMUNE to IPF patients, Priority Healthcare Corporation (now Express Scripts, Inc. d/b/a CuraScript), began with the headline "InterMune Announces Phase III Data Demonstrating Survival Benefit of ACTIMMUNE in IPF." The announcement then further represented that ACTIMMUNE "Reduces Mortality by 70% in Patients with Mild to Moderate Disease." The announcement included a copy of the August 28, 2002 remarks ascribing proven mortality benefits to ACTIMMUNE.

64.    Defendants InterMune and Harkonen also distributed a letter to patients that contained false and misleading information about the results of the Phase III ACTIMMUNE trial. At Defendant InterMune's and/or Harkonen's direction from their offices in California, the specialty pharmacy distributed a letter to ACTIMMUNE patients that included the August 28, 2002 press release, and provided the same misleading information about the results of the Phase III ACTIMMUNE trial results, stating, "ACTIMMUNE . . . showed a statistically significant reduction in mortality by 70% in patients with mild to moderate IPF." It continued, "[ACTIMMUNE] is the first treatment ever to show any meaningful impact in this disease in clinical trials. These results indicate that ACTIMMUNE should be used early in the course of treatment of this disease in order to realize the most favorable long-term survival benefit."

65.    InterMune not only provided misleading information about improvements in survival rates for IPF patients taking ACTIMMUNE, but also encouraged patients to begin taking the drug early in the treatment of their disease. Defendants InterMune and Harkonen knew that the clinical trial data did not support the claim of improved survival rates, but nonetheless represented to patients that taking the drug "early" would increase survival time. Given that Defendants InterMune and Harkonen knew the clinical data from the ACTIMMUNE trial did not delay mortality in IPF patients, promoting early use of the drug served to increase sales and profits from ACTIMMUNE while creating false hope in severely ill patients and causing patients and payors to pay exorbitant sums for useless prescriptions for the longest possible period of time.

**G.     InterMune Sales Representatives Promoted ACTIMMUNE for IPF**

66.     Despite the fact that the clinical data failed to establish that ACTIMMUNE was effective for the treatment of IPF, Defendants InterMune and Harkonen instructed and required InterMune sales staff to promote ACTIMMUNE for IPF.  Beginning in at least July 2001, InterMune sales representatives were instructed to market ACTIMMUNE for IPF, which included telling physicians that ACTIMMUNE demonstrated a survival benefit in mild to moderate IPF patients when defendants knew, or should have known, that the drug provided no significant survival benefit. The sales representatives complied with the instructions of their superiors to disseminate the fraudulent information.

67.     In 2000, InterMune recognized that "[a]lthough ACTIMMUNE is currently approved for only chronic granulomatous disease and severe, malignant osteopetrosis, we believe that some physicians are prescribing ACTIMMUNE to treat patients with idiopathic pulmonary fibrosis…."  InterMune knew that it could not survive if only 800 CGD and severe malignant osteopetrosis patients were prescribed the drug annually, and thus marketed ACTIMMUNE for IPF.  As part of its plan, the company set out to "develop a sales and marketing organization to serve pulmonologists" because "Pulmonologists are the physicians who generally treat idiopathic pulmonary fibrosis".  "Accordingly, we are developing a sales and marketing organization to support the approximately 7,000 pulmonologists … practicing in the United States."

68.     In 2002, InterMune executives acknowledged "that to meet the ACTIMMUNE sales goal for 2002, the company's field reps would be making approximately 6,800 U.S. personal 'detail' visits to the offices of approximately 6,800 U.S. pulmonologists this year.  That works out to about seven visits per doctor just to educate them about ACTIMMUNE."

69.     Subsequently, in 2003, according to a former employee, InterMune told sales representatives, "If anyone has a problem selling ACTIMMUNE for IPF … then you need to see your Regional Director."  The sales force was instructed and encouraged to misrepresent the state of scientific evidence relating to the effectiveness of ACTIMMUNE in treating IPF.  This same year, a slide presented at the national sales meeting set an ACTIMMUNE sales goal for the year that would require hundreds of new patients being prescribed the drug, an average rate of one

CLASS ACTION COMPLAINT

010059-11 238353 V1

1    patient per sales representative per week.  It would have been impossible to achieve this sales goal

2    without marketing the drug for unproven uses.  Defendant Harkonen, the then Vice President of

3    Sales and Marketing, and the rest of the California-based executives, knew this goal was untenable

4    with on-label prescriptions.

5          **1.**    **InterMune Sales Representatives Used Other InterMune Drugs to Gain Access to Pulmonologists, and Provided them with Inaccurate and Unproven Information about the Efficacy of ACTIMMUNE for IPF**

6

7        70.    Defendants InterMune and Harkonen directed InterMune sales representatives to

8    use other InterMune drugs to gain access to pulmonologists so that they could provide the doctors

9    with inaccurate and unproven information about the effectiveness of ACTIMMUNE for IPF.

10   Between August 2002 and January 2003, InterMune employed approximately 60 sales

11   representatives who focused on pulmonologists.  While InterMune also marketed the drug

12   Amphotec, an anti-fungal drug that is approved to treat aspergillosis (and can be used in the

13   treatment of pulmonary aspergillosis), sales representatives had never marketed Amphotec to

14   pulmonologists outside of a hospital setting prior to the fall of 2002.  At that time, sales

15   representatives began relying on Amphotec as a pretext to gain access to pulmonologists' offices

16   for the primary purpose of discussing and promoting the use of ACTIMMUNE for the treatment of

17   IPF.  Amphotec served as a Trojan horse that opened the door to pulmonologists offices for the

18   sales representatives.  Additionally, sales representatives were instructed to enter calls on

19   pulmonologists into the company's InfoLink system as "Amphotec" calls instead of

20   "ACTIMMUNE" calls in order to conceal the true representations being conveyed.

21       71.    Once they had gained access to pulmonologists, sales representatives were

22   encouraged to, and did in fact, promote ACTIMMUNE to physicians as demonstrating a survival

23   benefit in mild to moderate IPF patient populations, contrary to the clinical trial results and medical

24   literature.  Sales representatives also distributed and shared the October 2002 fax to pulmonologists

25   and the Fall 2002 patient letter.

26       72.    Defendants encouraged sales representatives to market ACTIMMUNE for unproven

27   indications by tying their bonuses to sales of ACTIMMUNE.  Despite the small number of patients

28   suffering from CGD and severe, malignant osteopetrosis, sales representatives received a quarterly

CLASS ACTION COMPLAINT

010059-11 238353 V1

bonus based on 7% of incremental ACTIMMUNE sales, but only 3.5% of incremental Amphotec sales. The smaller percentage offered to reward sales reps for Amphotec sales shows that defendants were incentivizing the sale of ACTIMMUNE beyond the sale of Amphotec.

**H.    The "ASAP" Registry Wrongfully Increased Sales of ACTIMMUNE for the Treatment of IPF**

73.    In 2001, Defendants InterMune and Harkonen created a registry that collected information about patients taking ACTIMMUNE for the treatment of IPF. The registry was known as the "ACTIMMUNE Safe and Appropriate Use Program," or the "ASAP registry." InterMune's represented purpose of this registry was to obtain data on "variation in current diagnostic and therapeutic management of patients receiving ACTIMMUNE" for the treatment of IPF. The information collected in the registry, according to Defendants InterMune and Harkonen, was to be available to "InterMune and to participating physicians for research and analysis" and "as a basis for scientific presentations and publications."

74.    In reality, the purpose of the registry was used to promote the use of ACTIMMUNE in treating IPF. The registry gave sales representatives another reason to contact pulmonologists about ACTIMMUNE, and appeared to legitimize InterMune's claims. Sales representatives were the principal source of registry enrollment, and served as the point of contact for physicians. In exchange for signing physicians up with the registry, sales representatives received payments in the form of stock options based on the number of patients they were able to enroll.

75.    Despite the registry's professed purpose of providing a source of information for physicians, InterMune provided a brief summary presentation at a scientific meeting in late 2002 in San Diego, California, but never shared the data contained in or derived from the registry directly with physicians, thereby concealing any negative trends in survival or progression data from the medical community.

**I.    InterMune Sponsored Meetings Advocating Use of ACTIMMUNE for IPF**

76.    Defendant InterMune sponsored meetings and programs for pulmonologists where experts spoke about pulmonary fibrosis and mentioned ACTIMMUNE. According to Defendant

CLASS ACTION COMPLAINT

- 19 -

010059-11 238353 V1

1   Harkonen, InterMune's most important "interaction with the physician community" was at

2   "medical conferences."

3       77.    InterMune also set up booths at pulmonologist medical meetings, and financed the

4   creation of a nonprofit patient advocacy group called the Coalition for Pulmonary Fibrosis

5   ("Coalition").

6       78.    InterMune funded the creation of the Coalition, set its agenda, and arranged its

7   location within the San Francisco offices of InterMune's public relations firm, Edelman Public

8   Relations.  As stated by Michael Rosensweig, the director of the legitimate non-profit entity

9   supporting IPF patients, Pulmonary Fibrosis Foundation, "The Coalition for Pulmonary Fibrosis is

10  a phony operation" and a "front for InterMune that was set up to sell ACTIMMUNE, not to support

11  IPF research."

12      79.    Defendants InterMune and Harkonen never disclosed to physicians or patients that

13  ACTIMMUNE was not proven effective for the treatment of IPF.  To the contrary, since the

14  moment InterMune acquired ACTIMMUNE, Defendants InterMune and Harkonen attempted to

15  saturate pulmonologists with favorable information about the drug.

16  **J.    Defendants Concealed the Fact That ACTIMMUNE Is Not Effective for IPF**

17      80.    Even in the face of overwhelmingly negative information about the benefit in

18  treating IPF with ACTIMMUNE, defendants continued to trumpet the unproven survival benefit of

19  ACTIMMUNE.  During a conference call on February 19, 2003, InterMune stated that the

20  proceedings of the November 5, 2002 annual meeting of the American College of Chest Physicians

21  ("CHEST"), held in San Diego California, were "very positive for the organization," but defendant

22  Harkonen later admitted that the presentation of the Phase III trial data was "ambiguous and

23  difficult to interpret."

24      81.    Defendants InterMune and Harkonen campaigned to counteract or discredit any

25  negative findings, exploiting the tendency among physicians and payors to provide access to a

26  potentially life-saving drug.

27

28

82.    InterMune's and Harkonen's concealment of the true results of the Phase III trial data, however, worked: ACTIMMUNE sales skyrocketed from $105.8 million in 2002 to $141.4 million in 2003 and stayed at above $90 million through 2006.

83.    Similarly, after the issuance of the FDA alert, Defendants InterMune and Harkonen took no steps to correct the misrepresentations they had previously made concerning the effectiveness of ACTIMMUNE. Defendants InterMune and Harkonen saturated the medical community with information about alleged survival benefits.  Studies have shown that doctors exhibit prescription habit persistence, and are reluctant to switch from prescribing the medication that they have prescribed in the past. Inertia and loyalty to particular drugs play a role in determining which drug will be prescribed by physicians, particularly when treating a terminal illness that has no FDA-approved treatment

84.    Notwithstanding irrefutable proof to the contrary, Defendants InterMune and Harkonen continued to allow the medical and patient communities to rely on their misrepresentations to sell more ACTIMMUNE.

### 1.    The 2004 New England Journal of Medicine Article

85.    Despite InterMune's and Harkonen's marketing campaign to promote ACTIMMUNE for IPF, the results of InterMune's own clinical trial and other medical literature all indicated that ACTIMMUNE provided no statistically significant benefit to IPF patients.  In January 2004, an article appeared in the *New England Journal of Medicine* that presented the results from InterMune's failed Phase III placebo controlled ACTIMMUNE trial. *See* Ganesh Raghu et al., *A Placebo-controlled Trial of Interferon Gamma-1b in Patients with Idiopathic Pulmonary Fibrosis*, 350 New England J. Medicine 125, 125-33 (2004).  The authors found that "[n]o significant differences were noted in the primary outcome measure of progression-free survival (defined as either disease progression or death) or in conventional measures of lung function and gas exchange at rest, or the quality of life." *Id.* at 131.

86.    The article also questioned the 1999 Austrian study, noting that the study may have included patients with idiopathic interstitial pneumonia who were not represented in the Phase III Trial. *Id.* at 131.

CLASS ACTION COMPLAINT

- 21 -

010059-11 238353 V1

### 2.    The 2006 Proceedings of the American Thoracic Society

87.    In 2006, an article published in the *Proceedings of the American Thoracic Society* reviewed all available literature on the treatment of IPF with ACTIMMUNE and determined that "current evidence does not justify the routine use of [ACTIMMUNE] in the management of IPF." *See* Walter, *supra*, at 335.

88.    Despite the unfavorable results suggested by previous studies, InterMune purported to study the effectiveness in treating IPF with ACTIMMUNE. The company started enrolling IPF patients in the INSPIRE Phase II clinical trial in 2003, and enrolled a second wave of patients in 2005. The INSPIRE study allowed InterMune to maintain the pretense that it was investigating the effectiveness of treating IPF with ACTIMMUNE, despite the negative results of prior investigations.

### 3.    The 2007 Termination of INSPIRE

89.    In March of 2007, the FDA announced the early termination of the INSPIRE study conducted by InterMune. INSPIRE was a randomized double-blind, placebo controlled study designed to evaluate the safety and efficacy of ACTIMMUNE in IPF patients with mild to moderate lung function. The primary endpoint was survival time. The FDA stated,

> FDA ALERT [03/9/2007]: FDA is issuing this alert to advise you of the early termination of the INSPIRE clinical study of ACTIMMUNE for the treatment of idiopathic pulmonary fibrosis (IPF). The study was stopped because an interim analysis showed **that patients with IPF who received ACTIMMUNE did not benefit**. (emphasis added.)

In fact, an analysis of the data collected prior to termination showed that 14.5% of patients treated with ACTIMMUNE died as compared to 12.7% of patients treated with placebo.

### K.    Defendants' Repeated Misrepresentations Caused Consumers and Payors Injury

90.    Physicians often lack information about new pharmaceutical treatments that would enable them to assess their appropriateness. If any information is available on a new treatment, usually it is information found in promotional materials.

91.    Because the physician is the gatekeeper, the only entity in the health care financing chain that has the power to decide what drug will be prescribed, and knows the indication for

1   which the drug is prescribed, the only existing safeguards are the truthfulness of the company about

2   the product. This is particularly true with respect to drugs that have been promoted for unproven

3   indications.

4       92.    Defendants InterMune and Harkonen repeatedly represented to doctors, patients,

5   and the general public that studies showed that ACTIMMUNE was effective in reducing mortality

6   in patients with IPF, despite the fact that the data derived from clinical trials did not support this

7   claim. All studies, however, concluded that clinical trials did not support a finding that

8   significantly extended the time to disease progression or death in IPF patients.

9       93.    Despite knowing that the data failed to show statistical significance as to overall

10   survival, Defendants InterMune and Harkonen fraudulently claimed that ACTIMMUNE

11   demonstrated a survival benefit or reduced mortality in IPF patient. In reliance on Defendants'

12   representations, tens of thousands of prescriptions were written by pulmonologists for the treatment

13   of IPF, and tens of thousands of consumers and/or third-party payors paid for ACTIMMUNE

14   prescriptions needlessly.

15   **L.    Criminal Prosecution of InterMune**

16       94.    After a two-year investigation, the United States Attorney for the Northern District

17   of California charged Defendant InterMune with widespread fraudulent drug promotion and

18   pervasive false and misleading marketing activities that caused medically unproven and

19   unnecessary prescriptions to be written and filled, resulting fraudulent claims being submitted to,

20   and paid by, governmental third-party payors such as Medicare, Medicaid, and other government

21   programs. Specifically:

22       95.    On October 26, 2006, the United States Attorney filed a Criminal Felony

23   Information charging InterMune with promoting ACTIMMUNE for the treatment of IPF with the

24   intent to defraud or mislead. *See* Criminal Information, attached as Exhibit A. In a press release,

25   the United States Department of Justice characterized ACTIMMUNE's marketing practices as

26   "deceptive and illegal" and "fraudulent," and stated that "InterMune knowingly caused the

27   submission of false and fraudulent claims for ACTIMMUNE that were not eligible for

28   reimbursement" by governmental payors because they were medically unnecessary. The

CLASS ACTION COMPLAINT

- 23 -

Department of Justice also stated that InterMune's wrongful actions caused governmental payors to pay for ACTIMMUNE prescriptions that they would not have paid for but for InterMune's deception. *See* Department of Justice Press Release, attached as Exhibit B.

96.     InterMune paid over $36 million to resolve the criminal charges against InterMune. Of this sum, $30.2 million was paid to the United States as restitution for losses suffered by governmental payors, including Medicare, Medicaid, the Veteran's Administration, the Department of Defense, and the Federal Employees Health Benefits Program, for knowingly causing the prescription of ACTIMMUNE for medically unnecessary uses. *See* Civil Settlement Agreement attached as Exhibit C.  InterMune also paid $6.7 million in restitution to the state Medicaid programs that paid a portion of the cost of prescriptions for ACTIMMUNE for IPF.

97.     On December 4, 2006, InterMune entered into a deferred prosecution agreement with the United States Attorney's Office for the Northern District of California, deferring prosecution of various offenses related to promoting ACTIMMUNE for unapproved indications and making misleading statements regarding ACTIMMUNE. *See* Deferred Prosecution Agreement, attached as Exhibit D.

98.     In addition to making restitution to the federal and state governments and entering into the deferred prosecution agreement, InterMune was required to enter a corporate integrity agreement with the Office of the Inspector General for the Department of Health and Human Services.   The company's conduct was so egregious that InterMune was forced to submit to monitoring and strict reporting requirements for five years. *See* Corporate Integrity Agreement, attached as Exhibit E.

## M.     Criminal Prosecution of Harkonen

99.     On March 18, 2008, a grand jury in the Northern District of California issued a two-count Felony Indictment charging Defendant Harkonen with unlawfully promoting ACTIMMUNE for the treatment of IPF. *See* Indictment, attached as Exhibit F.  In a press release, the Department of Justice stated that Harkonen "promoted and caused the promotion by InterMune of ACTIMMUNE as a safe and effective treatment for IPF . . . in order to sell more ACTIMMUNE

and to generate revenues and profits from sales of the pharmaceutical for InterMune." *See* Department of Justice Press Release dated March 18, 2008, attached as Exhibit G.

## IV.    CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of itself and the Class comprised of:

> All individuals and entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed, and/or paid for ACTIMMUNE for the treatment of IPF during the period from May 5, 1998 through the present. For purposes of the Class definition, individuals and entities purchased ACTIMMUNE if they paid for some or all of the purchase price.

Excluded from the Class are (a) each Defendant and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors; (b) any co-conspirators; and (c) any governmental entities who purchased or paid for such drugs during the Class Period and participated in the governmental settlement. Included in the Class are both third-party payors and consumers who made a co-payment or paid cash.

101.    The Class Period is May 5, 1998 to the present.

102.    The Class consists of numerous individuals and entities throughout the United States, making individual joinder impracticable. The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

103.    The claims of the representative plaintiff are typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative plaintiff is a person who, like all Class Members, and as a result of Defendants' deceptive and unlawful scheme, paid for drugs that were medically ineffective. The representative plaintiff, like all Class Members, has been damaged by Defendants' misconduct because, among other things, she paid for drugs that were not medically beneficial and that she would not have paid for but for Defendants' fraudulent and deceptive conduct.

104.    The factual and legal bases of each defendant's misconduct are common to the class members and represent a common thread of fraud and other illegal misconduct resulting in injury to plaintiff and member of the class.

105.    There are many questions of law and fact common to Plaintiff and the class, and those questions predominate over any questions that may affect individual class members, within the meaning of Rules 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

A.    Whether Defendants promoted the use of ACTIMMUNE for unproven and ineffective uses.

B.    Whether Defendants marketed ACTIMMUNE to physicians for the treatment of IPF.

C.    Whether the prescriptions of ACTIMMUNE for IPF were supported by medical necessity and/or conferred any medical benefit.

D.    Whether Defendants engaged in a pattern or deceptive, fraudulent, and/or unfair activity intended to deceive and/or defraud plaintiff and the class members

E.    Whether Defendants trained, authorized and encouraged sales representatives to misrepresent the results of clinical trials to induce physicians to prescribe ACTIMMUNE.

F.    Whether Defendants trained, authorized, and encouraged sales representatives to actively market ACTIMMUNE as a treatment for IPF, a disease for which ACTIMMUNE was medically unproven or ineffective, in order to induce physicians to prescribe ACTIMMUNE.

G.    Whether Defendants' fraudulent and unlawful promotion of ACTIMMUNE, an unapproved and unproven treatment for IPF, caused consumers and third-party payors to pay for ACTIMMUNE which the patients did not need and which provided them no medical benefit.

H.    Whether Defendants' publication and dissemination of various press releases, faxes to physicians, and direct mailings to patients caused consumers and third-party payors to pay for ACTIMMUNE in circumstances in which there was no medical benefit conferred on the patients taking ACTIMMUNE.

I.    Whether Defendants are liable to Plaintiff and Class Members for damages for conduct actionable under various state law provisions for unjust enrichment.

1

## V.    CAUSES OF ACTION

2

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Against Defendants InterMune and Harkonen)

3

4        106.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

5    herein.

6        107.    This Count, which alleges substantive violations of RICO, as provided in 18 U.S.C.

7    § 1962(c), is asserted against the Defendants InterMune and Harkonen on behalf of the Class.

8        108.    Plaintiff, members of the Class, and all Defendants are each "persons" as that term

9    is defined in 18 U.S.C. § 1961(3).

10       109.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants InterMune and

11   Harkonen conducted the affairs of the ACTIMMUNE Sales Enterprise which affected interstate

12   commerce through a pattern of racketeering activity.

13       110.    For purposes of this complaint, the RICO "enterprise" is the ACTIMMUNE Sales

14   Enterprise, an association-in-fact consisting of (i) InterMune, (ii) Connetics, and (iii) Genentech.

15   The ACTIMMUNE Sales Enterprise is an ongoing and continuing business organization consisting

16   of the three corporations (InterMune, Connetics, and Genentech) that have been associated for the

17   common and shared purpose of marketing and selling ACTIMMUNE for unproven uses.

18   InterMune, Connetics, and Genentech share the common purpose of maximizing the sales of

19   ACTIMMUNE regardless whether such sales are for scientifically proven or medically necessary

20   purposes, and each share in the profits generated by unlawful sales.

21       111.    The ACTIMMUNE Sales Enterprise has a systematic linkage because there are

22   contractual relationships, financial ties, and continuing coordination activities between InterMune,

23   Connetics, and Genentech. There is a common communication network between InterMune and

24   Genentech for the allocation of the profits from the scheme, the ongoing manufacture and delivery

25   of additional product by Genentech to InterMune for sale, and review of the marketing activities

26   conducted by InterMune.  Over many years, InterMune, Connetics and Genentech have

27   communicated repeatedly in order to effectuate the common purposes of the ACTIMMUNE Sales

28

CLASS ACTION COMPLAINT

- 27 -

Enterprises, have entered into, monitored and enforced contractual arrangements regarding licensing rights, payment streams and the delivery of ACTIMMUNE product.

112.   The ACTIMMUNE Sales Enterprise engaged in and affected interstate commerce because it engaged in the marketing, distribution and sale of ACTIMMUNE across state boundaries and throughout the United States.

113.   During the Class period, the illegal conduct and wrongful practices carried out by InterMune and Harkonen were effectuated by an array of InterMune employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds in the United States mails and interstate wire facilities.

114.   The nature and pervasiveness of the marketing of ACTIMMUNE nationwide necessarily required InterMune and Harkonen to communicate directly and frequently by the United States mails and interstate wire facilities.

115.   Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the unlawful marketing and sale of ACTIMMUNE was dependent upon deception by InterMune and Harkonen.

116.   Nevertheless, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail and wire fraud occurred, and how those acts were in furtherance of the unlawful marketing and sale of ACTIMMUNE.  Defendants' use of the U.S. mails and interstate wire facilities to perpetuate unlawful marketing of ACTIMMUNE included the following:

A.   creation and distribution of false and misleading "scientific" evidence about ACTIMMUNE and IPF;

B.   written representations and telephone calls between InterMune, Harkonen, or others acting on their behalf in connection with marketing activities directed to plans, physicians, and others;

C.    numerous communications between InterMune, Connetics, and Genentech regarding licensing arrangements, product supply arrangements, and the payment of shared profits from the sale of ACTIMMUNE for scientifically unproven purposes;

D.    written and oral communications directed to United States government agencies and private insurers that fraudulently represented the efficacy and/or safety of ACTIMMUNE for scientifically unproven purposes;

E.    receipts of increased profits sent through the United States mail and interstate wire facilities which in effect amounted to the wrongful proceeds from the unlawful ACTIMMUNE marketing scheme.

117.    During the Class period, InterMune and Harkonen have exerted control over the ACTIMMUNE Sales Enterprise, and in violation of the § 1962(c) of RICO, they have conducted or participated in the conducts of the affairs of the ACTIMMUNE Sales Enterprise, directly or indirectly, in the following ways:

A.    InterMune and Harkonen conceived of and implemented the unlawful marketing of ACTIMMUNE;

B.    InterMune and Harkonen directly controlled the creation and distribution of marketing, sales, and other materials used to misinform physicians, plans, other healthcare professionals and members of the Class regarding the purported, but untrue, utility of ACTIMMUNE for scientifically unproven purposes;

C.    InterMune and Harkonen intended that their publications and other communications containing falsities regarding the utility of ACTIMMUNE for scientifically unproven purposes would be sent through the United States mails and by interstate wire facilities. In summary, in violation of § 1962(c) of RICO, both InterMune and Harkonen conducted the affairs of the ACTIMMUNE Sales Enterprise.

118.    Each of the Defendants conducted and participated in the affairs of the ACTIMMUNE Sales Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, related to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Defendants' pattern of racketeering likely involved thousands of separate instances of use of

CLASS ACTION COMPLAINT

the United States mails or interstate wire facilities in furtherance of the unlawful marketing of ACTIMMUNE. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). These violations constitute a "pattern" of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in which both InterMune and Harkonen intended to defraud members of the Class and other intended victims.

119.    The racketeering activities by InterMune and Harkonen amounted to a common course of conduct with similar pattern and purpose, intended to deceive Plaintiff and members of the Class. The illegal conduct occurred over years. Each separate use of the United States mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims including Plaintiff and other members of the Class. Both InterMune and Harkonen have engaged in a pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the ACTIMMUNE Sales Enterprise.

120.    The violations of federal law by InterMune and Harkonen, coupled with their pattern of racketeering activity, have directly and proximately caused Plaintiff and members of the Class to be injured in their business or property. Plaintiff, members of the Class, and others reasonably relied upon a belief that ACTIMMUNE could legitimately and scientifically be used for non-CGD purposes, and that belief was driven exclusively by the unlawful marketing efforts conducted by InterMune and Harkonen. Among other things, reasonable reliance is shown because prescribers rely upon all available medical evidence, and InterMune substantially altered that body of evidence regarding ACTIMMUNE. Moreover, Defendants' own efforts, and the pattern of increased sales, demonstrate reliance. Payors and physicians reasonably rely upon the truth and balance of product information from pharmaceutical companies such as InterMune; it is a practical impossibility not to do so. Plaintiff and members of the Class have paid many hundreds of millions of dollars as a result of the fraud committed by InterMune and Harkonen.

121.    Over the years, InterMune and Harkonen have split these illegal profits with Genentech and Connetics.

122.    Under the provisions of § 1964(c) of RICO, both InterMune and Harkonen are jointly and severally liable to Plaintiff and members of the Class, plus cost of bringing suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

123.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    This Count, which alleges RICO conspiracy violations as provided in 18 U.S.C. § 1962(d), is asserted against all Defendants on behalf of the Class.

125.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

126.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the ACTIMMUNE Sales Enterprise described previously through a pattern of racketeering activity.

127.    Defendants' engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the Class of money.

128.    At all relevant times, Genentech was aware that InterMune was selling ACTIMMUNE for scientifically unproven uses. Genentech shared the profits from that illegal conduct. Genentech knew that the sales that might lawfully be garnered from the sale of ACTIMMUNE were quite modest; that the use of ACTIMMUNE for its two scientifically-proven purposes, CGD and severe, malignant osteopetrosis, was quite small; that the FDA had not approved ACTIMMUNE for any other purpose, and the reason for it not having done so is that no scientifically legitimate basis existed. With full knowledge of the limited lawful marketing opportunities for ACTIMMUNE, Genentech entered into licensing arrangements with InterMune under which InterMune and Harkonen were required to vastly "commercialize" the sale of

1  ACTIMMUNE into scientifically unproven purposes. Indeed, those agreements contemplated

2  profit split rights that might well exceed $1 billion.

3     129.   Of course, InterMune would need more than simply the license rights from

4  Connetics and Genentech; it would also need the ACTIMMUNE product itself, manufactured by

5  Genentech, in order to continue sales. And Genentech would monitor InterMune's marketing

6  activities. As a result, Genentech and InterMune entered into product distribution arrangements

7  under which Genentech agreed to continue to make ACTIMMUNE available to InterMune, and in

8  return Genentech would, of course, share in the profits of the ongoing sales of InterMune.

9     130.   Through all these arrangements, Genentech was able to have InterMune and

10  Harkonen do its dirty work. From a public relations point of view, Genentech wished avoid having

11  its corporate fingerprints on an ongoing, criminal enterprise in the marketing and sale of a product

12  like ACTIMMUNE.

13     131.   In summary, Genentech knowingly facilitated the ACTIMMUNE Sales Enterprise;

14  it shared the common purpose and interest in the establishment and operations of the scheme;

15  Genentech monitored InterMune's marketing activities, and licensing and product distribution

16  arrangements ensured how the operation of the enterprise would be conducted.

17     132.   The nature of the acts, material misrepresentations, and omissions in furtherance of

18  the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. §

19  1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that

20  their ongoing fraudulent acts have been and are part of an overall patter of racketeering activity.

21     133.   As a direct and proximate result of Defendants' overt acts and predicate acts in

22  furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff

23  and the Class have been and are continuing to be injured in their business or property.

24     134.   Defendants sought to and have engaged in the commission of and continues to

25  commit overt acts, including the following unlawful racketeering predicate acts:

26         A.     Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341

27  and 1342;

28         B.     Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

C.    Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346;

D.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

135.    Plaintiff and members of the Class were injured in their property by reason of these violations in that Plaintiff and members of the Class have paid over one-half of a billion dollars for ACTIMMUNE that they would not have made had Defendants not conspired to violate 18 U.S.C. § 1962(c).

136.    By reason of the unlawful acts engaged in by Defendants, Plaintiff and the Class have suffered ascertainable loss and damages. Injuries suffered by Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

137.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW,**
**CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200, *ET SEQ.***
**(Against all Defendants)**

138.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

139.    Defendants engaged in illegal, fraudulent, and unfair business practices when they fraudulently misrepresented that ACTIMMUNE was effective for the treatment of IPF when they had no reliable evidence to substantiate their claim, and induced physicians to prescribe ACTIMMUNE on the basis of these unfounded representations.  By issuing press releases, faxing physicians, mailing patients, suppressing negative information, and sending out sales representatives to disseminate their unsubstantiated claims (including that treatment with ACTIMMUNE would prolong survival), defendants permeated the pool of information that physicians draw from when making treatment decisions so successfully that physicians reasonably believed that ACTIMMUNE would benefit their IPF patients.

140.    Defendants violated the "fraudulent" prong of § 17200, the "unfair" prong of § 17200, and the "unlawful" prong of § 17200.

141.    All the conduct occurred in the course of Defendants' business. Defendants' wrongful conduct was part of a pattern or generalized course of conduct repeated on multiple occasions over many years.

142.    All or substantially all of the acts that constitute defendants' illegal, fraudulent, and unfair business practices took place in California. Defendants' scheme was devised and directed from InterMune's headquarters in California, resulting in revenues being generated for the California-based defendants. Defendants' misconduct injured ACTIMMUNE purchasers including purchasers in California.

143.    Defendants' illegal, fraudulent, and unfair conduct constitutes a violation of California Business and Professions Code §§ 17200, *et seq.* As a direct result of defendants' conduct, plaintiff and members of the class were injured in that they paid millions of dollars for ACTIMMUNE that they would not have paid had defendants not engaged in the wrongful conduct.

**COUNT IV**
**VIOLATION OF OTHER STATE CONSUMER PROTECTION STATUTES**
**(Against all Defendants)**

144.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

145.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes (listed below) when they fraudulently misrepresented that ACTIMMUNE was effective for the treatment of IPF when they had no reasonable evidence to substantiate their claim, and induced physicians to prescribe ACTIMMUNE on the basis of these unfounded representations. By issuing press releases, faxing physicians, mailing patients, suppressing negative information, and sending out sales representatives to disseminate their unsubstantiated claims (including that treatment with ACTIMMUNE would prolong survival), defendants saturated the pool of information that physicians draw from when making treatment decisions so successfully that physicians reasonably believed that ACTIMMUNE would benefit their IPF patients. As a direct result of defendants'

CLASS ACTION COMPLAINT

- 34 -

deceptive, unfair, unconscionable, and fraudulent conduct, plaintiff and members of the class were

injured in that they paid millions of dollars for ACTIMMUNE that they would not have paid had

defendants not engaged in unfair and deceptive conduct.

146.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Ariz. Rev. Stat. § 44-1522, *et seq.*

147.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Ark. Code § 4-88-101, *et seq.*

148.    Defendants engaged in unfair competition or unfair or deceptive acts or practices or

has made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*

149.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Conn. Gen. Stat. § 42-110b, *et seq.*

150.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of 6 Del. Code § 2511, *et seq.*

151.    Defendants engaged in unfair competition or unfair or deceptive acts or practices or

made false representations in violation of D.C. Code § 28-3901, *et seq.*

152.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Fla. Stat. § 501.201, *et seq.*

153.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Haw. Rev. Stat. § 480, *et seq.*

154.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Idaho Code § 48-601, *et seq.*

155.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of 815 ILCS § 505/10, *et seq.*

156.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Kan. Stat. § 50-623, *et seq.*

157.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in

violation of Ky. Rev. Stat. § 367.110, *et seq.*

158.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*

159.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

160.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*

161.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*

162.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, *et seq.*

163.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

164.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

165.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*

166.    Defendants engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, *et seq.*

167.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*

168.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349 *et seq.*

169.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

170.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*

171.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

172.    Defendants engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 § 751, *et seq.*

173.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*

174.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*

175.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*

176.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*

177.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*

178.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*

179.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code. § 13-11-1, *et seq.*

180.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, *et seq.*

181.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*

182.    Defendants engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, *et seq.*

183.    The unfair and deceptive acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to plaintiff and the members of the class.

184.    Defendants' actions and failures to act, including the false and misleading representations and omissions of material facts regarding the lack of proven medical necessity or benefit of ACTIMMUNE and the above described course of fraudulent conduct and fraudulent concealment constitute acts, uses, or employment by defendants of unconscionable commercial

CLASS ACTION COMPLAINT

- 37 -

practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of merchandise constitute a violation of the consumer protection statutes listed above.

185.    Physicians, consumers, and third-party payors relied upon defendants' misrepresentations and omissions in prescribing ACTIMMUNE to IPF patients.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and the class were damaged by paying for these needless prescriptions.  By reason of the unlawful acts engaged in by defendants, plaintiff and the class have suffered ascertainable losses and damages.

186.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the class are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit.

**COUNT V**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

187.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

188.    As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, defendants have profited and benefited from payments plaintiff and the class made for ACTIMMUNE as set forth in the complaint.

189.    In exchange for the payments they made for ACTIMMUNE, and at the time they made these payments, plaintiff and the class expected that the drug was medically beneficial for the condition for which it was prescribed, and the determination of medical benefit was based on fraudulent messages about efficacy disseminated by defendants.

190.    As a direct result of their marketing efforts to convince pulmonologists that ACTIMMUNE led to increased survival rates, defendants caused excessive and medically unnecessary prescriptions to be written for ACTIMMUNE, resulting in unnecessary payments by consumers and third-party payors.

191.    Defendants voluntarily accepted and retained the benefit of these payments with full knowledge and awareness that, as a result of their wrongdoing, plaintiff and the class paid for ACTIMMUNE when they otherwise would not have done so. The failure of defendants to provide plaintiff and the class with the remuneration they expected enriched defendants unjustly.

192.    Plaintiff and the Class are entitled in equity to seek restitution of defendants' wrongful profits, revenues and benefits to the extent and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy defendants' unjust enrichment.

## VI.    DEMAND FOR RELIEF

193.    Plaintiff and the Class demand judgment against Defendants, jointly and severally, as follows:

A.    On Plaintiff's and the Class's RICO claims, three times the damages Plaintiff and the Class have sustained as a result of Defendants' conduct, such amount to be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees;

B.    On Plaintiff's and the Class's claims under California Business and Professions Code §§ 17200, et seq, monetary relief in the form of actual damages, compensatory damages, restitution, and disgorgement of ill-gotten gains, punitive or treble damages, and such other relief as provided by law, such amount to be determined at trial, plus plaintiff's costs in this suit, including reasonable attorney's fees;

C.    On Plaintiff's and the Class's consumer protection act claims, compensatory damages, three times the damages plaintiff and the class have sustained as a result of defendants' conduct, and such other relief as provided by the statutes cited herein, such amount to be determined at trial, plus plaintiff' costs in this suit, including reasonable attorney's fees;

D.    On Plaintiff's and the Class's claim for unjust enrichment, recovery in the amount of plaintiff's and the Class's payment for ACTIMMUNE based on prescriptions that were not supported by medical necessity or benefit, such amount to be determined at trial, plus plaintiff's costs in this suit, including all reasonable attorney's fees;

E.    Awarding prejudgment and post-judgment interest on such monetary relief;

1        F.      Awarding Plaintiff and the Class other appropriate equitable relief;

2        G.     Awarding Plaintiff their costs and expenses in this litigation, including

3 reasonable attorneys' fees and expert fees; and

4        H.     Awarding Plaintiff and the Class such other and further relief as may be just

5 and proper under the circumstances.

6 **VII.    DEMAND FOR JURY TRIAL**

7     194.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

8 on all issues so triable.

9 Dated: May 8, 2008

HAGENS BERMAN SOBOL SHAPIRO, LLP

By:

REED R. KATHREIN

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

Steve Berman
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Thomas M. Sobol
David S. Nalven
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, Fourth Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
davidn@hbsslaw.com

Lance A. Harke
HARKE & CLASBY LLP
155 South Miami Avenue, Suite 600
Miami, FL 33130
Telephone:  (305) 536-8220

CLASS ACTION COMPLAINT

010059-11 238353 V1

Douglass A. Kreis
AYLSTOCK, WITKIN, KREIS
    & OVERHOLTZ, PLLC
603 North Palafox Street
Pensacola, FL 32501
Telephone: (850) 916-7450

Attorneys for Plaintiffs

# Exhibit A

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☑ INFORMATION ☐ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

### OFFENSE CHARGED

21 U.S.C. §§331(k) 333(a)(2) -
Misbranding

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

**DEFENDANT - U.S.**

▸ INTERMUNE, INC.

CR 06 0707

DISTRICT COURT NUMBER

PENALTY:

3 Years imprisonment
$10,000 fine
$100 Special Assessment

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)
FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW
DOCKET NO.

MAGISTRATE
CASE NO.

Name and Office of Person Furnishing Information on THIS FORM
KEVIN V. RYAN
☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)
IOANA PETROU

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▸
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges
☐ Fed'l ☐ State
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes" give date filed

**DATE OF ARREST** ▸ Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▸ Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☑ NO PROCESS* ☐ WARRANT Bail Amount:

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments:

KEVIN V. RYAN (CSBN 118321)
United States Attorney

FILED
OCT 25 AM 9: 52
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
N.D. DIST. OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CR 06    0707

| UNITED STATES OF AMERICA, | ) | No. |
|---|---|---|
| Plaintiff, | ) | VIOLATION: 21 U.S.C. §§ 331(k), |
| | ) | 333(a)(2) - Misbranding |
| v. | ) | |
| | ) | SAN FRANCISCO VENUE |
| INTERMUNE, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**INFORMATION**

The United States Attorney charges:

**INTRODUCTION**

At all times material and pertinent to this Information:

1.    The United States Food and Drug Administration ("FDA") was the federal agency within the United States Department of Health and Human Services charged with enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA" or "the Act") to protect the health and safety of the American public.  Under the Act, a drug was misbranded if its labeling did not bear adequate

INFORMATION                    1

1 directions for use to permit a layperson to administer the drug safely for each of its intended uses.

2 21 U.S.C. § 352(f)(1); 21 C.F.R. § 201.5.

3     2.   A "prescription drug" was a drug which, "because of its toxicity or other potentiality

4 for harmful effect, or the method of its use, or the collateral measure necessary for its use, [was]

5 not safe for use except under the supervision of a practitioner licensed by law to administer such

6 drug" or a drug which was "limited by an approved [new drug application] to use under the

7 supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1). A

8 prescription drug, by definition, could not bear adequate directions for use by a layperson.

9     3.   If a prescription drug did not bear adequate directions for use for all of its intended

10 uses, and if it was not subject to an exemption from the requirement that it bear adequate

11 directions for use for all of its intended uses, the drug was misbranded under the FDCA. 21

12 U.S.C. § 352(f)(1); 21 C.F.R. § 201.115.

13     4.   The FDCA prohibited the doing of any act with respect to a drug, if the act was done

14 while the drug was held for sale after shipment in interstate commerce and resulted in the drug

15 being misbranded. 21 U.S.C. § 331(k).

16 **STATEMENT OF FACTS**

17     5.   Defendant, InterMune, Inc., was a biopharmaceutical company engaged in developing

18 and commercializing therapies in pulmonology and hepatology, with its principal place of

19 business located in Brisbane, California.

20     6.   The FDA approved the use of the drug Actimmune® (interferon gamma-1b) for the

21 treatment of chronic granulomatous disease and severe, malignant osteopetrosis.

22     7.   Actimmune® was a "drug" within the meaning of 21 U.S.C. § 321(g)(1)(B) and (C), and

23 it was a "prescription drug" within the meaning of 21 U.S.C. § 353(b). Actimmune® was not

24 exempt under 21 C.F.R. § 201.115 from the requirement that it bear adequate directions for use

25 for all of its intended uses.

26     8.   Defendant InterMune contracted with a specialty pharmacy located in Florida to

27 distribute Actimmune® to patients located in the Northern District of California and elsewhere.

28     9.   From at least August 2002 until at least January 2003, in the Northern District of

INFORMATION               2

1   California and elsewhere, Defendant InterMune promoted Actimmune® for the treatment of

2   idiopathic pulmonary fibrosis (IPF), a new intended use for Actimmune®, for which InterMune

3   did not have an approved New Drug Application or effective Investigational New Drug

4   application.

## COUNT ONE

6        From in or about August 2002 until in or about January 2003, within the Northern District

7   of California and elsewhere, the defendant INTERMUNE, INC., with the intent to defraud and

8   mislead, promoted the drug Actimmune® for the treatment of idiopathic pulmonary fibrosis, a

9   condition for which it was not approved by FDA, while the drug was held for sale after shipment

10  in interstate commerce, which resulted in the drug being misbranded within the meaning of 21

11  U.S.C. § 352(f)(1), in that its labeling did not bear adequate directions for use, all in violation of

12  21 U.S.C. §§ 331(k) and 333(a)(2).

14  DATED: October 24, 2006                    United States Attorney
15                                             KEVIN V. RYAN

18                                             KEVIN V. RYAN
19                                             United States Attorney

21  (Approved as to form:  _____
22                         AUSA IOANA PETROU

INFORMATION                           3

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee of the office of the United States Attorney, Northern District of California and is a person of such age and discretion to be competent to serve papers. The undersigned certifies that he caused copies of

**INFORMATION**

in the case of **United States v. Intermune, Inc., No. TBD** to be served on the parties in this action, addressed as follows which are the last known addresses and fax numbers:

**Barbara Hoffman**
**Covington & Burling LLP**
**1330 Avenue of the Americas**
**New York, New York 10019**
**212-841-1143**
**Fax: 646-441-9143**
**bhoffman@cov.com**

____(By Personal Service), I caused such envelope to be delivered by hand to the person or offices of each addressee(s) above.

____ (By Facsimile), I caused each such document to be sent by Facsimile to the person or offices of each addressee(s) above.

____ (By Mail), I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at San Francisco, California.

__X__ (By Fed Ex), I caused each such envelope to be delivered by FED EX to the address listed above.

I declare under penalty of perjury that the foregoing is true and correct.

October 26, 2006

TYLE L. DOERR
United States Attorney's Office

# Exhibit B

#06-728: 10-26-06 Biopharmaceutical Firm Inter⁀ ⁀e to Pay U.S. Over $36 Million for Illegal Promotion⁀ Marketing of Drug Actimmune



# Department of Justice

**FOR IMMEDIATE RELEASE THURSDAY, OCTOBER 26, 2006 WWW. USDOJ.GOV**

**CIV (202) 514-2007 TDD (202) 514-1888**

## Biopharmaceutical Firm Intermune to Pay U.S. Over $36 Million for Illegal Promotion and Marketing of Drug Actimmune

WASHINGTON – InterMune, Inc, a Brisbane, Cal., biopharmaceutical company, has agreed to pay the United States more than $36.9 million to resolve criminal charges and civil liabilities in connection with its alleged illegal promotion and marketing of Actimmune, the Justice Department announced today.

Today's settlement resolves allegations that InterMune knowingly caused the submission of false and fraudulent claims for Actimmune that were not eligible for reimbursement because they were for unnecessary and/or off label uses. InterMune will pay $30.2 million for losses suffered by the federal portion of the Medicaid program, the Medicare Program, the Veteran's Administration, the Department of Defense and the Federal Employees Health Benefits program. Under separate civil settlement agreements with the states, the company will also pay nearly $6.7 million to state Medicaid programs.

"It is vital to public health and safety that pharmaceutical companies are deterred from improperly marketing their drugs to doctors and patients to treat illnesses that these drugs are not approved to treat," said Assistant Attorney General Peter D. Keisler. "Today's settlement sends a clear message to the pharmaceutical industry that the Justice Department will not tolerate these deceptive and illegal marketing practices."

The criminal investigation will be resolved by the filing of an information against InterMune and the company's entry into a deferred prosecution agreement (DPA) with the United States. InterMune is charged with one count of violating the Food, Drug, and Cosmetic Act (FDCA) by promoting, with intent to defraud or mislead, its drug Actimmune for the treatment of idiopathic pulmonary fibrosis (IPF) or lung

scarring, a condition for which Actimmune has not been approved by the Food and Drug Administration (FDA). It is further alleged that InterMune acted with an intent to defraud or mislead, thereby elevating the charge to a felony violation of the FDCA. Under the terms of the DPA, the Justice Department agrees to recommend to the court that prosecution of InterMune be deferred for a period of two years, contingent upon the company's past and future cooperation in the investigation as well as on its continued efforts to implement comprehensive changes to its compliance policies.

"This office has zero tolerance for fraud against the Medicare program. Given the high concentration of health care and biotech in the Northern District, prosecuting fraud in this industry is one of my highest priorities and we must zealously protect the Medicare Trust Fund against fraud," said Kevin V. Ryan, United States Attorney for the Northern District of California.

Actimmune was approved by the FDA for the treatment of chronic granulomatous disease (disorders of the immune system that are caused by defects in the immune system cells) and severe, malignant osteopetrosis (disease resulting in increased susceptibility to infection and an overgrowth of bony structures that may lead to blindness and/or deafness). However, the vast majority of Actimmune sales during the period of August 2002 through January 2003 were attributable to prescriptions for the treatment of IPF for which there is no FDA-approved treatment.

As further stated in the DPA, from 2000 to 2002, InterMune, Inc. conducted a clinical trial of Actimmune for the treatment of IPF. The trial failed to establish statistically significant evidence of benefit for either the primary or any of the secondary endpoints. Nevertheless, a company press release distributed in August 2002 characterized the clinical trial results as indicating that "Actimmune may extend the lives of patients suffering from this debilitating disease" and further stated that "Actimmune is the only available treatment demonstrated to have clinical benefit in IPF, with improved survival data in two controlled clinical trials."

In addition to the other components of the settlement, InterMune agreed to enter a five-year Corporate Integrity Agreement with the Office of Inspector General for the Department of Health and Human Services.

The two-year investigation was conducted by the Federal Bureau of Investigation; the Food and Drug Administration's Office of Criminal Investigations; the Department of Health and Human Services' Office of Inspector General, Office of Investigations; the Veterans Administration's Office of Investigations; and the Office of Personnel Management's Office of Investigations. The investigation and resolution were handled by attorneys from the Justice Department's Civil Division and the U.S. Attorney's Office for the Northern District of California, as well as the FDA Office of General Counsel.

###

06-728

# Exhibit C

CIVIL SETTLEMENT AGREEMENT

I. PARTIES

This Settlement Agreement ("Agreement") is entered into by and between the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the Northern District of California, on behalf of the Office of Inspector General ("OIG-HHS") of the United States Department of Health and Human Services ("HHS"); the United States Office of Personnel Management ("OPM"); the United States Department of Defense TRICARE Management Activity ("TMA"); the United States Department of Defense, Defense Logistics Agency ("DLA"), on behalf of the Defense Supply Center- Philadelphia ("DSCP") (collectively "the United States"); InterMune, Inc. ("InterMune"), a Delaware corporation with its principal place of business in Brisbane, California; and Joan Gallagher ("Relator") (hereafter referred to as "the Parties"), through their authorized representatives.

II. PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.    WHEREAS, at all relevant times, InterMune distributed, marketed and sold pharmaceutical products in the United States, including a drug it sold under the trade name Actimmune®;

B.    WHEREAS, on or about July 9, 2004, Relator Joan Gallagher filed a qui tam action in the United States District Court for the Eastern District of Pennsylvania, captioned United States of America ex rel. Joan Gallagher v. InterMune, Inc., Civil Action No. 04 CV 3249 (E.D. Pa.). On October 7, 2004, the qui tam action was transferred to the United States District Court for the Northern District of California ("Court"), now captioned United States of America

ex rel. Joan Gallagher v. InterMune, Inc., C 04-4323 MHP (N.D. Cal.)(the "Civil Action");

      C.    WHEREAS InterMune has agreed to enter into a Deferred Prosecution Agreement ("DPA") with the United States Attorney for the Northern District of California. The United States has filed an Information in the United States District Court for the Northern District of California (the "Court") charging InterMune with One Count of doing an act, with intent to defraud or mislead, with respect to a drug while the drug was held for sale after shipment in interstate commerce that results in the drug being misbranded, in violation of Title 21, United States Code, Section 331(k) (the "Information");

      D.    WHEREAS, the United States and InterMune will file with the Court the DPA, which states that the Department of Justice will recommend to the Court that prosecution of InterMune for the conduct charged in the Information be deferred for a period of 2 years from the date the Court approves the DPA and that the Department of Justice will seek dismissal with release of the Information thereafter if InterMune is in compliance with all of its obligations under the DPA;

      E.    WHEREAS, InterMune has entered into or will be entering into separate settlement agreements ("Medicaid State Settlement Agreements") with the states which will be receiving settlement funds from InterMune pursuant to Paragraph 1(c) below for the Covered Conduct described in Paragraph G below (hereinafter referred to as the "Medicaid Participating States");

      F.    WHEREAS, the United States and the Medicaid Participating States allege that InterMune caused to be submitted claims for payment for Actimmune to Medicaid Programs,

established pursuant to or in connection with Title XIX of the Social Security Act ("Act"), 42

U.S.C. §§ 1396-1396y (the "Medicaid Program"); and the United States further alleges that

InterMune caused to be submitted claims for payment of Actimmune to the Medicare Program,

42 U.S.C. §§ 1395-1395hhh, TRICARE Program (formerly known as the Civilian Health and

Medical Program of the Uniformed Services ("CHAMPUS")), 10 U.S.C. §§ 1071-1110, which is

administered by the Department of Defense through TMA, and to the Federal Employees Health

Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901-8914, and that InterMune caused purchases of

Actimmune by the Department of Veterans Affairs ("DVA") and DSCP;

      G.     WHEREAS, the United States contends that it has claims under the False Claims

Act, 31 U.S.C. §§ 3729-3733, and that it and the Medicaid Participating States (hereinafter

collectively referred to as the "Government") have certain other civil claims against InterMune

for allegedly engaging in the following conduct with respect to the marketing, promotion and sale

of Actimmune:

      (i)     The Government contends that between January 1, 2001 and June 30,

2003, InterMune knowingly and willfully promoted the sale and use of Actimmune for the

treatment of idiopathic pulmonary fibrosis ("IPF"), a use for which Actimmune had not been

approved by the United States Food and Drug Administration ("FDA"), and knowingly caused

the submission of claims to the Government as described in subparagraph (v) below.

Actimmune has only been approved by the FDA to treat two rare diseases, chronic

granulomatous disease and severe, malignant osteopetrosis;

      (ii)    The Government contends that notwithstanding the fact that InterMune's

Phase III clinical trial of Actimmune for the treatment of IPF failed to establish statistically

significant benefits on its primary endpoint or any of its secondary endpoints, including overall

survival, certain former InterMune employees encouraged InterMune sales force personnel to

inform physicians that Actimmune demonstrated a survival benefit in mild to moderate IPF

patient populations, and certain former sales force personnel did so;

      (iii)    The Government contends that InterMune's promotion of Actimmune for

IPF violated the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331(a) & (d);

      (iv)    The Government contends that the use of Actimmune for IPF

was not a "medically accepted indication" pursuant to 42 U.S.C. § 1396r-8(k)(6);

      (v)    The Government further contends that the conduct described in the

foregoing subparagraphs (i) through (iv) resulted in claims for Actimmune being submitted to the

Medicaid, Medicare, FEHBP and TRICARE Programs, and in DVA and DSCP purchasing

Actimmune for dispensing to patients for an unapproved indication, between January 1, 2001 and

June 30, 2005, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

InterMune's conduct as described in the Civil Action, the DPA and in Preamble

Paragraph G of this Agreement is hereafter referred to as the "Covered Conduct."

    H.    WHEREAS, the United States also contends that it has certain administrative

claims against InterMune for engaging in the Covered Conduct, as specified in Paragraphs 5-8

below;

    I.    WHEREAS, the United States and the Relator have reached an agreement with

-4-

respect to the Relator's claim of entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Agreement;

J.    WHEREAS, the Relator and InterMune have reached an agreement with respect to the Relator's claim of entitlement under 31 U.S.C. § 3730(d) to attorneys' fees and costs;

K.    WHEREAS, this Agreement is neither an admission of facts or liability by InterMune (with the exception of such admissions as InterMune makes in connection with the DPA referenced in Paragraph C above and accepted by the Court) nor a concession by the Government that its claims are not well founded; and

L.    WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth in this Agreement.

### III.  TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    InterMune shall pay to the United States and the Medicaid Participating States, collectively, the sum of thirty-six million, nine hundred forty-four thousand, forty-three dollars ($36,944,043), plus any interest that may have accrued between November 1, 2006 and the Effective Date of this Agreement at a rate of 5% per annum ("Settlement Amount").  On the

Effective Date of this Agreement, as defined in paragraph 32 herein, this sum shall constitute a debt due and immediately owing to the United States and the Participating States. InterMune shall discharge its debt to the United States and the Medicaid Participating States under the following terms and conditions:

        a.      InterMune shall pay to the United States the principal sum of $30,249,229 (the "Federal Settlement Amount"). InterMune shall pay the Federal Settlement Amount, plus interest accrued thereon at the rate of 5% per annum, in accordance with the payment schedule attached hereto as Exhibit A ("Payment Schedule"). Within 10 days after the Effective Date of this Agreement, InterMune shall pay the United States the initial fixed payment in the amount of $4,093,925 ("Initial Payment"), plus any interest that may have accrued between November 1, 2006 and the Effective Date, and thereafter make principal payments with interest according to the schedule in Exhibit A.

        b.      All payments set forth in this Paragraph 1(a) shall be made to the United States by electronic funds transfer pursuant to written instructions provided by the Office of the United States Attorney for the Northern District of California. The entire principal balance of the Federal Settlement Amount or any portion thereof, plus any interest accrued on the principal as of the date of any prepayment, may be prepaid without penalty.

        c.      InterMune shall pay to the Medicaid Participating States the sum of $6,694,814 ("Medicaid State Settlement Amount"). InterMune shall pay the Medicaid State Settlement Amount, plus interest accrued thereon at the rate of 5% per annum, in accordance with the Payment Schedule found at Exhibit A. Within 10 days after the Effective Date of this

Agreement, InterMune shall set aside $906,075, plus any interest that may have accrued between

November 1, 2006 and the Effective Date, into an interest-bearing account of its own choosing

("deposit account") as agreed upon between InterMune and the National Association of Medicaid

Fraud Control Units Settlement Team (the "NAMFCU Team") and, upon reaching agreements

with, and obtaining release from each of the Medicaid Participating States and receipt of written

payment instructions from the NAMFCU Team, shall pay the State Settlement Amount plus any

additional interest earned in the deposit account as directed by each settling Medicaid

Participating State. Upon reaching final agreements with, and obtaining release from the

Medicaid Participating States, Intermune shall thereafter make fixed pro rata payments according

to the schedule in Exhibit A and as directed by each settling Medicaid Participating State. The

entire principal balance of the Medicaid State Settlement Amount or any portion thereof, plus

any interest accrued on the principal as of the date of any prepayment, may be prepaid without

penalty.

        d.     InterMune shall pay attorneys' fees to the Relator in the amount of

$40,000. This amount shall be paid as an electronic funds transfer to the Relator's attorney (to be

allocated in accordance with their instructions) no later than seven (7) business days after the

stipulations of dismissal are filed as set forth in Paragraph 13.

        2.     If the Court does not accept the DPA as described in Preamble Paragraph D or

refuses to impose the agreed upon disposition for whatever reason, this Agreement shall be null

and void at the option of either the United States or InterMune. If either the United States or

InterMune exercises this option, which option shall be exercised by notifying all Parties, through

counsel, in writing within ten (10) business days of the Court's decision, the Parties will not

object to the voiding of this Agreement and the Agreement will be deemed rescinded. If this

Agreement is rescinded, InterMune will not plead, argue or otherwise raise any defenses under

the theories of statute of limitations, laches, estoppel or similar theories, to any such civil or

administrative claims, actions or proceedings relating to the Covered Conduct which are brought

by the United States within 90 calendar days of notification to all other Parties of that rescission,

except to the extent such defenses were available before the Effective Date of this Agreement.

      3.     Subject to the exceptions in Paragraphs 4, 5, 6, 7 and 8, in consideration of

the obligations of InterMune set forth in this Agreement, conditioned upon InterMune's payment

in full of the Settlement Amount, subject to Paragraph 20 below (concerning bankruptcy

proceedings commenced within 91 days of the Effective Date of this Agreement, as defined

below), and subject to the Court's approval of the DPA described in Preamble Paragraph D, the

United States, on behalf of itself, and its officers, agents, agencies, and departments, as set forth

above, hereby fully and finally releases InterMune, its predecessors, subsidiaries, corporate

parents and affiliates, successors and assigns, and current or former officers, directors, and

employees, except as excluded in Paragraph 4, below, from any civil or administrative monetary

claim that the United States has against InterMune under the False Claims Act, 31 U.S.C. §§

3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Civil Monetary

Penalties Law, 42 U.S.C. § 1320a-7a; any statutory provision applicable to the federally-funded

programs in this Agreement for which the Civil Division, United States Department of Justice,

has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I,

§ 0.45(d); and common law claims for fraud, payment by mistake, unjust enrichment or disgorgement for the Covered Conduct.

    4.    Notwithstanding any term of this Agreement, the United States specifically does not herein release any person or entity from any of the following claims or liabilities: (a) any potential criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code); (b) any criminal liability; (c) any potential liability to the United States (or any agencies thereof) for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) except as explicitly stated in Paragraphs 5, 6, 7 and 8 of this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (f) any express or implied warranty claims or other claims for defective or deficient products and services; (g) any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct; (h) any claim based on a failure to deliver items or services due; or (i) any civil or administrative claims against individuals, including current and former directors, officers, and employees of InterMune, its predecessors, subsidiaries, and its corporate parent and affiliates, who, related to the Covered Conduct, receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

    5.    In consideration of the obligations of InterMune set forth in this Agreement and in the Corporate Integrity Agreement ("CIA"), conditioned upon InterMune's payment in full of the Settlement Amount, and subject to Paragraph 20 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement), the OIG-HHS agrees to

release and refrain from instituting, directing, or maintaining any administrative action seeking

exclusion against InterMune from Medicare, Medicaid or other Federal health care programs (as

defined in 42 U.S.C. § 1320a-7b(f)) under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law),

or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited

activities), for the Covered Conduct except as reserved in Paragraph 4 above, and as reserved in

this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory

obligations to exclude InterMune from the Medicare, Medicaid, or other Federal health care

programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct.

Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons,

or for conduct and practices, for which claims have been reserved in Paragraph 4, above.

InterMune will immediately begin implementing its obligations under the CIA upon execution of

this Agreement.

6.    In consideration of the obligations of InterMune set forth in this Agreement,

conditioned upon InterMune's full payment of the Settlement Amount, and subject to Paragraph

20 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of

this Agreement or any payment under this Agreement), TMA agrees to release and refrain from

instituting, directing, or maintaining any administrative action seeking exclusion or suspension

from the TRICARE Program against InterMune and its predecessors, subsidiaries, corporate

parents, affiliates, successors and assigns, or its current directors, officers or employees under 32

C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 4 above, and as

reserved in this Paragraph. TMA expressly reserves its authority to exclude InterMune under 32

-10-

C.F.R. § 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct.

Nothing in this Paragraph precludes TMA or the TRICARE Program from taking action against

entities or persons, or for conduct and practices, for which claims have been reserved in

Paragraph 4, above.

7.      In consideration of the obligations of InterMune in this Agreement, conditioned

upon InterMune's full payment of the Settlement Amount, and subject to Paragraph 20 below

(concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this

Agreement or any payment under this Agreement), OPM agrees to release and refrain from

instituting, directing, or maintaining any administrative action seeking debarment from FEHBP

against InterMune and its predecessors, subsidiaries, corporate parents, affiliates, successors and

assigns, or its current directors, officers or employees under 5 U.S.C. § 8902a or 5 C.F.R. Part

970 for the Covered Conduct, except as reserved in Paragraph 4, above.  OPM expressly reserves

all rights to comply with any statutory obligations to debar InterMune from the FEHBP under 5

U.S.C. § 8902a(b) (mandatory debarment) based upon the Covered Conduct.  Nothing in this

Paragraph precludes OPM from taking action against entities or persons, or for conduct and

practices, for which claims have been reserved in Paragraph 4, above.

8.      In consideration of the obligations of InterMune set forth in this Agreement,

conditioned upon InterMune's full payment of the Settlement Amount, and subject to Paragraph

20 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of

this Agreement or any payment under this Agreement), DSCP/DLA agrees to defer to the OIG-

HHS for any contractor integrity issues arising from this settlement and the Covered Conduct.

Nothing in this Paragraph precludes DLA from taking action against entities or persons, or for

conduct and practices, for which claims have been reserved in Paragraph 4, above.

9.     Relator and her heirs, successors, attorneys, agents, and assigns agree not to object

to this Agreement and agree and confirm that settlement of this Civil Action, and the payment

schedule set forth in Exhibit A, is fair, adequate and reasonable under all the circumstances,

agree not to challenge this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly

waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. §

3730(c)(2)(B).

10.     Upon her receipt of the pro rata share of the Initial Payment, the Relator,

individually, and for her heirs, successors, agents and assigns, fully and finally releases, waives,

and forever discharges the United States, its agencies (including, but not limited to, the

OIG-HHS, TMA, OPM, DVA, and DLA), employees, servants, and agents from any claims

arising from or relating to 31 U.S.C. § 3730 from any claims arising from the filing of the qui

tam civil action, and from any other claims for a share of the Federal Settlement Amount, and in

full settlement of any claims Relator may have under this Agreement.  This Agreement does not

resolve or in any manner affect any claims the United States has or may have against the Relator

arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this

Agreement.

11.     The United States agrees to pay the Relator $5,748,160 as her share of the

proceeds pursuant to 31 U.S.C. § 3730(d)(the "Relator's Share").  The United States will pay the

Relator her pro rata share of each payment that InterMune pays the United States under the

-12-

Payment Schedule set forth in Exhibit A. The United States will pay the Relator her pro rata

share within 21 days of the United States' receipt of each payment from InterMune. The Relator

expressly understands and agrees that the United States is only liable to the Relator for funds

actually received or collected by the United States.

12.    Conditioned upon InterMune's full payment of the Settlement Amount, the

Relator, individually, and for her heirs, successors, agents and assigns, fully and finally releases,

waives, and forever discharges InterMune, its predecessors, subsidiaries, corporate parents and

affiliates, successors and assigns, and current or former officers, directors, and employees,

from any claims that the Relator has or may have that arises under or relates to any of the

allegations in the Civil Action and/or the Covered Conduct, including claims for attorney's fees,

expense and costs pursuant to 31 U.S.C. § 3730(d). The Relator hereby represents and warrants

that no other individual is entitled to assert any matter released in this paragraph in or through the

Relator's right.

13.    Upon execution of this Agreement by all parties, the United States will file a

notice of intervention in the qui tam action and advise the Court that the parties have reached a

civil settlement. Upon receipt of the full payments described in Paragraph 1(a) and (c) above and

in Exhibit A, the United States and Relator shall promptly sign and file in the Civil Action a

Joint Stipulation of Dismissal with prejudice of the Civil Action pursuant to the terms of the

Agreement.

14.    In consideration of the obligations of the United States set forth in this

Agreement, InterMune and its predecessors, subsidiaries, corporate parents and affiliates fully

-13-

and finally release the United States, its agencies (including, but not limited to, HHS, TMA,

OPM and DVA), employees, servants, and agents from any claims (including attorneys' fees,

costs, and expenses of every kind and however denominated) which they have asserted, could

have asserted, or may assert in the future against the United States, its agencies, employees,

servants, and agents, related to or arising from the United States' criminal and civil investigations

of the Civil Action and the Covered Conduct.

  15. In consideration of the obligations of the Relator set forth in this Agreement,

InterMune, and its predecessors, subsidiaries, corporate parents and affiliates, and all of their

agents, successors and assigns, hereby fully and finally release the Relator and her respective

heirs, successors, assigns, agents and attorneys from any claims they have asserted, could have

asserted, or may assert in the future against the Relator arising from the filing of the Civil Action

and the United States' criminal and civil investigations of the Civil Action and the Covered

Conduct.

  16. The Settlement Amount shall not be decreased as a result of the denial of claims

for payment now being withheld from payment by any Federal or State payer, related to the

Covered Conduct; and InterMune shall not resubmit to any Federal or State payer any previously

denied claims related to the Covered Conduct, and shall not appeal any such denials of claims.

  17. InterMune agrees to the following:

  a. Unallowable Costs Defined:  that all costs (as defined in the Federal

Acquisition Regulations (FAR) 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social

Security Act, 42 U.S.C. §§ 1395-1395hhh and 1396-1396y, and the regulations and official

-14-

program directives promulgated thereunder) incurred by or on behalf on InterMune, its present or former officers, directors, employees, shareholders, and agents in connection with: (1) the matters covered by this Agreement and the related DPA; (2) the United States' civil and criminal investigation of the matters covered by this Agreement; (3) InterMune's investigation, defense, and any corrective actions undertaken in direct response to the United States' civil and criminal investigations in connection with the matters covered by this Agreement (including attorneys' fees); (4) the negotiation and performance of this Agreement, the DPA, and the Medicaid State Settlement Agreement, (5) the payments made to the United States or any State pursuant to this Agreement, the DPA, or the Medicaid State Settlement Agreement and any payments that InterMune may make to Relator; (6) the negotiation of, and the obligations undertaken pursuant to the CIA, including to (i) retain an independent review organization to perform annual reviews as described in Section III.D of the CIA; and (ii) prepare and submit reports to the OIG-HHS, are unallowable costs on Government contracts with DVA, DLA and other agencies and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP. However, nothing in this Paragraph affects the status of costs that are not allowable based on any other authority applicable to InterMune. (All costs described or set forth in this Paragraph 17(a) are hereafter, "unallowable costs").

   b.    Future Treatment of Unallowable Costs:   If applicable, these unallowable costs will be separately estimated and accounted for by InterMune, and it will not charge such unallowable costs directly or indirectly to any contracts with the United States or any State Medicaid Program, or seek payment for such unallowable costs through any cost report, cost

-15-

statement, information statement, or payment request submitted by them or any of their

subsidiaries to Medicare, Medicaid, TRICARE, FEHBP, DLA or DVA.

        c.     Treatment of Unallowable Costs Previously Submitted for Payment: If

applicable, InterMune further agrees that within 90 days of the Effective Date of this Agreement,

it will identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or

contractors, and Medicaid, DLA, DVA, and FEHBP fiscal agents, any unallowable costs (as

defined in this Paragraph) included in payments previously sought from the United States, or any

State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost

statements, information reports, or payment requests already submitted by InterMune or any of its

subsidiaries, and will request, and agree, that such cost reports, cost statements, information

reports, or payment requests, even if already settled, be adjusted to account for the effect of the

inclusion of the unallowable costs. InterMune agrees that the United States, at a minimum, will

be entitled to recoup from InterMune any overpayment plus applicable interest as a result of the

inclusion of such unallowable costs on previously-submitted cost reports, information reports,

cost statements, or requests for payment. Any payment due after the adjustments have been

made shall be paid to the United States pursuant to the direction of the Department of Justice,

and/or the affected agencies. The United States reserves its rights to disagree with any

calculations submitted by InterMune or any of its subsidiaries on the effect of inclusion of

unallowable costs (as defined in this Paragraph) on InterMune's or any of its subsidiaries' cost

reports, cost statements, or information reports. Nothing in this Agreement shall constitute a

waiver of the rights of the United States to examine or reexamine the unallowable costs

-16-

described in this Paragraph.

18.    InterMune agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors. InterMune waives any causes of action against these beneficiaries or their parents or sponsors based upon the claims for payment covered by this Agreement.

19.    InterMune expressly warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and expects to remain solvent following the payments to the United States hereunder. Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, the Parties (a) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to InterMune, within the meaning of 11 U.S.C. § 547(c)(1), and (b) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

20.    In the event InterMune or any other party commences, within 91 days of the Effective Date of this Agreement (defined below), or of any payment made hereunder, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, (a) seeking to have any order for relief of InterMune's debts, or seeking to adjudicate InterMune as bankrupt or insolvent, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for InterMune for all or any substantial part of its assets, InterMune agrees as follows:

a.    InterMune's obligations under this Agreement may not be avoided

-17-

pursuant to 11 U.S.C. § 547 or 548, and InterMune will not argue or otherwise take the position

in any such case, proceeding or action that: (i) InterMune's obligations under this Agreement

may be avoided under 11 U.S.C. § 547 or 548; (ii) InterMune was insolvent at the time this

Agreement was entered into, or became insolvent as a result of the payment made to the United

States hereunder; or (iii) the mutual promises, covenants and obligations set forth in this

Agreement do not constitute a contemporaneous exchange for new value given to InterMune;

      b.     In the event that InterMune's obligations hereunder are avoided for any

reason, including, but not limited to, the exercise of a trustee's avoidance powers under the

Bankruptcy Code, the United States, at its sole option, may rescind the releases in this

Agreement, and bring any civil and/or administrative claim, action or proceeding against

InterMune for the claims that would otherwise be covered by the releases provided in this

Agreement.  If the United States chooses to do so, InterMune agrees that, for purposes only of

any case, action, or proceeding referenced in the first clause of this Paragraph, (i) any such

claims, actions or proceedings brought by the United States (including any proceedings to

exclude InterMune from participation in Medicare, Medicaid, or other Federal Health Care

programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. Section 362(a) as a result

of the action, case or proceeding described in the first clause of this Paragraph, and that

InterMune will not argue or otherwise contend that the United States' claims, actions or

proceedings are subject to an automatic stay; (ii) that InterMune will not plead, argue or

otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or

similar theories, to any such civil or administrative claims, actions or proceedings which are

brought by the United States within 30 calendar days of written notification to InterMune that the

releases herein have been rescinded pursuant to this Paragraph, except to the extent such defenses

were available before the Effective Data of this Agreement; and (iii) the United States and the

Participating States have valid claims against InterMune in at least the aggregate amount of the

Settlement Amount and they may pursue their claims, inter alia, in the case, action or proceeding

referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding;

and

        c.      InterMune acknowledges that its agreement in this Paragraph is provided

in exchange for valuable consideration provided in this Agreement.

     21.     In the event that InterMune fails to pay any and all of the payments owed pursuant

to this Agreement within 30 calendar days of the due date ("Default"), any dismissals as to

InterMune shall, at the United States' option, be null and void, and the Settlement Amount

referenced in Paragraph 1 above, less any payments already made, shall become immediately due

and payable and shall bear interest at the Medicare interest rate (per 42 C.F.R. part 405.378) as of

the date of Default until payment of the Settlement Amount is made in full.

     Furthermore, in the event of a breach of the payment provisions as described in the

preceding paragraph, the United States may at its option: 1) rescind its releases; 2) offset the

remaining unpaid balance of the Settlement Amount from any amounts due and owing to

InterMune by any department, agency, or agent of the United States at the time of Default; 3)

reinstitute an action or actions against InterMune in this Court; and 4) InterMune agrees not to

contest any draw, offset, or collection action undertaken by the United States pursuant to this

Paragraph, either administratively or in any court.

In the event of a Default of any payment under this Agreement, InterMune agrees to pay the United States all reasonable costs of collection and enforcement of this Agreement, including attorneys' fees and expenses. In the event the United States reinstitutes an action under this Paragraph, InterMune expressly agrees not to plead, argue, or otherwise raise any defense under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims, which: (a) are filed by the United States within 30 calendar days of written notification to InterMune that this Agreement has been made a nullity, and (b) relates to the Covered Conduct, except to the extent these defenses were available on September 4, 2006.

22.     In the event of Default as defined in Paragraph 21 above, OIG-HHS may exclude InterMune from participating in all Federal health care programs until InterMune pays the Settlement Amount and reasonable costs as set forth in Paragraphs 1 and 21 above. OIG-HHS will provide written notice of any such exclusion to InterMune. InterMune waives any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7), and agrees not to contest such exclusion either administratively or in any state or federal court. Reinstatement to program participation is not automatic. If at the end of the period of exclusion InterMune wishes to apply for reinstatement, InterMune must submit a written request for reinstatement to the OIG in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005. InterMune will not be reinstated unless and until the OIG approves such request for reinstatement.

23.     InterMune has provided financial statements to the United States and the United States has relied on the accuracy and completeness of these financial statements in reaching this

-20-

Agreement. If the United States learns that the historical financial statements contained in

InterMune SEC filings made between May 2005, and the Effective Date, either (a) failed to

disclose a material non-contingent asset or assets in which InterMune had an interest (a "Material

Nondisclosure"); or (b) contained any other knowing, material misrepresentation or omission

regarding the financial condition of InterMune (a "Knowing Material Misrepresentation"), the

United States may at its option pursue relief under this Paragraph 23 as follows: (a) the United

States shall provide InterMune with written notice of the nature of the Material Nondisclosure or

Knowing Material Misrepresentation; (b) within ten (10) calendar days of the date of the written

notice, InterMune shall provide the United States, in writing, with any explanation it may have

regarding the Material Nondisclosure or Knowing Material Misrepresentation referenced in the

written notice; (c) if unsatisfied with InterMune's explanation, as determined in its sole and

absolute discretion, the United States may file an action seeking relief under this Paragraph 23 in

which action the United States shall bear the burden of establishing by a preponderance of the

evidence the Material Nondisclosure or Knowing Material Misrepresentation; (d) if the court

finds a Material Nondisclosure or Knowing Material Misrepresentation, then – (i) the Settlement

Amount shall be increased by one hundred percent (100%) of the amount of the Material

Nondisclosure or Knowing Material Misrepresentation; (ii) the remaining unpaid principal

portion of the Settlement Amount (including the increase specified in subparagraph (d)(i) above)

shall become accelerated and immediately due and payable, with interest at a simple rate of 5%

from the Effective Date of this Agreement to the date of the court finding, and at the Medicare

interest rate (per 42 C.F.R. part 405.378) from the date of the court finding until the date of

payment; (iii) the United States may offset the remaining unpaid balance of the Settlement

Amount (inclusive of interest and the increase specified in subparagraph (d)(i) above) from any

amounts due and owing to InterMune by any department, agency, or agent of the United States;

and (iv) InterMune shall immediately pay the United States all reasonable costs incurred in the

action seeking relief under this Paragraph 23, including attorney's fees and expenses.

24.    If, after the Effective Date of this agreement and before the company has made all

payments required pursuant to Paragraph 1 of this Agreement, the company obtains a cumulative

total of more than $150,000,000.00 in cash financing from (1) license fees and milestone

payments paid to the company pursuant to partnering agreements, (2) external debt financing,

and/or (3) external equity financing, the company shall notify the United States and apply twenty

percent (20%) of the excess over $150,000,000.00 ("excess cash amount") to make advance

payments against the Settlement Amount. The company shall make the advance payment(s) first

by paying the outstanding principal owed (plus any interest accrued on that principal through the

advance payment date) in 2011 and shall continue to make such advance payments in reverse

chronological order until the excess cash amount is reduced to zero. The payment schedule

referenced in Exhibit A shall remain in effect until the balance of the Settlement Amount is paid

off. Cash financing, for purposes of this paragraph, is limited to the sources enumerated in the

first sentence of this paragraph and shall expressly exclude any increase in operating revenues

after the Effective Date or reimbursement of research or development expenses from a partner.

Advance payments made by the company pursuant to this paragraph shall not exceed

$10,000,000.00 in any single calendar year. Further, in the event InterMune is sold (either

through an asset sale or an equity sale) or merged into another non-affiliated entity, then all remaining payments owed pursuant to the Settlement Agreement, are accelerated and become immediately due and payable.

In addition to notifying the United States when it has obtained more than $150,000,000 in cash financing, Intermune will be required to provide the United States with notice within ten days of each financing arrangement or agreement (agreement) it obtains after the Effective Date of the settlement after the cumulative financing described in the preceding paragraph totals $150,000,000, along with a copy of each such financing agreement. InterMune further agrees that it shall pay the U.S. all amounts required under this provision within 10 days following receipt of external financing which causes a prepayment under this paragraph. Amounts that are due under this  paragraph and not paid when due will be considered amounts in Default. Default amounts are subject to the Default provisions (except that Default will be effective immediately and not within 30 days of the due date) contained in this Settlement Agreement as specified in paragraph 21, including the Default rate of interest at the Medicare interest rate (per 42 C.F.R. part 405.378) beginning as of the date of Default until payment of the Settlement Amount is made in full.

25.    InterMune waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

-23-

26.    The Parties each represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

27.    Except as otherwise stated herein, this Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity.

28.    Nothing in any provision of this Agreement constitutes an agreement by the United States, InterMune or the Relator concerning the characterization of the Settlement Amount or the relator's share for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

29.    Except as expressly provided in this Agreement, each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

30.    This Agreement is governed by the laws of the United States. The Parties agree that the United States District Court for the Northern District of California shall retain jurisdiction over this Agreement until all the terms and conditions have been completely satisfied. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the Northern District of California, including any dispute regarding Relator's share of the settlement, except that disputes arising under the CIA shall be resolved through the dispute resolution provisions set forth in the CIA.

31.    The undersigned InterMune signatories represent and warrant that they are

-24-

authorized by their Board of Directors to execute this Agreement. The undersigned signatory or signatories for the Relator represents and warrants that he is authorized to execute this Agreement on behalf of the Relator. The undersigned United States signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the United States through their respective agencies and departments, and, in the case of the OIG-HHS and TMA, on behalf of their respective Departments.

32.     This Agreement is effective on the later of (1) the date of signature of the last signatory to the Agreement, or (2) the date the Court approves the DPA as described in Preamble Paragraph D (the "Effective Date"). Facsimiles of signatures shall constitute acceptable binding signatures for purposes of this Agreement.

33.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties.

34.     This Agreement and Exhibit A attached hereto, together with the CIA, and the DPA described in Preamble Paragraphs C and D, constitute the complete agreement between the Parties with regard to the Covered Conduct. This Agreement may not be amended except by written consent of all the Parties, except that only InterMune and OIG-HHS must agree in writing to a modification of the CIA, without the consent of any other party to this Agreement or the DPA.

35.     InterMune and the Relator hereby consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

36.     This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

-25-

UNITED STATES OF AMERICA

By: _____

    ALEX G. TSE                Dated:  10/24/06
    Assistant United States Attorney
    United States Attorney's Office
    Northern District of California


By: _____

    ANDY J. MAO               Dated:
    Trial Attorney
    Commercial Litigation Branch
    Civil Division
    United States Department of Justice


By: _____

    GREGORY E. DEMSKE      Dated:
    Assistant Inspector General for Legal Affairs
    Office of Counsel to the Inspector General
    Office of Inspector General
    U.S. Department of Health and Human Services


By: _____

    LAUREL C. GILLESPIE      Dated:
    Deputy General Counsel
    TRICARE Management Activity
    United States Department of Defense

UNITED STATES OF AMERICA


By: _____          Dated:

     ALEX G. TSE
     Assistant United States Attorney
     United States Attorney's Office
     Northern District of California


By: _____          Dated: 10/25/06

     ANDY J. MAO
     Trial Attorney
     Commercial Litigation Branch
     Civil Division
     United States Department of Justice


By: _____          Dated:

     GREGORY E. DEMSKE
     Assistant Inspector General for Legal Affairs
     Office of Counsel to the Inspector General
     Office of Inspector General
     U.S. Department of Health and Human Services

UNITED STATES OF AMERICA


By: _____

ALEX G. TSE                                        Dated: _____
Assistant United States Attorney
United States Attorney's Office
Northern District of California


By: _____

ANDY J. MAO                                        Dated: _____
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice


By: _____

GREGORY E. DEMSKE                                  Dated: 10/25/06
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services


-26-

By: _Kathleen M. Gettigan_____    Dated: _10/20/2006_
    KATHLEEN McGETTIGAN
    Deputy Associate Director
    Center for Retirement & Insurance Services United States Office of Personnel
    Management


By: _David Cope_____    Dated: _10/20/2006_
    J. DAVID COPE
    Assistant Inspector General for Legal Affairs \
    United States Office of Personnel Management

By: _____          Dated: 24 Oct 06
    LAUREL C. GILLESPIE
    Deputy General Counsel
    TRICARE Management Activity
    United States Department of Defense


By: _____          Dated:
    SUSAN CHADICK
    Deputy General Counsel
    Defense Logistics Agency


InterMune, Inc. Settlement Agreement

Sent by: DLA/OFFICE OF GENERAL COUNSEL    703 767 6090;    10/25/06   3:47PM;JetFax_#846;Page 2/2

By: _____          Dated:
    LAUREL C. GILLESPIE
    Deputy General Counsel
    TRICARE Management Activity
    United States Department of Defense


By: _____          Dated: October 25, 2006
    SUSAN CHADICK
    Deputy General Counsel
    Defense Logistics Agency

INTERMUNE, INC.

By: _____

Robin Steele, General Counsel
Intermune, Inc.

Dated: _October 24, 2006._

By: _____

ETHAN M. POSNER
Covington & Burling LLP

Dated: _10-24-06_

DOJ Civil Settlement – Execution FINAL

From:BERANBAUM MENKE          1 212 509 8088          10/24/2006 13:55 #144 P.003/004

Oct 24 06 03:22p    Summer Beach Dev          2774227          p.1
From:BERANBAUM MENKE          1 212 509 8088          10/24/2006 13:45 #143 P.001/001

RELATOR

By: _Joan Gallagher_____          Dated: _October 24, 2006_
    JOAN GALLAGHER

By: _____          Dated: _____
    JOHN A. BERANBAUM
    Beranbaum Menken Ben-Asher & Bierman LLP

-30-

RELATOR

By: _____
    JOAN GALLAGHER                          Dated:

By: _____
    JOHN A. BERANBAUM                       Dated: 10-24-06
    Beranbaum Menken Ben-Asher & Bierman LLP

-30-

## EXHIBIT A: PAYMENT SCHEDULE

TOTAL PAYMENT

| Year | Payment | Interest at 5% | Principal | Balance |
|---|---|---|---|---|
| | | | | 36,944,043.50 |
| 11/1/2006 | 5,000,000.00 | - | 5,000,000.00 | 31,944,043.50 |
| 11/1/2007 | 5,000,000.00 | 1,597,202.18 | 3,402,797.83 | 28,541,245.68 |
| 11/3/2008 | 6,500,000.00 | 1,427,062.28 | 5,072,937.72 | 23,468,307.96 |
| 11/2/2009 | 7,000,000.00 | 1,173,415.40 | 5,826,584.60 | 17,641,723.36 |
| 11/1/2010 | 9,000,000.00 | 882,086.17 | 8,117,913.83 | 9,523,809.52 |
| 11/1/2011 | 10,000,000.00 | 476,190.48 | 9,523,809.52 | 0.00 |
| Total | 42,500,000.00 | | 36,944,043.50 | |

PAYMENT TO THE UNITED STATES

| Year | Payment | Interest at 5% | Principal | Balance |
|---|---|---|---|---|
| | | | | 30,249,228.50 |
| 11/1/2006 | 4,093,924.98 | - | 4,093,924.98 | 26,155,303.52 |
| 11/1/2007 | 4,093,924.98 | $1,307,765 | 2,786,159.80 | 23,369,143.72 |
| 11/3/2008 | 5,322,102.47 | $1,168,457 | 4,153,645.29 | 19,215,498.43 |
| 11/2/2009 | 5,731,494.97 | $960,775 | 4,770,720.05 | 14,444,778.38 |
| 11/1/2010 | 7,369,064.96 | $722,239 | 6,646,826.04 | 7,797,952.34 |
| 11/1/2011 | 8,187,849.96 | $389,898 | 7,797,952.34 | 0.00 |
| Total | 34,798,362.32 | 4,549,133.82 | 30,249,228.50 | |

PAYMENT TO THE MEDICAID PARTICIPATING STATES

| Year | Payment | Interest at 5% | Principal | Balance |
|---|---|---|---|---|
| | | | | 6,694,815.00 |
| 11/1/2006 | 906,075.02 | - | 906,075.02 | 5,788,739.98 |
| 11/1/2007 | 906,075.02 | $289,437 | 616,638.02 | 5,172,101.96 |
| 11/3/2008 | 1,177,897.53 | $258,605 | 919,292.43 | 4,252,809.53 |
| 11/2/2009 | 1,268,505.03 | $212,640 | 1,055,864.55 | 3,196,944.97 |
| 11/1/2010 | 1,630,935.04 | $159,847 | 1,471,087.79 | 1,725,857.18 |
| 11/1/2011 | 1,812,150.04 | $86,293 | 1,725,857.18 | 0.00 |
| Total | 7,701,637.68 | 1,006,822.68 | 6,694,815.00 | |

# Exhibit D

KEVIN V. RYAN (CA Bar No. 118321)
United States Attorney

MARK KROTOSKI (CA Bar No. 138549)
Chief, Criminal Division

IOANA PETROU (CA Bar No. 170834)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-7189
Facsimile: (415) 436-6748
Ioana.Petrou@usdoj.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 06-0707 JSW |
| Plaintiff, | VIOLATION: 21 U.S.C. §§ 331(k), 333(a)(2) - Misbranding |
| v. | SAN FRANCISCO VENUE |
| INTERMUNE, INC., | **DEFERRED PROSECUTION AGREEMENT** |
| Defendant. | |

## DEFERRED PROSECUTION AGREEMENT

InterMune, Inc. ("InterMune"), by its undersigned officer, and the Department of Justice, by the United States Attorney's Office for the Northern District of California (the "Department"), enter into this Agreement in resolution of the Department's ongoing criminal investigation into matters relating to the promotion of the pharmaceutical product Actimmune® (interferon gamma-1b) by InterMune from a time period spanning 2000 to 2003.

For purposes of this Agreement, the relevant time period is from August 2002 through

January 2003 (the "Investigative Period"). The effective date of this Agreement will be the date that it is accepted by the Court for the Northern District of California.

This Agreement is binding upon InterMune, Inc. and the Attorney General for the United States, the United States Department of Justice, and all United States Attorneys. This Agreement does not bind the Tax Division of the U.S. Department of Justice or the Internal Revenue Service of the U.S. Department of the Treasury. InterMune, Inc. understands that this Agreement does not bind any state or local prosecutive authorities.


INFORMATION

1.    The United States will file an Information in the United States District Court for the Northern District of California charging InterMune with One Count of doing an act, with intent to defraud or mislead, with respect to a drug while the drug was held for sale after shipment in interstate commerce that resulted in the drug being misbranded, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2) (the "Information").


THE DEPARTMENT'S INVESTIGATION

2.    During the course of the investigation, the Department notified InterMune that certain former InterMune personnel violated federal criminal law, specifically that certain former InterMune employees promoted Actimmune® for unapproved indications and made misleading statements regarding Actimmune in violation of: (a) the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331; and (b) Health Care Fraud, 18 U.S.C. § 1347. As described more fully below, InterMune has provided extensive cooperation to the Department in this investigation.

3.    InterMune does not contest that the Department has developed evidence during its investigation that one or more former InterMune employees violated federal criminal law during the Investigative Period. One or more former InterMune employees instructed certain members of the Actimmune sales force and a specialty pharmacy to promote Actimmune for idiopathic pulmonary fibrosis, an indication other than those for which the drug had received FDA approval. InterMune acknowledges that part of the Department's investigation is set forth in

Deferred Prosecution Agreement
No. CR 06-0707 JSW                            2

Attachment A and does not contest the facts set forth in Attachment A. InterMune accepts responsibility for the conduct of its former employees and conduct its former employees directed. InterMune does not endorse, ratify or condone criminal conduct, and, as set forth below, has taken steps to prevent such conduct from occurring in the future.

## COOPERATION AND REMEDIAL MEASURES

4.    InterMune provided substantial cooperation and assistance to the Department's investigation.

    A.    First, InterMune disclosed the results of internal investigations that had occurred prior to the Department's investigation and related to the conduct set forth in Attachment A.

    B.    Second, InterMune fully complied with the subpoena served by the Department and provided significant information regarding the conduct of certain former employees and officers.

    C.    Third, InterMune made numerous presentations that were helpful to the Department's investigation.

    D.    Fourth, InterMune made certain current employees and officers who were employed by the Company during the period of investigation available to the Department in connection with its investigation.

InterMune has agreed to, and will, continue to fully cooperate with the Department as may be reasonably required during the term of this agreement, which is two (2) years from the effective date of this Agreement.

5.    InterMune's management team -- the great majority of whom were hired after the Investigative Period -- also instituted numerous and comprehensive compliance changes, including new compliance policies, audits and internal reviews, and revised sales representative compensation programs. These compliance changes were instituted by the Company prior to the commencement of the Department's investigation.

Deferred Prosecution Agreement
No. CR 06-0707 JSW                  3

AGREEMENT

6.      Based upon InterMune's significant cooperation and the corrective measures it has

implemented, and InterMune's commitment to implement and audit such measures and its

willingness to continue to cooperate with the Department in its investigation of these matters, the

Department, on the understandings specified below, agrees that the Department shall recommend

to the Court that prosecution of InterMune on the Information be deferred for a period of two (2)

years from the effective date of this Agreement (the "Effective Period"). InterMune shall

expressly waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States

Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure

48(b), and any applicable Local Rules of the United States District Court for the Northern

District of California for the period during which this Agreement is in effect.

7.      The Department agrees that if InterMune is in compliance with all of its obligations under

this Agreement, the Department will, within 30 days of the expiration of two (2) years from the

effective date of this Agreement, seek dismissal with prejudice of the Information filed against

InterMune pursuant to paragraph 1 of this Agreement, and this Agreement shall expire. Except

in the event of a breach of this Agreement, the Department will bring no additional criminal

charges against InterMune relating to or arising out of matters set forth in the Information or in

Attachment A or the promotion of Actimmune during the period 2000 through 2003; the

Department acknowledges that this Agreement protects InterMune from indictment and/or trial

as to such matters. InterMune and the Department understand that the Agreement to defer

prosecution of InterMune must be approved by the Court, in accordance with 18 U.S.C. §

3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any

reason, both the Department and InterMune are released from any obligation imposed upon them

by this Agreement, and this Agreement shall be null and void.

8.      This Agreement does not provide any protection to any former employee of InterMune or

any other entity, except successor entities as described in Paragraph 19, below. InterMune

understands and agrees that if it violates this Agreement, the Department can prosecute

Deferred Prosecution Agreement
No. CR 06-0707 JSW                          4

1 InterMune for any crimes committed by its employees, officers or directors relating to the

2 promotion of Actimmune®.

3 The understandings on which this Agreement are premised are:

4 9.    For the Effective Period, InterMune shall continue to fully cooperate with the Department

5 regarding any matter relating to the Department's investigation of the promotion of Actimmune

6 about which InterMune has information or knowledge, including, but not limited to, the

7 following: (a) InterMune shall truthfully disclose all information of which it may be aware with

8 respect to the activities of InterMune, its directors, officers and employees, about which the

9 Department shall inquire; (b) InterMune shall provide to the Department, on written request, any

10 document, record or other tangible evidence, including but not limited to information and

11 documents concerning presentations, publications, and patient registries, about which the

12 Department shall inquire; (c) InterMune shall provide to the Department reasonable access to

13 InterMune's facilities, documents and employees.  In addition,

14    A.    InterMune will use its best efforts to continue to make records and witnesses

15         available during the Effective Period regarding activities of the Company during

16         the Investigative Period, provided, however, this agreement to cooperate does not

17         apply to any information provided by InterMune to legal counsel after May 1,

18         2004 in connection with the provision of legal advice and the legal advice itself,

19         and nothing in this Agreement shall be construed to require InterMune to provide

20         any such information or advice to the Department.

21    B.    This agreement by InterMune to cooperate shall not be construed as a waiver with

22         respect to third parties of the attorney-client privilege, work-product protection, or

23         any other privilege applicable to information or documents provided to the

24         Department pursuant to this Agreement; InterMune neither expressly nor

25         implicitly waives its right to assert any privilege that may be available against

26         entities other than the Department of Justice.

27

28 Deferred Prosecution Agreement
No. CR 06-0707 JSW                        5

C.    This agreement to cooperate shall not apply in the event that the Department

pursues a criminal prosecution against InterMune.

10.    Upon request of the Department, with respect to any issue relevant to its investigation of

the promotion of Actimmune at any time (not limited to the Investigative Period), InterMune

shall designate knowledgeable employees, agents or attorneys to provide non-privileged

information and/or materials on InterMune's behalf to the Department.  It is further understood

that InterMune must at all times give complete, truthful and accurate information to the

Department.

11.    With respect to any information, testimony, document, record or other tangible evidence

relating to the promotion of Actimmune provided by InterMune to the Department or a grand

jury, InterMune consents to any and all disclosures to governmental law enforcement entities of

such materials as the Department, in its reasonable discretion and in good faith, deems

appropriate.  With respect to any such materials that constitute "matters occurring before the

grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure,

InterMune further consents to a) any order sought by the Department permitting such disclosure

and b) the Department's ex parte or in camera application for such orders.  The Department

agrees that any material which comprises trade secrets or other proprietary information shall,

prior to disclosure to any governmental entity, be redacted of such information, or be

accompanied by a prominent warning notifying the agency of the protected status of the material.

Nothing in this paragraph shall be construed as a waiver of InterMune's rights in the materials it

provides to the Department, and such materials shall not be provided to non-governmental

entities without InterMune's prior written consent.

12.    InterMune agrees that it will use its best efforts to not make any public statements, in

litigation or otherwise, materially contradicting the facts set forth in Attachment A, or its

representations in this Agreement.  Any such statements shall constitute a breach of this

Agreement, and InterMune thereafter would be subject to prosecution unless it cures its breach as

set forth below.  Upon the Department's providing written notice to InterMune of such a

Deferred Prosecution Agreement
No. CR 06-0707 JSW                          6

1   contradictory statement, InterMune may avoid a breach of this Agreement by publicly

2   repudiating such statement within 72 hours after receipt of written notification by the

3   Department.

4   13.    InterMune is simultaneously entering into an agreement with the Department's Civil

5   Division (the "Civil Settlement Agreement") regarding the payment of money to settle certain

6   civil claims. InterMune is also simultaneously entering into a Corporate Integrity Agreement

7   ("CIA") with the Office of Inspector General of the Department of Health and Human Services

8   ("OIG-HHS") to implement certain specified compliance measures. Failure by InterMune to

9   comply fully with those material terms of the Civil Settlement Agreement called to occur during

10  the Effective Period of this Agreement may constitute a breach of this Agreement, provided,

11  however, that a breach of the CIA referenced in the Civil Settlement Agreement does not

12  constitute a breach of this Agreement. Any disputes arising under the CIA shall be resolved

13  exclusively through the dispute resolution provisions of the CIA. The parties understand that

14  nothing in this paragraph shall be construed to enlarge the Effective Period of this Agreement, or

15  to delay the dismissal of the Information as described in paragraph 7 if at the time specified

16  therein, InterMune is in full compliance with its obligations under the Civil Settlement

17  Agreement. The parties further understand and agree that this paragraph does not deprive

18  InterMune of its rights under the Civil Settlement Agreement or the common law to contest the

19  existence of a breach of the Civil Settlement Agreement in the Northern District of California.

20  The Department further agrees that nothing in this paragraph shall be construed by the United

21  States as affecting the underlying nature of InterMune's obligations under the Civil Settlement

22  Agreement.

23  14.    It is further understood that should it be determined that InterMune has deliberately given

24  materially false, incomplete, or misleading information under this Agreement, or has committed

25  any criminal health care fraud offense during the Effective Period, or that InterMune has

26  otherwise knowingly, intentionally and materially violated any provision of this Agreement,

27  InterMune shall, in the Department's reasonable discretion and in good faith, thereafter be

28  Deferred Prosecution Agreement

    No. CR 06-0707 JSW                    7

subject to prosecution for any federal criminal violation of which the Department has knowledge.

Any such prosecutions may be premised on information provided by InterMune to the

Department. Moreover, InterMune agrees that any criminal prosecutions relating to the unlawful

promotion of Actimmune from 2000 through 2003 that are not time-barred by the applicable

statute of limitations on the effective date of this Agreement may be commenced against

InterMune in accordance with this Agreement, notwithstanding the expiration of the statute of

limitations between the effective date of this Agreement and its expiration date two years after

the date this Agreement is accepted by the Court. By this Agreement, InterMune expressly

intends to and does waive any rights with respect to the statute of limitations as described in the

preceding sentence.

15.    It is further agreed that should it be determined that InterMune has knowingly,

intentionally and materially violated any provision of this Agreement:

A.    all statements made by InterMune to the Department, FDA, HHS-OIG, the FBI or

       any other federal agency, or any testimony given by InterMune before a grand

       jury, the United States Congress, the SEC, or elsewhere, whether prior or

       subsequent to this Agreement, including this Agreement and the statement of facts

       in Attachment A, shall be admissible in evidence in any and all criminal

       proceedings brought by the Department against InterMune;

B.    nothing in this agreement shall prohibit the admission in such proceedings of any

       evidence derived from such statements or testimony; and

C.    InterMune shall not assert any claim under the United States Constitution, Rule

       11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules

       of Evidence, or any other federal rule, that statements made by InterMune prior to

       or subsequent to this Agreement, or any leads therefrom, should be suppressed.

16.    In the event the Department asserts that InterMune has breached any provision of this

Agreement, the Department shall provide written notice to InterMune and will provide

InterMune with a two-week period from receipt of such notice, except as otherwise specified

Deferred Prosecution Agreement
No. CR 06-0707 JSW                                    8

herein, in which to make a presentation to the Department, or its designee, to demonstrate that no breach has occurred, or, to the extent applicable, that the breach was not knowing, intentional or material, or has been cured. The Department shall have four weeks from providing written notice to InterMune asserting a breach to file a motion with the Court asserting the breach and seeking a finding of a breach; however, this motion shall not be filed less than 15 days from the day the Department provides InterMune written notice asserting the breach. In the event a motion is filed by the Department, the Court shall determine whether a breach occurred by a preponderance of the evidence.

17.     InterMune agrees to not enter into any joint defense agreements relating to the Department's investigation during the Effective Period of this Agreement without Department approval, and InterMune further agrees to withdraw from current joint defense agreements, if any exist, for which the Department does not approve of InterMune's continuing participation. The Department agrees that its approval pursuant to this paragraph will not be unreasonably withheld.

18.     The Company agrees that if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall provide the Government with reasonable prior notice and it shall include in any contract for sale or merger a provision binding the purchaser-successor to the obligations described in this Agreement.

19.     With respect to the matters described in this Agreement, and with the exception of the agreements described in paragraph 13, and the letter from Ethan M. Posner to the Department dated October 9th, 2006, this Agreement supersedes all prior, if any, understandings, promises, and/or conditions between the Department and InterMune. This Agreement may not be modified except in writing signed by all the parties.

20.     InterMune hereby warrants and represents that the Board of Directors of InterMune has duly authorized, in a specific resolution, the execution and delivery of this Agreement by InterMune, and that the person signing the Agreement has authority to bind InterMune. InterMune agrees that either a duly authorized corporate officer or a duly authorized attorney for

Deferred Prosecution Agreement
No. CR 06-0707 JSW                              9

1    InterMune, at the discretion of the Court, shall appear on behalf of InterMune to enter into this
2    Agreement.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28    Deferred Prosecution Agreement
     No. CR 06-0707 JSW                          10

1

On Behalf of the United States Department of Justice:

2

3

4

5    $10 \cdot 24 \cdot 06$

6    DATE                                    Kevin V. Ryan

7                                            United States Attorney
                                             Northern District of California

8

9                                            Ioana Petrou
                                             Assistant United States Attorney

10

11

12   **On Behalf Of InterMune, Inc.**

13

14

15   DATE                                    Robin Steele

16                                           Senior Vice President and General Counsel
                                             InterMune, Inc.

17                                           3280 Bayshore Boulevard

18                                           Brisbane, CA  94005

19

20   DATE                                    Ethan Posner

21                                           Covington & Burling
                                             Counsel to InterMune, Inc.

22

23

24

25

26

27

28

Deferred Prosecution Agreement            11

1   On Behalf of the United States Department of Justice:

2

3

4

5

6   _____                      
DATE                       Kevin V. Ryan

6                         United States Attorney

7                         Northern District of California

8

9                         Ioana Petrou

10                       Assistant United States Attorney

11

12  On Behalf Of InterMune, Inc.

13

14

15  _October 24, 2006_                 
DATE                       Robin Steele

16                       Senior Vice President and General Counsel

17                       InterMune, Inc.

17                       3280 Bayshore Boulevard

18                       Brisbane, CA 94005

19

20  _10-24-06_                   
DATE                       Ethan M. Posner

21                       Covington & Burling

21                       Counsel to InterMune, Inc.

22

23

24

25

26

27

28

Deferred Prosecution Agreement        11

# Exhibit E

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
INTERMUNE, INC.

## I.    PREAMBLE

InterMune, Inc. (InterMune) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and the statutes, regulations and written directives of the Food and Drug Administration (FDA requirements). Contemporaneously with this CIA, InterMune is entering into a Settlement Agreement with the United States. InterMune will also enter into settlement agreements with various States, and InterMune's agreement to this CIA is a condition precedent to those agreements.

Prior to the investigation of InterMune by the United States, InterMune established a comprehensive voluntary compliance program (Compliance Program), which includes a corporate Compliance Officer and Compliance Committee, a Code of Conduct for all employees, written policies and procedures, educational and training initiatives, review and disciplinary procedures, a confidential disclosure program, and internal review procedures designed, as represented by InterMune, to promote compliance with applicable laws and the promotion of high ethical standards.

InterMune shall continue the operation of the Compliance Program in accordance with the terms set forth below for the term of this CIA. InterMune may modify its Compliance Program as appropriate, but, at a minimum, InterMune shall ensure that during the term of this CIA, it shall comply with the integrity obligations enumerated in this CIA.

## II.    TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by InterMune under this CIA shall be 5 years from the effective date of this CIA, unless otherwise specified. The effective date shall be the date on which the final signatory of this CIA executes this CIA (Effective Date). Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B. Sections VII, IX, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) InterMune's final Annual Report; or (2) any additional materials submitted by InterMune pursuant to OIG's request, whichever is later.

C. The scope of this CIA shall be governed by the following definitions:

1

1. "Covered Persons" includes:

a. all owners who are natural persons (other than shareholders who: (1) have an ownership interest of less than 5%; and (2) acquired the ownership interest through public trading), officers, directors, and employees of InterMune; and

b. all contractors, subcontractors, agents, and other persons who perform sales, marketing, promotional, pricing, government contract, and research and development activities (except preclinical researchers and clinical investigators) on behalf of InterMune.

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year.

2. "Relevant Covered Persons" includes all Covered Persons of InterMune whose job responsibilities relate to the provision of information about or services relating to InterMune's products; distribution of Actimmune or other InterMune products; research and development (except preclinical researchers and clinical investigators); or the sales, marketing, or promotion of InterMune's products (hereafter collectively referred to as "Product Services Related Functions.") This includes, but is not limited to, Medical Science Liaisons, and any individuals who work in the following areas: Clinical Affairs, Medical Affairs, Regulatory, Legal Affairs, Corporate Compliance, Corporate Administration, and Commercial Operations.[1]

3. "Third Party Personnel" shall mean personnel of the entities with whom InterMune has or may, in the future, enter agreements to distribute and purchase its products, joint venture agreements and/or other agreements to co-market its products. InterMune has represented that: 1) Third Party Personnel are employed by other independent entities; 2) InterMune does not control Third Party Personnel; and 3) it would be commercially impracticable to compel the compliance of Third Party Personnel with the requirements set forth in this CIA. However, InterMune agrees to use its best efforts to promote compliance by Third Party Personnel with Federal health care program and FDA requirements as set forth below in Sections III.B and V.

4. An "Educational or Informational Activity" shall mean any continuing medical education (CME), disease awareness, or other scientific, educational or professional program, meeting, or event, including, but not limited to, sponsorship of booths or activities at medical conferences or symposia.

---

[1] If there are future changes in the organizational structure of InterMune, individuals who undertake the functions of the specific groups enumerated in the preceding sentence shall be considered Relevant Covered Persons.

### III.    CORPORATE INTEGRITY OBLIGATIONS

To the extent not already accomplished, InterMune shall maintain a Compliance Program throughout the term of this CIA that includes the following elements:

A. Compliance Officer and Committee.

1. *Compliance Officer.* InterMune presently has a Compliance Officer with responsibility for administering InterMune's Compliance Program. InterMune shall continue to employ an individual to serve as its Compliance Officer during the term of the CIA. The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements and FDA requirements. The Compliance Officer shall be a member of senior management of InterMune, shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors of InterMune, and shall be authorized to report on such matters to the Board of Directors at any time. The Compliance Officer shall also have the option of reporting any matter directly to the CEO. The Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer. The Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by InterMune as well as for any reporting obligations created under this CIA.

InterMune shall report to OIG, in writing, any changes in the identity or position description of the Compliance Officer, or any actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

2. *Compliance Committee.* Prior to the Effective Date, InterMune established a Compliance Committee, and InterMune shall maintain the Compliance Committee during the term of this CIA. The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as Clinical Affairs, Medical Affairs, Regulatory, Legal Affairs, Corporate Compliance, Corporate Administration, and Commercial Operations.) The Compliance Officer shall chair the Compliance Committee. The Compliance Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the organization's risk areas and shall oversee monitoring of internal and external audits and investigations).

InterMune shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

B. Written Standards.

1. *Code of Conduct.* Prior to the Effective Date, InterMune established a written Code of Conduct applicable to all Covered Persons. InterMune shall continue to make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

a.  InterMune's commitment to full compliance with all Federal health care program and FDA requirements, including its commitment to market, sell, promote, research, develop, and advertise its products in accordance with such requirements;

b.  InterMune's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program and FDA requirements and with InterMune's own Policies and Procedures as implemented pursuant to Section III.B (including the requirements of this CIA);

c.  the requirement that all of InterMune's Covered Persons shall be expected to report to the Compliance Officer, or other appropriate individual designated by InterMune, suspected violations of any Federal health care program or FDA requirements or of InterMune's own Policies and Procedures;

d.  the possible consequences to both InterMune and Covered Persons of failure to comply with Federal health care program and FDA requirements and with InterMune's own Policies and Procedures and the failure to report such noncompliance; and

e.  the right of all individuals to use the Disclosure Program described in Section III.E, and InterMune's commitment to nonretaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

To the extent not already accomplished, within 90 days after the Effective Date, each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by InterMune's Code of Conduct. New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

Within 90 days after the Effective Date, and annually thereafter by the anniversary of the Effective Date, InterMune shall send a letter to all entities which employ Third Party Personnel. The letter shall outline InterMune's obligations under the CIA and its commitment to full compliance with all Federal health care program and FDA requirements. The letter shall include a description of InterMune's Compliance Program. InterMune shall attach a copy of its Code of Conduct to the letter and shall ask that the other entity either: (a) make a copy of InterMune's Code of Conduct and the description of InterMune's Compliance Program available to all relevant personnel within its organization; or (b) represent to InterMune that it has and enforces a substantially comparable Code of Conduct and Compliance Program for relevant persons within its organization.

InterMune shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review. Any revised Code of Conduct shall be distributed within 30 days after any revisions are finalized. Each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by the revised Code of Conduct within 30 days after the distribution of the revised Code of Conduct.

Distribution may include publishing the Code of Conduct on InterMune's intranet or other internal web site available to all employees. If InterMune uses such an electronic method of distribution, it must notify the individuals receiving the Code of Conduct that the Code of Conduct will be distributed in such a manner and InterMune must monitor the distribution to ensure that all appropriate individuals received the Code of Conduct.

    2. *Policies and Procedures.* To the extent not already accomplished, within 90 days after the Effective Date, InterMune shall implement written Policies and Procedures regarding the operation of InterMune's Compliance Program and its compliance with Federal health care program and FDA requirements. At a minimum, the Policies and Procedures shall address:

    a.  the subjects relating to the Code of Conduct identified in Section III.B.1;

    b.  selling, marketing, and promoting InterMune products in compliance with all applicable Federal health care program requirements, including, but not limited to, the Federal anti-kickback statute, codified at 42 U.S.C. § 1320a-7b(b);

    c.  selling, marketing, promoting, advertising, and disseminating information about InterMune's products in compliance with all applicable FDA requirements, including procedures governing the response to requests for information about off-label uses;

    d.  compensation (including salaries and bonuses) for Covered Persons that are designed to ensure that financial incentives do not inappropriately motivate sales and marketing personnel to engage in the improper promotion, sales, and marketing of InterMune's products;

    e.  employee discipline for violations of InterMune's Policies and Procedures, including those policies relating to Federal health care program and FDA requirements;

    f.  appropriate mechanisms by which Medical Affairs receives and responds to requests for information about off-label uses of InterMune's products, including but not limited to, the following: the form and content of information disseminated by Medical Affairs in response to such requests; and the internal review process for the information disseminated.

The Policies and Procedures shall include a requirement that InterMune develop a database (the Medical Affairs Inquiries Database) that includes the following items of information for each unique inquiry (Inquiry) received for information about InterMune's products: 1) date of Inquiry; 2) form of Inquiry (e.g., fax, phone, etc.); 3) name of the requesting health care professional (HCP); 4) nature and topic of request (including exact language of the Inquiry if made in writing); 5) an evaluation of whether the Inquiry relates to information about an off-label indication for the product; 6) nature/form of the response from InterMune (including a record of the materials provided to the

HCP in response to the request); 7) the name of the InterMune representative who called on or interacted with the HCP; and 8) the status and findings of any follow-up review conducted by InterMune in situations in which it appears that the Inquiry may have related to improper off-label promotion;

g.  speaker programs, advisory board programs, focus group programs, and all other consultant arrangements. These policies shall be designed to ensure that the consultant arrangements and related events are used for legitimate and lawful purposes in accordance with applicable Federal health care program and FDA requirements. The policies shall include requirements about the uses, content, and circumstances of such arrangements and events;

h.  funding of, or participation in, any Educational or Informational Activity as defined in Section II.C.4 above (e.g., third party educational grants or sponsorship for CME or other third-party educational programs or events). These Policies and Procedures shall be designed to ensure that InterMune's funding and/or sponsorship of such programs satisfies all applicable Federal health care program and FDA requirements related to the sponsorship of any Educational or Informational Activity.

The Policies and Procedures shall require: 1) the disclosure of InterMune's financial support of the Educational or Informational Activity and any financial relationships with faculty, speakers, or organizers at such Educational or Informational Activity; 2) that the Educational or Informational Activity have an educational focus; 3) that the Educational or Informational Activity be independent; 4) that the Educational or Informational Activity be non-promotional in tone/nature; and 5) that the information provided at the Educational or Informational Activity be fair, balanced, accurate and not misleading;

i.  funding of charitable grants or sponsorships in a manner that is designed to ensure that InterMune's funding complies with all applicable Federal health care program requirements and FDA requirements; and

j.  sponsorship or funding of research activities (including clinical trials, market research, or authorship of articles or other publications) by InterMune in a manner that is designed to ensure that InterMune's funding or sponsorship of such activities complies with all applicable Federal health care program and FDA requirements. In addition, such Policies and Procedures shall ensure that sales and marketing activities are separate from clinical trial enrollment.

To the extent not already accomplished, within 90 days after the Effective Date, the relevant portions of the Policies and Procedures shall be distributed to all individuals whose job functions relate to those Policies and Procedures. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), InterMune shall assess and update, as necessary, the Policies and Procedures. Within 30 days after the effective date of any revisions, the relevant portions of any such revised Policies and Procedures shall be distributed to all individuals whose job functions relate to those Policies and Procedures.

Distribution may include publishing such Policies and Procedures on InterMune's intranet or other internal web site available to all employees. If InterMune uses such an electronic method of distribution, it must notify the individuals receiving the Policies and Procedures that the Policies and Procedures will be distributed in such a manner and InterMune must monitor the distribution to ensure that all appropriate individuals received the Policies and Procedures. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

C. Training and Education.

1. *General Training*. Within 90 days after the Effective Date, InterMune shall provide at least two hours of General Training to each Covered Person. This training, at a minimum, shall explain InterMune's:

> a. CIA requirements;
>
> b. InterMune's Compliance Program (including the Code of Conduct and the Policies and Procedures as they pertain to general compliance issues); and
>
> c. in general, the proper methods of promoting, marketing, selling, conducting research (including clinical trials), and disseminating information about InterMune's products in accordance with Federal health care program and FDA requirements.

To the extent that General Training provided to Covered Persons during the 90 days immediately prior to the execution of this CIA satisfies the requirements of Sections III.C.1.b-c, above, the OIG shall credit the training toward the training requirements set forth in this Section III.C.1 for the first Reporting Period. InterMune may satisfy its remaining General Training obligation for those Covered Persons who received training as described above by notifying the Covered Persons of the fact that InterMune entered a CIA and notifying them of InterMune's requirements and obligations under the CIA.

New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later. After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

2. *Specific Training*. Within 90 days after the Effective Date, each Relevant Covered Person shall receive at least four hours of Specific Training in addition to the General Training required above. This Specific Training shall include a discussion of:

> a. all Federal health care program requirements relevant to the proper methods for selling, marketing, promoting, and providing information about

InterMune's products, including, but not limited to, the requirements of the Federal anti-kickback statute; the Civil Monetary Penalties Law; the civil False Claims Act; and the Medicaid Drug Rebate statute;

b.   all applicable FDA requirements relevant to promotion, marketing, research (including clinical trials), and dissemination of information about InterMune's products including but not limited to, the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations;

c.   the personal obligation of each Relevant Covered Person involved in Product Services Related Functions to comply with all applicable legal requirements;

d.   the legal sanctions for violations of the Federal health care program requirements or FDA requirements relating to Product Services Related Functions; and

e.   examples of proper and improper practices relating to Product Services Related Functions.

New Relevant Covered Persons shall receive this training within 30 days after the beginning of their employment or becoming Relevant Covered Persons, or within 90 days after the Effective Date, whichever is later.  An InterMune employee who has completed the Specific Training shall review a new Relevant Covered Person's work, to the extent that the work relates to Product Services Related Functions, until such time as the new Relevant Covered Person completes his or her Specific Training.

To the extent that Specific Training provided to Relevant Covered Persons during the 90 days immediately prior to the execution of this CIA satisfies the requirements of this Section III.C.2, the OIG shall credit the training toward the Specific Training requirements for the first Reporting Period.

After receiving the initial Specific Training described in this Section, each Relevant Covered Person shall receive at least two hours of Specific Training in each subsequent Reporting Period.

3.   *Certification*.  Each individual who is required to receive training shall certify, in writing, or in electronic form, if applicable, that he or she has received the required training. The certification shall specify the type of training received and the date received.  The Compliance Officer (or designee) shall retain the certifications, along with all course materials. These shall be made available to OIG, upon request.

4.   *Qualifications of Trainer*.  Persons providing the training shall be knowledgeable about the subject area(s) of their training, including the applicable Federal health care program and FDA requirements.

5.   *Update of Training*.  InterMune shall review the training annually, and, where appropriate, update the training to reflect changes in Federal health care program or FDA

8

requirements, any issues discovered during internal audits or any of the IRO Reviews, and any other relevant information.

6. *Computer-based Training.* InterMune may provide the training required under this CIA through appropriate computer-based training approaches. If InterMune chooses to provide computer-based training, it shall make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the individuals receiving such training.

D. Review Procedures.

1. *General Description.*

a. *Engagement of Independent Review Organization.* Within 90 days after the Effective Date, InterMune shall engage an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform a Promotional and Product Services Engagement. Each IRO engaged by InterMune shall have expertise in Federal health care program and FDA requirements applicable to the Promotional and Product Services Engagement. Each IRO shall assess, along with InterMune, whether it can perform the IRO review in a professionally independent and/or objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or other engagements that may exist. The applicable requirements relating to the IRO are outlined in Appendix A to this CIA, which is incorporated by reference.

b. *Description and Frequency of Reviews.* The Promotional and Product Services Engagement shall consist of two components – a systems review (the Promotional and Product Services Systems Review) and a transactions review (Promotional and Product Services Transactions Review), as described more fully in Appendix B to this CIA, which is incorporated by reference.

The Promotional and Product Services Transactions Review shall be performed annually and shall cover each of the Reporting Periods. The IRO(s) shall perform all components of each of these annual Reviews.

If there are no material changes in InterMune's systems, processes, policies, and practices relating to Product Services Related Functions, the IRO shall perform the Promotional and Product Services Systems Review for two Reporting Periods to be selected by the OIG. As set forth in Appendix B, if InterMune materially changes its systems, processes, policies, and practices relating to Product Services Related Functions, then the IRO shall perform a Promotional and Product Services Systems Review for the Reporting Period(s) in which such changes were made in addition to conducting the Review for the two Reporting Periods selected by the OIG.

The OIG will select the Reporting Periods in which the Systems Reviews shall be conducted based, in part, on information provided by InterMune about the

size of InterMune, the nature of the functions undertaken by InterMune employees *e.g.* sales and marketing activities, research activities, *etc.*), the number of products that InterMune is actively marketing, and other aspects of InterMune's business. InterMune shall report such information to the OIG 90 days prior to the end of each Reporting Period. The OIG shall review the information submitted and shall notify InterMune at least 30 days prior to the end of each Reporting Period whether InterMune shall be required to retain an IRO to conduct a Systems Review in the next upcoming Reporting Period. The OIG will not require a Systems Review in the first Reporting Period.

c. *Retention of Records.* The IRO and InterMune shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and InterMune) related to the reviews.

2. Review Reports. The IRO shall prepare a report based upon each Promotional and Product Services Transaction Review and Promotional and Product Services Systems Review performed. Information to be included in each Report is described in Appendix B.

3. Validation Review. In the event OIG has reason to believe that: (a) any of InterMune's IRO Reviews fails to conform to the requirements of this CIA; or (b) the IRO's findings or Review results are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the Review in question complied with the requirements of the CIA and/or the findings or Review results are inaccurate (Validation Review). InterMune shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents. Any Validation Review of Reports submitted as part of InterMune's final Annual Report must be initiated no later than one year after InterMune's final submission (as described in Section II) is received by OIG.

Prior to initiating a Validation Review, OIG shall notify InterMune of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, InterMune may request a meeting with OIG to: (a) discuss the results of any Review submissions or findings; (b) present any additional information to clarify the results of the Review in question or to correct the inaccuracy of the Review; and/or (c) propose alternatives to the proposed Validation Review. InterMune agrees to provide any additional information as may be requested by OIG under this Section in an expedited manner. OIG will attempt in good faith to resolve any IRO Review issues with InterMune prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

4. Independence/Objectivity Certification. The IRO shall include in its report(s) to InterMune a certification or sworn affidavit that it has evaluated its professional independence and/or objectivity, as appropriate to the nature of the engagement, with regard to the applicable Review and that it has concluded that it is, in fact, independent and/or objective.

E. Disclosure Program.

Prior to the Effective Date, InterMune established a disclosure program designed to facilitate communications relating to compliance with Federal health care program and FDA requirements and with InterMune's policies (Disclosure Program). During the term of this CIA, InterMune shall continue to maintain a Disclosure Program that includes a mechanism e.g. the toll-free Code of Conduct Ethics Helpline) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with InterMune's policies, conduct, practices, or procedures with respect to a Federal health care program or FDA requirement believed by the individual to be a potential violation of criminal, civil, or administrative law. InterMune shall appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall continue to emphasize a nonretribution, nonretaliation policy, and shall continue to include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, InterMune shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall continue to maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews. The disclosure log shall be made available to OIG upon request.

F.  Ineligible Persons.

1.  *Definitions.* For purposes of this CIA:

a.  an "Ineligible Person" shall include an individual or entity who:

i.  is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

ii.  has been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

b.  "Exclusion Lists" include:

i.  the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

ii.  the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov).

c.  "Screened Persons" include prospective and current owners (other than shareholders who: (1) have an ownership interest of less than 5%; and (2) acquired the ownership interest through public trading), officers, directors, employees, contractors, and agents of InterMune.

2.  *Screening Requirements*.  InterMune has a policy to not hire or engage as a Covered Person any Ineligible Person, and it shall maintain that policy during the term of the CIA.  InterMune shall continue to ensure that all Screened Persons are not Ineligible Persons, by implementing the following screening requirements.

a.  InterMune shall screen all Screened Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Screened Persons to disclose whether they are Ineligible Persons.

b.  InterMune shall screen all Screened Persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

c.  InterMune shall implement a policy requiring all Screened Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in this Section affects the responsibility of (or liability for) InterMune to refrain (if applicable) from billing Federal health care programs for items or services furnished, ordered, or prescribed by an Ineligible Person.  InterMune understands that items or services furnished by excluded persons are not payable by Federal health care programs and that InterMune may be liable for overpayments and/or criminal, civil and administrative sanctions for employing or contracting with an excluded person regardless of whether InterMune meets the requirements of Section III.F.

3.  *Removal Requirement*.  If InterMune has actual notice that a Screened Person has become an Ineligible Person, InterMune shall remove such Screened Person from responsibility for, or involvement with, InterMune's business operations related to the Federal health care programs and shall remove such Screened Person from any position for which the Screened Person's compensation or the items or services furnished, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Screened Person is reinstated into participation in the Federal health care programs.

4.  *Pending Charges and Proposed Exclusions*.  If InterMune has actual notice that a Screened Person is charged with a criminal offense that falls within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Screened Person's employment or contract term, InterMune shall take all appropriate actions to ensure that the responsibilities of that Screened Person have not and shall not adversely affect the accuracy of any claims submitted to any Federal health care program.

G.  Notification of Government Investigation or Legal Proceedings.

Within 30 days after discovery, InterMune shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to InterMune conducted or brought by a governmental entity or its agents involving an allegation that InterMune has committed a crime or has engaged in fraudulent activities in the United States. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. InterMune shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

H.  Notification of Reportable Event.

1.  *Definition of Reportable Event.*  For purposes of this CIA, a "Reportable Event" means anything that involves a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program, and/or applicable to any FDA requirements relating to the promotion of prescription drugs for which penalties or exclusion may be authorized.  A Reportable Event may be the result of an isolated event or a series of occurrences.

2.  *Reporting of Reportable Events.*  Current policies of InterMune require reporting of violations of its current policies.  If InterMune determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, InterMune shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.  The report to OIG shall include the following information:

a.  a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program and/or FDA authorities implicated;

b.  a description of InterMune's actions taken to correct the Reportable Event; and

c.  any further steps InterMune plans to take to address the Reportable Event and prevent it from recurring.

I.  Notification of Communications with FDA.

Within 30 days after the date of any written report, correspondence, or communication from InterMune to the FDA that materially discusses InterMune's or a Covered Person's unlawful or improper promotion of InterMune's products (including any improper dissemination of information about off-label indications), InterMune shall provide a copy of the report, correspondence, or communication to the OIG.  InterMune shall also provide written notice to the OIG within 30 days after the resolution of any such disclosed off-label matter, and shall provide the OIG with a description of the findings and/or results of the matter, if any.

J.  Review of Records Reflecting the Content of Detailing Sessions.

InterMune has represented that, as of the Effective Date, it does not currently have employees or agents engaged in the direct promotion of any product. If, in the future, InterMune reestablishes a sales force for the direct promotion of Actimmune or any other product, InterMune agrees to obtain non-InterMune records (*e.g.*, Verbatims or similar records) generated by an independent entity (Survey Entity) reflecting the purported content and subject matter of detailing interactions between sales representatives and HCPs for up to three InterMune products. In order to satisfy its obligations under this Section III.J, InterMune may propose that it obtain an alternative type of survey record (*e.g.*, message recall studies) rather than the records of the detailing sessions. The OIG will consider InterMune's proposal, and, after considering InterMune's proposal, shall, in its discretion, identify the type of survey records to be obtained.

Prior to the re-establishment of any sales force, InterMune shall notify the OIG of this development and provide specific information about the sales staff and InterMune's products to the OIG. After reviewing the information provided by InterMune and engaging in a dialogue with InterMune about the issue, the OIG shall provide more specific information to InterMune about the requirements of this Section III.J. The OIG shall have the discretion to establish the specific requirements of this Section III.J consistent with the provisions set forth herein. However, in general terms, this Section III.J will require InterMune to contract with a Survey Entity to conduct inquiries into the content and subject matter of the detailing interactions (or alternate types of inquiries as proposed by InterMune) between InterMune sales personnel and HCPs for each Reporting Period in which InterMune has such a sales force. For each product designated by the OIG (Covered Product), InterMune shall obtain records reflecting the purported content and subject matter of detailing sessions (or alternate types of records) in all regions across the United States.

InterMune shall review the records obtained and shall identify any instances in which the records appear to indicate that Covered Persons may have discussed and/or disseminated information about off-label uses of the Covered Products. InterMune shall make findings based on its review (Off-Label Findings) and shall take any responsive action it deems necessary. If necessary for purposes of its review, InterMune shall endeavor to gather additional factual information about the circumstances relating to any Off-Label Findings. As part of each Annual Report, InterMune shall provide the OIG with copies of the underlying records of the detailing interactions, a copy of InterMune's Off-Label Findings, and a description of the action(s), if any, InterMune took in response to the Off-Label Findings.

## IV.    NEW BUSINESS UNITS OR LOCATIONS

In the event that, after the Effective Date, InterMune changes locations or sells, closes, purchases, or establishes a new business unit or location, InterMune shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change of location, sale, closure, purchase, or establishment. This notification shall include the address of the new business unit or location, phone number, fax number, any Federal health care program provider identification number and/or supplier number, and any corresponding contractor's name and address that has issued each Federal health care program provider number. Each new business unit or location shall be subject to all the requirements of this CIA.

## V.    IMPLEMENTATION AND ANNUAL REPORTS

A. Implementation Report. Within 120 days after the Effective Date, InterMune shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

1.   a copy of the letter (including all attachments) required by Section III.B sent to each entity which employs Third Party Personnel; ii) a list of all existing distribution, purchase, joint venture and/or co-marketing agreements; and iii) a description of the entities' response to InterMune's letter;

2.   the name, address, phone number, and position description of the Compliance Officer required by Section III.A, and a summary of other noncompliance job responsibilities the Compliance Officer may have;

3.   the names and positions of the members of the Compliance Committee required by Section III.A;

4.   a copy of InterMune's Code of Conduct required by Section III.B.1;

5.   a copy of all Policies and Procedures required by Section III.B.2;

6.   the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG, upon request);

7.   the following information regarding each type of training required by Section III.C:

   a.   a description of such training, including a summary of the topics covered, the length of sessions and a schedule of training sessions;

   b.   the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be available to OIG, upon request.

8.   a description of the Disclosure Program required by Section III.E;

9.   the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; (c) a summary and description of any and all current and prior engagements and agreements between InterMune and the IRO; and (d) the proposed start and completion dates of each Review;

10. a certification from the IRO regarding its professional independence and/or objectivity with respect to InterMune;

11. a description of the process by which InterMune fulfills the requirements of Section III.F regarding Ineligible Persons;

12. the name, title, and responsibilities of any person who is determined to be an Ineligible Person under Section III.F; and the actions taken in response to the screening and removal obligations set forth in Section III.F;

13. a list of all of InterMune's locations (including locations and mailing addresses); the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Federal health care program provider and/or supplier number(s) (if applicable); and the name and address of each Federal health care program contractor to which InterMune currently submits claims (if applicable);

14. a description of InterMune's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and

15. the certifications required by Section V.C.

B. Annual Reports. InterMune shall submit to OIG annually a report with respect to the status of, and findings regarding, InterMune's compliance activities for each of the 5 Reporting Periods (Annual Report).

Each Annual Report shall include, at a minimum:

1. a copy of the letter (including all attachments) required by Section III.B sent to each entity which employs Third Party Personnel; ii) a list of all existing distribution, purchase, joint venture and/or co-marketing agreements; and iii) a description of the entities' response to InterMune's letter to the OIG;

2. any change in the identity, position description, or other noncompliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in Section III.A;

3. a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (e.g., change in contractor policy) and copies of any compliance-related Policies and Procedures;

4. the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG, upon request);

5. the following information regarding each type of training required by Section III.C:

a. a description of such training, including a summary of the topics covered, the length of sessions and a schedule of training sessions;

     b.  the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be available to OIG, upon request.

     6.  a complete copy of all reports prepared pursuant to Section III.D, along with a copy of the IRO's engagement letter (if applicable);

     7.  InterMune's response and corrective action plan(s) related to any issues raised by the reports prepared pursuant to Section III.D;

     8.  a summary and description of any and all current and prior engagements and agreements between InterMune and the IRO, if different from what was submitted as part of the Implementation Report;

     9.  a certification from the IRO regarding its professional independence and/or objectivity with respect to InterMune;

     10. a summary of all internal reviews, audits, or analyses related to Product Services Related Functions (including, at a minimum, the objective of the review, audit, or analysis; the protocol or methodology for the review, audit, or analysis; and the results of the review, audit, or analysis) and any corrective action plans developed in response to such reviews, audits, or analyses;

     11. a summary of Reportable Events (as defined in Section III.H) identified during the Reporting Period and the status of any corrective and preventative action relating to all such Reportable Events;

     12. a summary of the disclosures in the disclosure log required by Section III.E that relate to Federal health care programs or to FDA requirements;

     13. any changes to the process by which InterMune fulfills the requirements of Section III.F regarding Ineligible Persons;

     14. the name, title, and responsibilities of any person who is determined to be an Ineligible Person under Section III.F; the actions taken by InterMune in response to the screening and removal obligations set forth in Section III.F;

     15. a summary describing any ongoing communication with the FDA required to have been reported pursuant to Section III.I. The summary shall include a description of the matter, and the status of such matter;

     16. a copy of all information required by Section III.J;

     17. a list and description of all actively promoted InterMune products; and information about the estimated relative usage (e.g., the percentage) of those products for off-label purposes;

18. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.G. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

19. a description of all changes to the most recently provided list of InterMune's locations (including addresses) as required by Section V.A.13; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Federal health care program provider number(s), and/or supplier number(s); and the name and address of each Federal healthcare program contractor to which InterMune currently submits claims (if applicable); and

20. the certifications required by Section V.C.

The first Annual Report shall be received by OIG no later than 60 days after the end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C. Certifications. The Implementation Report and Annual Reports shall include a certification by the Compliance Officer that:

1. to the best of his or her knowledge, except as otherwise described in the applicable report, InterMune is in compliance with all of the requirements of this CIA;

2. he or she has reviewed the Report and has made reasonable inquiry regarding its content and believes that the information in the Report is accurate and truthful;

3. if applicable, InterMune has complied with its obligations under the Settlement Agreement: (a) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b) not to charge to or otherwise seek payment from federal or state payors for unallowable costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past charges or claims for unallowable costs; and

4. InterMune's: 1) Policies and Procedures as referenced in Section III.B.2 above; 2) templates for standardized contracts and other similar documents; 3) training materials used for purposes of Section III.C, above; and 4) promotional or educational materials containing claims or information about InterMune's products have been reviewed by competent legal counsel and have been found to be in compliance with the requirements of the Federal anti-kickback statute, the Prescription Drug Marketing Act, and other applicable laws. If the applicable legal requirements have not changed, after the initial review of the documents listed above, only material changes to the documents must be reviewed by competent legal counsel. The certification shall include a description of the document(s) reviewed and approximately when the review was completed. The documentation supporting this certification shall be available to OIG, upon request.

D. Designation of Information. InterMune shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and

privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. InterMune shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI.    NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:

> Administrative and Civil Remedies Branch
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, S.W.
> Washington, DC 20201
> Telephone: 202.619.2078
> Facsimile: 202.205.0604

InterMune:

> Malcolm McKay
> Compliance Officer
> InterMune, Inc.
> 3280 Bayshore Blvd.
> Brisbane, CA 94005
> Telephone: 415.466.2284
> Facsimile: 415.466.2384

With a copy to:

> Robin Steele
> Senior Vice President
> General Counsel and Corporate Secretary
> InterMune, Inc.
> 3280 Bayshore Blvd.
> Brisbane, CA 94005
> Telephone: 415.466.2264
> Facsimile: 415.508.0006

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt.

## VII.    OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of InterMune's books,

records, and other documents and supporting materials and/or conduct on-site reviews of any of InterMune's locations for the purpose of verifying and evaluating: (a) InterMune's compliance with the terms of this CIA; and (b) InterMune's compliance with the requirements of the Federal health care programs in which it participates and with applicable FDA requirements. The documentation described above shall be made available by InterMune to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of InterMune's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. InterMune shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. InterMune's employees may elect to be interviewed with or without a representative of InterMune present.

## VIII. DOCUMENT AND RECORD RETENTION

InterMune shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs, or to compliance with this CIA, for 6 years (or longer if otherwise required by law) from the Effective Date.

## IX. DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify InterMune prior to any release by OIG of information submitted by InterMune pursuant to its obligations under this CIA and identified upon submission by InterMune as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, InterMune shall have the rights set forth at 45 C.F.R. § 5.65(d).

## X. BREACH AND DEFAULT PROVISIONS

InterMune is expected to fully and timely comply with all of its CIA obligations. A breach of this CIA does not constitute a breach of the Settlement Agreement or the Deferred Prosecution Agreement between InterMune and the United States executed simultaneously herewith. Similarly, a breach of this CIA does not constitute a breach of the settlement agreements with individual States referenced in the preamble. Any breach of the terms of those agreements does not constitute a breach of this CIA, except to the extent that such a breach independently also constitutes a breach of this CIA. Section X of this CIA specifies all of the remedies available to the OIG if InterMune fails to satisfy its obligations under this CIA. The remedies available to the OIG under this Section X do not preempt or limit any actions that the United States or any individual States may take against InterMune under any separate appropriate authorities.

A. Stipulated Penalties for Failure to Comply with Certain Obligations. As a contractual remedy, InterMune and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1.  A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day InterMune fails to establish and implement any of the following obligations as described in Section III:

   a.  a Compliance Officer;

   b.  a Compliance Committee;

   c.  a written Code of Conduct;

   d.  written Policies and Procedures;

   e.  the training of Covered Persons;

   f.  a Disclosure Program;

   g.  Ineligible Persons screening and removal requirements;

   h.  Notification of Government investigations or legal proceedings;

   i.  notification of communications regarding off-label related matters; and

   j.  a review of records reflecting the content of detailing sessions.

2.  A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day InterMune fails to engage an IRO, as required in Section III.D and Appendices A and B.

3.  A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day InterMune fails to submit the Implementation Report or the Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

4.  A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day InterMune fails to submit the annual Report associated with any of the Reviews in accordance with the requirements of Section III.D and Appendix B.

5.  A Stipulated Penalty of $1,500 for each day InterMune fails to grant access to the information or documentation as required in Section VII.  (This Stipulated Penalty shall begin to accrue on the date InterMune fails to grant access.)

6.  A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of InterMune as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

7.  A Stipulated Penalty of $1,000 for each day InterMune fails to comply fully and adequately with any obligation of this CIA.  OIG shall provide notice to InterMune, stating the specific grounds for its determination that InterMune has failed to comply fully and

adequately with the CIA obligation(s) at issue and steps InterMune shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after InterMune receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1-6 of this Section.

B. <u>Timely Written Requests for Extensions</u>. InterMune may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after InterMune fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after InterMune receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C. <u>Payment of Stipulated Penalties</u>.

1. *Demand Letter*. Upon a finding that InterMune has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify InterMune of: (a) InterMune's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties (this notification is referred to as the "Demand Letter").

2. *Response to Demand Letter*. Within 10 days after the receipt of the Demand Letter, InterMune shall either: (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties; or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E. In the event InterMune elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until InterMune cures, to OIG's satisfaction, the alleged breach in dispute. Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

3. *Form of Payment*. Payment of the Stipulated Penalties shall be made by certified or cashier's check, payable to: "Secretary of the Department of Health and Human Services," and submitted to OIG at the address set forth in Section VI.

4. *Independence from Material Breach Determination*. Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that InterMune has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

D. Exclusion for Material Breach of this CIA.

    1. *Definition of Material Breach.* A material breach of this CIA means:

        a. a failure by InterMune to report a Reportable Event, and take corrective action, as required in Section III.H;

        b. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

        c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C; or

        d. a failure to engage and use an IRO in accordance with Section III.D and Appendices A-B.

    2. *Notice of Material Breach and Intent to Exclude.* The parties agree that a material breach of this CIA by InterMune constitutes an independent basis for InterMune's exclusion from participation in the Federal health care programs. Upon a determination by OIG that InterMune has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify InterMune of: (a) InterMune's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").

    3. *Opportunity to Cure.* InterMune shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

        a. InterMune is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

        b. the alleged material breach has been cured; or

        c. the alleged material breach cannot be cured within the 30-day period, but that: (i) InterMune has begun to take action to cure the material breach; (ii) InterMune is pursuing such action with due diligence; and (iii) InterMune has provided to OIG a reasonable timetable for curing the material breach.

    4. *Exclusion Letter.* If, at the conclusion of the 30-day period, InterMune fails to satisfy the requirements of Section X.D.3, OIG may exclude InterMune from participation in the Federal health care programs. OIG shall notify InterMune in writing of its determination to exclude InterMune (this letter shall be referred to hereinafter as the "Exclusion Letter"). Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of InterMune's receipt of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and nonprocurement programs. Reinstatement to program participation is not automatic. After the end of the period of exclusion, InterMune may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. Dispute Resolution

     1. *Review Rights.* Upon OIG's delivery to InterMune of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, InterMune shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. § 1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

     2. *Stipulated Penalties Review.* Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether InterMune was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance. InterMune shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders InterMune to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless InterMune requests review of the ALJ decision by the DAB. If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

     3. *Exclusion Review.* Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

     a.  whether InterMune was in material breach of this CIA;

     b.  whether such breach was continuing on the date of the Exclusion Letter; and

     c.  whether the alleged material breach could not have been cured within the 30-day period, but that: (i) InterMune had begun to take action to cure the material breach within that period; (ii) InterMune has pursued and is pursuing such action with due diligence; and (iii) InterMune provided to OIG within that period a reasonable timetable for curing the material breach and InterMune has followed the timetable.

     For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for InterMune, only after a DAB decision in favor of OIG. InterMune's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude InterMune upon the issuance of an ALJ's decision in favor of OIG.

If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that InterMune may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. InterMune shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of InterMune, InterMune shall be reinstated effective on the date of the original exclusion.

       4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI.   EFFECTIVE AND BINDING AGREEMENT

       Consistent with the provisions in the Settlement Agreement pursuant to which this CIA is entered, InterMune and OIG agree as follows:

       A. This CIA shall be binding on the successors, assigns, and transferees of InterMune;

       B. This CIA shall become final and binding on the date the final signature is obtained on the CIA;

       C. Any modifications to this CIA shall be made with the prior written consent of the parties to this CIA;

       D. The undersigned InterMune signatories represent and warrant that they are authorized to execute this CIA. The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

OCT-23-2006 MON 08:23 PM HOTEL MONACO          FAX NO. 8015328500          P. 02

ON BEHALF OF INTERMUNE, INC.

_____          DATE  October 24, 2006
Robin Steele
Senior Vice President and General Counsel
InterMune, Inc.

_____          DATE  10/24/06
Malcolm McKay
Compliance Officer
InterMune, Inc.

_____          DATE  10-24-06
Ethan Posner, Esq.
Counsel for InterMune, Inc.

Corporate Integrity Agreement SIGNED FINAL          26
October 24th, 2006

ON BEHALF OF THE OFFICE OF INSPECTOR
GENERAL OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES


10/25/06
DATE

Gregory E. Demske
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human
Services

27

# APPENDIX A
## INDEPENDENT REVIEW ORGANIZATION

This Appendix contains the requirements relating to the Independent Review Organization (IRO) required by Section III.D of the CIA.

A.     IRO Engagement.

InterMune shall engage an IRO that possesses the qualifications set forth in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO shall conduct the review in a professionally independent and/or objective fashion, as set forth in Paragraph D. Within 30 days after OIG receives written notice of the identity of the selected IRO, OIG will notify InterMune if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, InterMune may continue to engage the IRO.

If InterMune engages a new IRO during the term of the CIA, this IRO shall also meet the requirements of this Appendix. If a new IRO is engaged, InterMune shall submit the information identified in Section V.A.9 to OIG within 30 days of engagement of the IRO. Within 30 days after OIG receives written notice of the identity of the selected IRO, OIG will notify InterMune if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, InterMune may continue to engage the IRO.

B.     IRO Qualifications.

The IRO shall:

    1.     assign individuals to conduct the Promotional and Product Services Engagement who have expertise in the Federal health care program and FDA requirements applicable to sales, marketing, research, and promotion of pharmaceutical products. The assigned individuals shall also be knowledgeable about the general requirements of the Federal health care program(s) under which InterMune products are reimbursed;

    2.     assign individuals to design and select the Promotional and Product Services Engagement samples who are knowledgeable about the appropriate statistical sampling techniques; and

    3.     have sufficient staff and resources to conduct the reviews required by the CIA on a timely basis.

C.     IRO Responsibilities.

The IRO shall:

    1.     perform each Promotional and Product Services Engagement in accordance with the specific requirements of the CIA, including Appendix B to the CIA;

1

2.  follow all applicable Federal health care program and FDA requirements in making assessments in Promotional and Product Services Engagement;

3.  respond to all OIG inquires in a prompt, objective, and factual manner; and

4.  prepare timely, clear, well-written reports that include all the information required by Appendices A and B.

D.  IRO Independence/Objectivity.

The IRO must perform the Promotional and Product Services Engagement in a professionally independent and/or objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or engagements that may exist between the IRO and InterMune.

E.  IRO Removal/Termination.

1.  *Provider.* If InterMune terminates its IRO during the course of the engagement, InterMune must submit a notice explaining its reasons to OIG no later than 30 days after termination. InterMune must engage a new IRO in accordance with Paragraph A of this Appendix.

2.  *OIG Removal of IRO.* In the event OIG has reason to believe that the IRO does not possess the qualifications described in Paragraph B, is not independent and/or objective as set forth in Paragraph D, or has failed to carry out its responsibilities as described in Paragraph C, OIG may, at its sole discretion, require InterMune to engage a new IRO in accordance with Paragraph A of this Appendix.

    Prior to requiring InterMune to engage a new IRO, OIG shall notify InterMune of its intent to do so and provide a written explanation of why OIG believes such a step is necessary. To resolve any concerns raised by OIG, InterMune may request a meeting with OIG to discuss any aspect of the IRO's qualifications, independence or performance of its responsibilities and to present additional information regarding these matters. InterMune shall provide any additional information as may be requested by OIG under this Paragraph in an expedited manner. OIG will attempt in good faith to resolve any differences regarding the IRO with InterMune prior to requiring InterMune to terminate the IRO. However, the final determination as to whether or not to require InterMune to engage a new IRO shall be made at the sole discretion of OIG.

2

**Appendix B to CIA for InterMune, Inc.**
**Promotional and Product Services Engagement**

## I.    IRO Engagement, General Description

As specified more fully below, InterMune shall retain an Independent Review Organization(s) (IRO) to perform engagements to assist InterMune in assessing and evaluating its systems, processes, policies, and procedures related to sales, marketing, promotion, and product services activities (Promotional and Product Services Engagement). The Promotional and Product Services Engagement shall consist of two components - a systems review (the Promotional and Product Services Systems Review) and a transactions review (the Promotional and Product Services Transactions Review), as described more fully below. InterMune may engage, at its discretion, a single entity to perform both components of the Promotional and Product Services Engagement, provided that the entity has the necessary expertise and capabilities to perform both.

As set forth below and in the CIA, InterMune shall engage an IRO to conduct the Promotional and Product Services Transactions Review for each year of the CIA. If there are no material changes in InterMune's systems, processes, policies, and practices relating to Product Services Related Functions, the IRO shall perform the Promotional and Product Services Systems Review for two Reporting Periods to be selected by the OIG. The OIG will not require a Systems Review in the first Reporting Period.

If InterMune materially changes its systems, processes, policies, and practices relating to Product Services Related Functions, then the IRO shall perform a Promotional and Product Services Systems Review for the Reporting Period(s) in which such changes were made in addition to conducting the Review for the two Reporting Periods selected by the OIG. The additional Systems Review(s) shall consist of: 1) an identification of the material changes; 2) an assessment of whether other systems, processes, policies, and practices previously reported did not materially change; and 3) a review of the systems, processes, policies, and practices that materially changed.

## II.    Promotional and Product Services Systems Review

## A.    Description of Reviewed Policies and Practices

The Promotional and Product Services Systems Review shall be a review of InterMune's systems, processes, policies, and procedures (including the controls on those systems, processes, policies, and procedures) relating to Product Services Related Functions. For at least two Reporting Periods, the IRO shall review InterMune's systems, processes, policies, and procedures associated with the following (hereafter "Reviewed Policies and Practices"):

1. InterMune's systems, policies, processes, and procedures applicable to the manner in which InterMune representatives (including sales personnel and/or Medical Science Liaisons (MSLs)) handle requests or inquiries relating to information about off-label uses of InterMune products, and the manner in which

1

InterMune disseminates materials relating to off-label uses of products. This review includes:

(i)    the manner in which field personnel and/or Medical Affairs receive and respond to requests for information about off-label uses;

(ii)    the form and content of information disseminated by Medical Affairs;

(iii)    InterMune's internal review process for the information disseminated by Medical Affairs;

(iv)    InterMune's systems, processes, and procedures (including its Medical Affairs Inquiries Database) to track requests for information about off-label uses of products and responses to those requests;

(v)    the manner in which InterMune collects and supports information reported in its Medical Affairs Inquiries Database;

(vi)    the processes and procedures by which the Compliance Officer (and other appropriate individuals within InterMune) identify situations in which it appears that improper off-label promotion may have occurred; and

(vii)    InterMune's processes and procedures for investigating, documenting, resolving, and taking appropriate disciplinary action for potential situations involving off-label promotion;

2.    InterMune's policies and procedures applicable to the manner and circumstances under which Medical Affairs personnel (including MSLs) participate in meetings or events with physicians, pharmacists, or other health care professionals (HCPs) (either alone or with members of the sales force) and the role of the Medical Affairs personnel at such meetings or events;

3.    InterMune's systems, policies, processes, and procedures relating to the retention of HCPs as consultants (*e.g.*, including as members of advisory boards, focus groups, or clinical research project teams) or speakers. This shall include a review of:

(i)    the criteria used to determine whether, how many, and under what circumstances (including the venue for the performance of any services) InterMune will enter contracts for such consulting or speaking arrangements;

(ii)    the processes and criteria used to identify and select HCPs with whom InterMune enters consultant, speaker, or other contractual arrangements, including the role played by sales representatives in the process. This includes a review of InterMune's internal review and

2

approval process for such contracts, and the circumstances under which there may be exceptions to the process;

(iii)  InterMune's tracking or monitoring of services provided or the work performed by the consultants or speakers (including the receipt of the consultants' work product, if any);

(iv)  InterMune's policies and procedures related to circumstances, if any, under which the recipient or the recipient's agent is required to disclose the existence of the consulting or speaking arrangement in place between InterMune and the HCP;

(v)  the uses made of work product received from consultants or speakers, if any;

(vi)  InterMune's processes for establishing the amounts paid to HCPs and the reasons or justifications for any differentials in the amounts paid to different HCPs;

(vii) the criteria used to determine under what circumstances entertainment, recreation, travel, lodging, meals and/or other items or reimbursements are provided to consultants or speakers, and InterMune's processes for establishing the amounts reimbursed or the type of entertainment or recreation provided;

(viii)whether and in what manner InterMune tracks or monitors the prescribing habits or product use of individuals or entities with whom it enters consulting, speakers, or other contractual arrangements, if any; and

(ix)  the budget funding source within InterMune (*e.g.*, department or division) for the consulting or contractual arrangement;

4.  InterMune's systems, policies, processes, and procedures relating to funding or sponsorship of any Educational or Informational Activity.  This review shall include a review of the following items:

(i)  the processes and procedures used to approve the funding or sponsorship of an Educational or Informational Activity;

(ii)  the criteria used to determine whether and under what circumstances the funding or sponsorship will be provided;

(iii)  the processes and criteria used to select recipients of the funding or sponsorships, including the role played by sales representatives in the processes (if any), and the circumstances under which there may be exceptions to the processes;

3

(iv)  InterMune's policies and procedures related to circumstances, if any, under which the recipient or the recipient's agent is required to disclose InterMune's funding or sponsorship and any financial relationship InterMune may have with the recipients;

(v)  InterMune's policies or procedures for determining and memorializing the amounts paid to recipients of the funding or sponsorship and the purpose or justifications for the amounts paid;

(vi)  InterMune's policies and procedures relating to the independence of any programs funded through the funding or sponsorship;

(vii) InterMune's policies and procedures relating to the content and promotional nature of any programs sponsored through the funding or sponsorships;

(viii) whether and in what manner InterMune tracks or monitors the prescribing habits or product use of individuals or entities receiving the funding or sponsorship, if any; and

(ix)  the budget funding source within InterMune (*e.g.*, department or division) from which the funding or sponsorships are provided;

5.  InterMune's systems, policies, processes, and procedures relating to funding or sponsorship of research agreements, grants, and/or research collaborations (including clinical trials and independent research) (collectively "Research Activities"). This review shall include a review of the following items:

(i)  the processes and procedures used by InterMune to approve funding for Research Activities;

(ii)  the criteria used to determine whether, and under what circumstances, InterMune will fund or otherwise participate in the Research Activities;

(iii)  the processes and criteria used to select the recipients of funding for Research Activities, including the role played by any InterMune field personnel in the processes (if any), and the circumstances under which there may be exceptions to the processes;

(iv)  InterMune's policies and procedures for requiring the recipient of the funding to disclose InterMune's participation in or funding of Research Activities and any financial relationship InterMune may have with the recipient;

(v)  InterMune's policies or procedures for determining and memorializing the amounts paid to participants in the Research Activities and the purpose or justifications for the amounts paid;

4

(vi)  InterMune's policies and procedures relating to the independence of the Research Activities funded by InterMune;

(vii)  whether and in what manner InterMune tracks or monitors the prescribing habits or product use of individuals or entities receiving funding or otherwise participating in the Research Activities, if any; and

(viii) the budget funding source within InterMune (*e.g.*, department or division) for the Research Activity;

6.  InterMune's systems, policies, processes, and procedures relating to the provision of any gifts, meals, receptions, travel, entertainment or other items of value (collectively "Expenses") to HCPs.  This shall include a review of:

(i)  the criteria used to determine whether, how many, and under what circumstances (including the venue for the performance of any services) InterMune will reimburse for Expenses of HCPs;

(ii)  the processes and criteria used to identify and select HCPs to whom InterMune provides reimbursement of Expenses.  This includes a review of InterMune's internal review and approval process for such Expenses, the circumstances under which there may be exceptions to the processes, and the role played by sales representatives in the process;

(iii)  InterMune's tracking or monitoring of services provided, or the work performed by the HCPs in exchange for the Expenses, if any;

(iv)  the uses made of work product received from HCPs receiving Expenses from InterMune, if any;

(v)  InterMune's processes for establishing the amounts paid to HCPs and the reasons or justifications for any differentials in the amounts paid to different HCPs;

(vi)  whether and in what manner InterMune tracks or monitors the prescribing habits or product use of HCPs who receive Expenses from InterMune, if any; and

(vii)  the budget funding source within InterMune (*e.g.*, department or division) for the Expenses;

7.  InterMune's systems, policies, processes, and procedures relating to charitable contributions by InterMune.  This review shall include a review of the following items:

(i)  the processes and procedures used to approve charitable contributions;

(ii)   the criteria used to determine whether and under what circumstances the charitable contributions will be provided;

(iii)  the processes and criteria used to select and approve recipients of the charitable contributions, including the role played by field personnel in the processes (if any), and the circumstances under which there may be exceptions to the processes;

(iv)  InterMune's policies and procedures related to circumstances, if any, under which the recipient or the recipient's agent is required to disclose InterMune's charitable contribution and any financial relationship InterMune may have with the recipients;

(v)   InterMune's policies or procedures for determining and memorializing the amounts paid to recipients of the charitable contribution and the purpose or justifications for the amounts paid;

(vi)  InterMune's policies and procedures relating to the independence of any programs funded through the charitable contribution;

(vii) InterMune's policies and procedures relating to the content and promotional nature of any programs sponsored through the charitable contributions;

(viii) whether and in what manner InterMune tracks or monitors the prescribing habits or product use of individuals or entities receiving the charitable contribution, if any; and

(ix)  the budget funding source within InterMune (*e.g.*, department or division) from which the charitable contributions are provided;

8.   InterMune's systems, policies, processes, and procedures relating to internal reviews conducted by: (i) InterMune's Medical Review Committee; and (ii) InterMune's Promotional Review Committee;

9.   InterMune's systems, policies, processes, and procedures for tracking expenditures (individual and aggregate) associated with the Reviewed Policies and Practices;

10. InterMune's policies, processes, and procedures relating to the disciplinary actions that InterMune may impose in the event a Covered Person violates a InterMune policy or procedure;

11. InterMune's systems, polices, processes and procedures for compensating (including with salaries and bonuses) non-Overtime Eligible employees, with regard to whether the systems, policies, processes, and procedures are designed to ensure that financial incentives do not inappropriately motivate sales and marketing personnel to engage in the improper promotion, sales, and marketing of

InterMune's products. This shall include a review of the bases upon which compensation is determined and the extent to which compensation is based on product performance; and

12. InterMune's systems, processes, policies, and procedures relating to the development of call plans for InterMune's sales staff. This shall include a review of the basis upon which specialties are included or excluded from the call plan based upon their potential on-label and off-label utilization of InterMune products promoted by the sales staff.

**B.     Promotional and Product Services Systems Review Report**

The IRO shall prepare a report based upon its Systems Review. For each of the Reviewed Policies and Practices identified in Section II.A above, the report shall include the following items:

a)      a description of the documentation (including policies) reviewed and any personnel interviewed;

b)      a detailed description of InterMune's systems, policies, processes, and practices with regard to the items identified in Sections II.A.1-12 above, including a general description of InterMune's control and accountability systems (*e.g.*, documentation and approval requirements, tracking mechanisms) and written policies regarding the Reviewed Policies and Practices;

c)      a description of the manner in which the control and accountability systems and the written policies relating to the items identified in Sections II.A.1-12 above are made known or disseminated within InterMune;

d)      a detailed description of any system used to track and respond to requests for information about InterMune's products that come to Medical Affairs;

e)      a description of InterMune's systems, policies, processes, and procedures for tracking expenditures associated with the Reviewed Policies and Practices or other promotional activities;

f)      a general description of the disciplinary measures InterMune has established for failure to comply with its systems, processes, policies and procedures relating to the Reviewed Policies and Practices;

g)      a detailed description of InterMune's compensation system (including salaries and bonuses) for non-Overtime Eligible employees, including a description of the bases upon which compensation is determined and the extent to which compensation is based on product performance. To the extent that InterMune may establish compensation differently for individual products, the IRO shall report separately on each such type of compensation arrangement;

7

     h)     findings and supporting rationale regarding any weaknesses in InterMune's systems, processes, policies, and practices relating to the Reviewed Policies and Practices, if any; and

     i)     recommendations to improve any of the systems, policies, processes, or practices relating to the Reviewed Policies and Practices, if any.

Prior to the IRO's submission of the report to the OIG, InterMune shall be provided with a copy of the report and an opportunity to respond to each comment made by the IRO. Provided it does not delay the timely filing of the Annual Reports, any responses by InterMune may be included in the IRO report submitted to the OIG. Otherwise, any responses by InterMune to the IRO's findings may be submitted separately to the OIG following the Annual Report submission.

## III.    Promotional and Product Services Transactions Review

The IRO shall conduct a Promotional and Product Services Transactions Review for each of the Reporting Periods. As described below, the Transactions Review shall include reviews of a sample of Inquiries reflected in the Medical Affairs Inquiries Database.

### A.    Promotional and Product Services Transactions Review

    1.    Review of Inquiries Made to Medical Affairs Group

InterMune has in place a policy addressing the discussion and dissemination of information about non-FDA approved uses of products (off-label information). This policy provides, among other things, that Covered Persons may not directly or indirectly solicit, encourage, or promote unapproved uses of a product to HCPs. InterMune also has established a Medical Affairs unit to respond to requests for information about off-label uses of InterMune products.

    a)    Information To Be Included in Medical Affairs Inquiries Database

InterMune shall document and record all inquiries that Medical Affairs receives from HCPs regarding Actimmune or other InterMune products in a database (Medical Affairs Inquiries Database). Medical Affairs shall record in the Medical Affairs Inquiries Database the following information about each unique inquiry (Inquiry) received for information about InterMune's products: 1) date of inquiry; 2) form of inquiry (*e.g.*, fax, phone, etc.); 3) name of requesting HCP; 4) nature and topic of request (including exact language of the inquiry if made in writing); 5) an evaluation of whether the inquiry relates to information about an off-label indication for the product; 6) nature/form of the response from InterMune (including a record of the materials provided to the HCP in response to the request); 7) the name of the InterMune representative who called on or interacted with the HCP; and 8) the status and findings of any follow-up review conducted by InterMune in situations in which improper off-label promotion is suspected.

    b)    Internal Review of Medical Affairs Inquiries Database

On a semi-annual basis, the Compliance Officer or other appropriate personnel shall review the Medical Affairs Inquiries Database and related information, as appropriate, and shall generate a report summarizing the items of information outlined in Section III.A.1.a above for each Inquiry handled by Medical Affairs during the preceding two quarters (the Medical Affairs Inquiry Report). On a semi-annual basis, the Compliance Officer shall review the Medical Affairs Inquiry Reports to assess whether the information contained in the report suggests that improper off-label promotion may have occurred in connection with any Inquiry(ies). If the Compliance Officer, in consultation with other appropriate InterMune personnel, suspects that improper off-label promotion may have occurred in connection with one or more Inquiries, the Compliance Officer shall undertake a follow-up review of the Inquiry (Off-Label Review), make findings based on his/her Off-Label Review, and take any responsive action (including disciplinary action) deemed necessary and appropriate.

      c)    IRO Review

As part of the Promotional and Product Services Transactions Review, the IRO shall evaluate InterMune's processes relating to its Medical Affairs Inquiries Database. Specifically, the IRO shall select a random sample of 50 Inquiries from among the Inquiries reflected in the Medical Affairs Inquiries Database for each Reporting Period. One half of the Inquiries reviewed by the IRO shall be Inquiries for which InterMune conducted an Off-Label Review, and the other half shall be Inquiries for which InterMune did not conduct an Off-Label Review.

For each Inquiry reviewed, the IRO shall determine:

      (i)    whether each item of information listed above in Section III.A.1.a is reflected in the Medical Affairs Inquiries Database for each reviewed Inquiry; and

      (ii)    for each Inquiry for which the Compliance Officer conducted an Off-Label Review, the basis for suspecting that improper off-label promotion may have occurred; the steps undertaken as part of the Off-Label Review; the findings of the Compliance Officer as a result of the Off-Label Review; and any follow-up actions taken by InterMune based on the Compliance Officer's findings.

**B.    Promotional and Product Services Transactions Review Report**

For each Reporting Period, the IRO shall prepare a Report based on its Promotional and Product Services Transactions Review. Each Report shall include the following:

      1.    *Elements to Be Included*:

          a.    Promotional and Product Services Transactions Review Objectives: A clear statement of the objectives intended to be achieved by the Review;

b.  Engagement Protocol: A detailed narrative description of the procedures performed and a description of the universe of Inquiries from which samples were selected; and

c.  Sources of Data: A full description of documentation (and/or other information) relied upon by the IRO when performing the Promotional and Product Services Transactions Review.

2.  <u>Results to Be Included</u>:

The following results shall be included in each Promotional and Product Services Transactions Review Report:

a.  a description of each type of sample unit reviewed, including the number of each type of sample reviewed (i, e., the number of Inquiries) and an identification of the types of documents and information reviewed for the Inquiries;

b.  for each Inquiry sample unit, the IRO shall summarize the information contained in the Medical Affairs Inquiry Database about the Inquiry;

c.  for each Inquiry sample unit, the IRO shall state its findings and supporting rationale as to whether: (i) each item of information listed in Section III.A.1.a is reflected in the Medical Affairs Inquiries Database for each reviewed Inquiry; and (ii) for each Inquiry for which the Compliance Officer conducted an Off-Label Review, the basis for suspecting that improper off-label promotion may have occurred; the steps undertaken as part of the Off-Label Review; the findings of the Compliance Officer as a result of the Off-Label Review; and any follow-up actions taken by InterMune as a result of the Compliance Officer's findings;

d.  the findings and supporting rationale regarding any weaknesses in InterMune's systems, processes, policies, and practices relating to the Inquiries, if any; and

e.  recommendations for improvement in InterMune's systems, processes, policies, and practices relating to the Inquiries, if any.

10

# Exhibit F

E-filing ## United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO



CR 08 0164

UNITED STATES OF AMERICA,

V.

CRB

## W. SCOTT HARKONEN

### DEFENDANT(S).

# INDICTMENT

18 U.S.C. §1343 - Wire Fraud;
18 U.S.C. § 2 - Aiding and Abetting;
21 U.S.C. §§ 331(k), 333(a)(2) and 352(a) - Doing acts, with intent to
defraud and mislead, resulting in drugs being misbranded while held
for sale following shipment in interstate commerce

A true bill.

_Elizabeth Falk_
Foreman

Filed in open court this _18th_ day of

_March 2008._

_Karen L. Hom_

~~JOSEPH C. SPERO~~    KAREN L. HOM
UNITED STATES MAGISTRATE JUDGE    Clerk

Bail, $ _no process_

AO 257 (Rev. 6/78)

| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** |

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT
☐ SUPERSEDING

─── **OFFENSE CHARGED** ───

See attached                    ☐ Petty
                                ☐ Minor
*E-filing*                      ☐ Misde-
                                    meaner
                                ☒ Felony
PENALTY:   See attached

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

─── **DEFENDANT - U.S** ───

  W. SCOTT HARKONEN

  DISTRICT COURT NUMBER

  CR **08** — **0164**   CRB

─── **PROCEEDING** ───

Name of Complainant Agency, or Person (& Title, if any)

U.S. FOOD AND DRUG ADMINISTRATION

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
}  SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
}  MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person
Furnishing Information on this form    Brian J. Stretch, Acting USA
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)    IOANA PETROU

**DEFENDANT**

**IS *NOT* IN CUSTODY**
    Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior ▶
    summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
}  ☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges
    If answer to (6) is "Yes", show name of institution

Has detainer ☐ Yes    If "Yes"
been filed?  ☐ No      give date filed

**DATE OF ARREST** ▶        Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

─── **ADDITIONAL INFORMATION OR COMMENTS** ───

PROCESS:
☒ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT    Bail Amount: _____

If Summons, complete following:
☒ Arraignment  ☐ Initial Appearance
Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: 3/28/08 @ 9:30 am    Before Judge:  JOSEPH C. SPERO

Comments:

**PENALTY SHEET ATTACHMENT**                    W. SCOTT HARKONEN

OFFENSES:

COUNT ONE:

18 U.S.C. §1343 – WIRE FRAUD

18 U.S.C. § 2 – AIDING AND ABETTING

COUNT TWO:

21 U.S.C. §§ 331(K), 333(A)(2) AND 352(A) – DOING ACTS, WITH INTENT TO
DEFRAUD AND MISLEAD, RESULTING IN DRUGS BEING MISBRANDED
WHILE HELD FOR SALE FOLLOWING SHIPMENT IN INTERSTATE COMMERCE

PENALTIES:

COUNT ONE:

18 U.S.C. §1343 – 20 YEARS IMPRISONMENT, $250,000 FINE, 3 YEARS
SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT

COUNT TWO:

21 U.S.C. §§ 331(K), 333(A)(2) AND 352(A) – 3 YEARS IMPRISONMENT, ~~$10,000~~
$250,000 FINE, 1 YEAR SUPERVISED RELEASE, $100 SPECIAL ASSESSMENT

1  BRIAN J. STRETCH (CABN 163973)
   Acting United States Attorney
2

3

4                           E-filing

5

6

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,          )   No.
                                       )
13          Plaintiff,                 )   CR 08   0164
                                       )   VIOLATIONS:
14                                     )
        v.                             )   18 U.S.C. §1343 - Wire Fraud;
15                                     )   18 U.S.C. § 2 - Aiding and Abetting;
                                       )   21 U.S.C. §§ 331(k), 333(a)(2) and
16                                     )   352(a) - Doing acts, with intent to
    W. SCOTT HARKONEN,                 )   defraud and mislead, resulting in drugs
17                                     )   being misbranded while held for sale
        Defendant.                     )   following shipment in interstate
18                                     )   commerce
                                       )
19                                     )
                                       )   SAN FRANCISCO VENUE
20  _____)

21

22                         I N D I C T M E N T

23  The Grand Jury charges:

24              INTRODUCTORY ALLEGATIONS

25      At times relevant to this Indictment:

26      1.      InterMune, Inc. ("InterMune"), was a Delaware corporation that developed,

27  marketed and sold drugs for lung and liver diseases. InterMune's drugs were

28  biopharmaceuticals, which are drugs based on chemicals that the human body produces

INDICTMENT                      -1-

1    naturally. From in or about February 1998 through in or about May 2000, InterMune's

2    principal place of business was in Palo Alto, California. From in or about June 2000

3    through in or about June 2001, InterMune's principal place of business was in

4    Burlingame, California. In June 2001, InterMune moved its principal place of business to

5    Brisbane, California.

6         2.    From April 1999 through March 2000, InterMune was a private corporation

7    without any publicly traded stock. In March 2000, InterMune became a publicly traded

8    company on the New York Stock Exchange and started selling shares of its stock to the

9    public.

10        3.    InterMune marketed and sold a drug called "interferon gamma-1b" under

11   the brand name "Actimmune." Actimmune was a drug regulated and approved by the

12   United States Food and Drug Administration ("FDA") , the federal agency charged with

13   enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq.

14   ("FDCA").

15        4.    Actimmune was approved by the FDA to treat chronic granulomatous

16   disease in or about 1990, as well as approved to treat severe, malignant osteopetrosis in or

17   about 2000. Both of these diseases are rare disorders that primarily affect children.

18        5.    InterMune marketed and sold Actimmune to treat a disease called idiopathic

19   pulmonary fibrosis ("IPF"). IPF is a fatal disease that affects mainly middle-aged people.

20   IPF causes a person's lungs to fill up gradually with fibrotic scar tissue, which eventually

21   prevents the lungs from working and deprives the victim of the ability to breathe.

22        6.    Treating IPF was not an FDA-approved use of Actimmune. The FDA-

23   approved label for a drug states all of the diseases that FDA has approved the drug to

24   treat. An "off-label" use of a drug is the use of a drug to treat a disease for which FDA

25   has not approved the drug and that is not on the drug's FDA-approved label.

26   ///

27   ///

28   ///

7.    InterMune's sales from 2000 through 2003 were as follows:

|              | 2000        | 2001        | 2002         | 2003         |
|--------------|-------------|-------------|--------------|--------------|
| Actimmune:   | $11,201,000 | 36,320,000  | 105,802,000  | 141,402,000  |
| Other products: | -0-      | 3,631,000   | 6,163,000    | 12,736,000   |
| Total sales: | $11,201,000 | 39,950,000  | 111,965,000  | 154,138,000  |

8.    The vast majority of InterMune's sales of Actimmune were for the unapproved, off-label use of treating IPF.

9.    The cost of Actimmune for one IPF patient for one year was approximately $50,000.

10.    Actimmune was manufactured by Genentech, Inc., located in South San Francisco, California, and by subsidiaries of Boehringer Ingelheim, located in Europe. Actimmune was shipped from these manufacturers to InterMune's contract distributor, Cardinal SPS, formerly known as CORD Logistics, a subsidiary of Cardinal Health, Inc., located in Dublin, Ohio. Actimmune was shipped from Cardinal SPS' warehouse in La Vergne, Tennessee, to secondary distributors and pharmacies throughout the United States. These secondary distributors and pharmacies in turn shipped Actimmune to retail locations for distribution to patients, or directly to patients, throughout the United States, including, but not limited to, San Francisco, California.

## The Defendant

11.    Defendant W. SCOTT HARKONEN ("HARKONEN") was the Chief Executive Officer of InterMune from February 1998 through at least June 30, 2003. HARKONEN was also a member of InterMune's Board of Directors from February 1998 through September 2003. He directed all aspects of InterMune's operations, including, but not limited to, research, marketing, and investor relations. HARKONEN was a medical doctor and was licensed to practice medicine in California.

12.    HARKONEN, along with others both known and unknown to the Grand Jury, was responsible for the marketing, distribution, and sale of Actimmune.

//

1 | **FDA Regulation and Approval of Actimmune**

2    13.    The FDCA prohibited the doing of any act with respect to a drug, if the act

3 was done while the drug was held for sale after shipment in interstate commerce and

4 resulted in the drug being misbranded.  A drug was misbranded if its labeling was false or

5 misleading in any respect.  Labeling included any written, printed, or graphic matter that

6 accompanied a drug, and would further include materials disseminated by or on behalf of

7 a drug manufacturer or distributor that are descriptive of a drug.

8 | **Studies of Actimmune as a Treatment for IPF**

9    14.    In October 1999, the results of an Austrian study of 18 patients was

10 published in the New England Journal of Medicine ("the Ziesche study").  The Ziesche

11 study stated that interferon gamma-1b had anti-fibrotic properties and that the lung

12 function of the 9 patients who received interferon gamma-1b improved.  It also stated that

13 a larger, more scientifically controlled study was needed to test whether the results of the

14 Ziesche study were valid.

15    15.    In October 2000, InterMune began a Phase III clinical trial, named the

16 GIPF-001 trial, to evaluate Actimmune's effect on the progression of IPF.  In August

17 2002, the results of the GIPF-001 trial failed to show that Actimmune was effective in

18 treating IPF.

19    16.    On August 16, 2002, HARKONEN and others known to the Grand Jury,

20 received the data from the GIPF-001 Phase III trial.  After receiving the data showing that

21 the GIPF-001 Phase III trial had failed, HARKONEN directed that InterMune employees

22 conduct additional analyses of the mortality data that involved breaking the patient

23 population into subgroups that had not been specified in the trial.  This after-the-fact

24 subgroup analysis suggested a survival trend for patients whose IPF was described by

25 InterMune as "mild to moderate."

26    17.    On August 27, 2002, HARKONEN and a small number of other InterMune

27 employees, whose identities are known to the Grand Jury, spoke with the medical review

28 staff at FDA about the results of the GIPF-001 Phase III trial and the additional analyses

1    of the mortality data.  FDA medical review staff advised that the GIPF-001 Phase III trial

2    data were inconclusive, that it would not be enough to get FDA approval for Actimmune

3    to treat IPF, and that further study would be needed to determine whether Actimmune was

4    effective for treating IPF.

5           18.    Thereafter, HARKONEN and others at InterMune began discussions with

6    FDA regarding the design of another trial of Actimmune to treat IPF.  The main purpose

7    of this study, known as the "INSPIRE" trial, was to find out if Actimmune helped patients

8    with mild to moderate IPF live longer.  InterMune began to enroll patients in the

9    INSPIRE trial in December 2003.

10          19.    On or about March 5, 2007, InterMune notified FDA and the public that it

11   was discontinuing the INSPIRE trial because the IPF patients did not benefit from

12   Actimmune.

13                    **Marketing of Actimmune to Treat IPF**

14          20.    Commencing in or about October, 2000, and continuing thereafter,

15   HARKONEN, and others known and unknown to the Grand Jury, promoted and caused

16   the promotion by InterMune of Actimmune as a safe and effective treatment for IPF, an

17   intended use for which Actimmune had not been approved as safe and effective by FDA,

18   in order to sell more Actimmune and to generate revenues and profits from sales of

19   Actimmune for InterMune.

20          21.    Commencing in or about October, 2000, and continuing thereafter,

21   HARKONEN, and others known and unknown to the Grand Jury, established, and

22   directed that InterMune establish, sales goals for Actimmune and hired, trained, and

23   directed sales representatives at InterMune to call on doctors known as pulmonologists,

24   who treat patients with lung diseases, to market and sell Actimmune to treat IPF in order

25   to meet those sales goals.  HARKONEN, and others known and unknown to the Grand

26   Jury, devised plans to provide incentives and rewards to InterMune's sales representatives

27   based upon the number of Actimmune prescriptions written by the doctors they called on

28

1  for the purpose of motivating the sales representatives to advocate that doctors prescribe

2  Actimmune to treat IPF.

3  **Scheme to Defraud**

4      22.    Beginning at a time unknown, but no later than August 16, 2002, and

5  continuing through on or about June 30, 2003, in the Northern District of California and

6  elsewhere, the defendant,

7  W. SCOTT HARKONEN,

8  did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain

9  money and property by means of materially false and fraudulent pretenses,

10  representations, and promises, well knowing that the pretenses, representations, and

11  statements were materially false when made, in order to induce doctors to prescribe, and

12  patients to take, Actimmune to treat IPF.

13      23.    It was part of the scheme to defraud that HARKONEN, and others known

14  and unknown to the Grand Jury, caused the general public media and InterMune's sales

15  force to communicate information about the GIPF-001 Phase III trial results that falsely

16  portrayed Actimmune as an effective treatment for IPF by helping IPF patients live

17  longer.

18      a.    On August 28, 2002, InterMune publicly announced the

19      results of the GIPF-001 Phase III clinical trial of Actimmune

20      for the treatment of IPF in the form of a press release.

21      HARKONEN wrote the headline and byline and controlled

22      the content of the entire press release. The press release

23      contained false and misleading information regarding

24      Actimmune and falsely portrayed the results of the GIPF-001

25      Phase III trial as establishing that Actimmune helped IPF

26      patients live longer.  The headline stated that "InterMune

27      Announces Phase III Data Demonstrating Survival Benefit of

28

INDICTMENT              -6-

1    Actimmune in IPF," with the subheading "Reduces Mortality

2    by 70% in Patients With Mild to Moderate Disease."

3    b.    On or about August 28, 2002, HARKONEN caused the press

4    release to be posted on InterMune's own website, hosted by a

5    company located in San Francisco, and caused the press

6    release to be sent to a wire service located in New York for

7    release to news outlets nationwide.

8    c.    On August 28, 2002, HARKONEN provided T-shirts

9    regarding the GIPF-001 Phase III trial results to InterMune

10    employees, including members of the sales force, at a party

11    held by HARKONEN to celebrate the announcement of the

12    trial results. These T-shirts were prepared at the direction of

13    HARKONEN. The front of the T-shirts stated

14    "ACTIMMUNE GIPF-001 IPF." The back of the T-shirts

15    depicted a vial with an Actimmune label and stated, "FEEL

16    BETTER LIVE LONGER."

17    d.    On or about August 27, 2002, and with the knowledge and

18    approval of HARKONEN, InterMune hired a marketing

19    research firm to find out whether the upcoming August 28,

20    2002 press release would have an impact on the doctors'

21    decision to prescribe Actimmune for IPF. On or about

22    September 11, 2002, the research firm provided InterMune a

23    report stating that the survey had found that the August 28,

24    2002 press release had a positive impact on pulmonologists

25    and increased their likelihood to use Actimmune to treat IPF.

26    e.    On August 28, 2002, InterMune's Vice President of

27    Pulmonary Marketing, whose identity is known to the Grand

28    Jury, forwarded to InterMune's sales representatives an email

INDICTMENT                          -7-

1    containing information regarding Actimmune.  Attached to

2    this email were: (1) a document identified as "Phase III

3    Communications" instructing the sales representatives how to

4    speak with doctors about the August 28, 2002 press release,

5    and (2) a copy of that press release.  The "Phase III

6    Communications" document contained "Frequently Asked

7    Questions" and a page that stated at its top: "Top-line results

8    from the Phase III Actimmune trial are as follows."

9        24.    It was an essential part of the scheme to defraud that the information in the

10   press release be conveyed to pharmacies that sold Actimmune and to patients and doctors.

11   In furtherance of the scheme to defraud, HARKONEN, and others known and unknown

12   to the Grand Jury, assisted and caused the dissemination by a specialty pharmacy in

13   Florida of information to patients and doctors that portrayed Actimmune as an effective

14   treatment for IPF in order to induce doctors to prescribe, and patients to take, Actimmune

15   for IPF.

16       a.    From in or around September 2002 to in or around October

17   2002, the same specialty pharmacy distributed a letter to

18   Actimmune patients, which was sent with their Actimmune

19   prescriptions.  The letter contained information about

20   Actimmune and stated, "On August 28, 2002, InterMune, Inc.

21   announced that preliminary data from its Phase III clinical

22   trial of Actimmune (Interferon gamma-1b) injection for the

23   treatment of [IPF] showed a statistically significant reduction

24   in mortality by 70% in patients with mild to moderate IPF.

25   Interferon gamma-1b is the first treatment ever to show any

26   meaningful impact in this disease in clinical trials.  These

27   results indicate that Actimmune should be used early in the

28

1  course of treatment of this disease in order to realize the most

2  favorable long-term survival benefit."

3      b.    Between on or about September 26, 2002, through on or about October 16,

4  2002, the same speciality pharmacy sent the press release with a cover

5  sheet highlighting information in the press release to over 2,000

6  pulmonologists via fax blast.

7

8  **COUNT ONE:  (18 United States Code § 1343 – Wire Fraud; 18 United States Code**

9  **§ 2 – Aiding and Abetting)**

10      25.    Paragraphs 1 through 24 of this Indictment are realleged and incorporated

11  by reference as if fully set forth herein.

12      26.    On or about August 27, 2002, in the Northern District of California and

13  elsewhere, having devised and intending to devise a scheme and artifice to defraud by

14  means of materially false and fraudulent pretenses, representations and promises, the

15  defendant,

16                    W. SCOTT HARKONEN,

17  did, in furtherance of such scheme and artifice to defraud, knowingly transmit, and cause

18  to be transmitted, the following wire communication in interstate commerce from the

19  Northern District of California to a location outside of the State of California:  a press

20  release entitled "InterMune Announces Phase III Data Demonstrating Survival Benefit of

21  Actimmune in IPF," with the subheading "Reduces Mortality by 70% in Patients With

22  Mild to Moderate Disease," which contained materially false and misleading information

23  regarding Actimmune and falsely portrayed the results of the GIPF-001 Phase III trial as

24  establishing that Actimmune reduced mortality in patients with IPF, all in violation of

25  Title 18, United States Code, Sections 1343 and 2.

26  ///

27  ///

28  ///

INDICTMENT                    -9-

1    COUNT TWO: (21 United States Code §§ 331(k), 333(a)(2) and 352(a) – Doing acts,
     with intent to defraud and mislead, resulting in drugs being misbranded while held
2    for sale after shipment in interstate commerce; 18 United States Code § 2 – Aiding
     and Abetting)
3

4        27.    Paragraphs 1 through 24 of this Indictment are hereby realleged and

5    incorporated by reference as if fully set forth herein.

6        28.    On or about August 28, 2002, and continuing thereafter through on or about

7    June 2003, in the Northern District of California and elsewhere, the defendant,

8                            W. SCOTT HARKONEN,

9    did, with the intent to defraud and mislead, disseminate and cause the dissemination of

10   false and misleading information regarding Actimmune, thereby causing Actimmune to

11   be misbranded while it was held for sale at retail locations throughout the United States,

12   following shipment in interstate commerce, all in violation of Title 21, United States

13   Code, Sections 331(k), 333(a)(2), and 352(a) and Title 18, United States Code, Section 2.

14

15

16   DATED:                                A TRUE BILL.

17   03/18/08

18                                         _____
                                           FOREPERSON
19   BRIAN J. STRETCH
     Acting United States Attorney
20

21   _____
     BRIAN J. STRETCH
22

23   (Approved as to form: _____
                              AUSA PETROU
24

25   Sondra Mills and Allan Gordus, Trial Attorneys
     U.S. Department of Justice, Office of Consumer Litigation
26

27

28

INDICTMENT                         -10-

# Exhibit G



# Department of Justice

**FOR IMMEDIATE RELEASE**
**TUESDAY, MARCH 18, 2008**
WWW.USDOJ.GOV

**CIV**
**(202) 514-2007**
**TDD (202) 514-1888**

## Former Intermune CEO W. Scott Harkonen Indicted for Wire Fraud and FDA Violations

SAN FRANCISCO – W. Scott Harkonen, M.D., the former CEO of InterMune Inc., was indicted on wire fraud and felony Food, Drug and Cosmetic Act charges for his role in the creation and dissemination of false and misleading information about the efficacy of InterMune's drug Actimmune (Interferon gamma-1b) as a treatment for idiopathic pulmonary fibrosis (IPF), the Justice Department announced today.

The indictment alleges that Harkonen, a medical doctor, was the chief executive officer of InterMune from February 1998 through June 30, 2003, and a member of InterMune's board of directors from February 1998 through September 2003. Under Harkonen's direction, InterMune marketed and sold Actimmune to treat IPF, a fatal disease, despite the fact that the drug was not approved by the Food and Drug Administration (FDA) as a safe and effective treatment.

According to the indictment, Harkonen promoted and caused the promotion by InterMune of Actimmune as a safe and effective treatment for IPF, despite the lack of FDA approval, in order to sell more Actimmune and to generate revenues and profits from sales of the pharmaceutical for InterMune. The cost of Actimmune for one IPF patient for one year was approximately $50,000 and the vast majority of the company's sales of Actimmune were for the unapproved, off-label use of treating IPF.

The indictment further states that Harkonen devised a scheme to induce doctors to prescribe, and patients to take, Actimmune to treat IPF. As part of that scheme to defraud, on Aug. 28, 2002, InterMune issued a press release publicly announcing the results of a clinical trial of Actimmune for the treatment of IPF. Although the clinical trial in fact failed, Harkonen caused the issuance and distribution of a false and misleading press release to portray that the results of the trial established that Actimmune helped IPF patients live longer. Specifically, the press release's headline falsely stated that, "InterMune Announces Phase III Data Demonstrating Survival Benefit of Actimmune in IPF," with the subheading "Reduces Mortality by 70% in Patients With Mild to Moderate Disease."

According to the indictment, it was part of the scheme to defraud that the information in the press release be conveyed to pharmacies that sold Actimmune and to patients and doctors. In furtherance of this scheme, defendant Harkonen caused a specialty pharmacy to distribute the misleading information in the press release to more than 2,000 pulmonologists and to patients taking Actimmune.

In October 2006, InterMune agreed to enter into a deferred prosecution agreement and to pay nearly $37 million to resolve criminal charges and civil liability in connnection with the illegal promotion and marketing of its drug Actimmune. InterMune also entered into a 5-year Corporate Integrity Agreement with the Office of Inspector General for the Department of Health and Human Services.

"When corporate executives provide false and misleading information about pharmaceuticals, they jeopardize the public health and welfare," said Jeffrey S. Bucholtz, acting Assistant Attorney General for the

Civil Division. "The Department of Justice is committed to ensuring that patients and their doctors receive truthful information about medical products and will hold accountable those individuals who are responsible for sending the public deceptive information."

"The U.S. Attorney's Office for the Northern District of California is committed to protecting the public against health care fraud," said Brian J. Stretch, acting U.S. Attorney. "Those who unlawfully violate the trust that exists among the biotechnology industry, the FDA, doctors and patients will be prosecuted."

The maximum statutory penalty for wire fraud is 20 years in prison, a $250,000 fine, three years supervised release and, $100 mandatory special assessment. The maximum statutory penalty for acting with intent to defraud and mislead, resulting in drugs being misbranded while held for sale after shipment in interstate commerce, is three years in prison, a $250,000 fine, one year supervised release and, $100 mandatory special assessment. However, any sentence following conviction would be imposed by the court after consideration of the U.S. Sentencing Guidelines and the federal statute governing the imposition of a sentence. Harkonen is scheduled to be arraigned on Friday, March 28, 2008, at 9:30 a.m. before the Hon. Magistrate Judge Joseph C. Spero.

"Pharmaceutical executives who promote drugs using false and misleading information should not be allowed to hide behind a corporate shield," said Kim Rice, Special Agent in Charge of FDA's Office of Criminal Investigations, Washington Field Office. "Pharmaceutical companies do not run themselves, and those who engage in criminal conduct will be held personally accountable."

"We have an obligation to pursue and bring to justice those who prey on the vulnerable and place profits before public health," said FBI Special Agent in Charge Charlene B. Thornton. "This four-year investigation reflects the seriousness with which the FBI takes violations of the law by those entrusted to safeguard the health of the public."

"The results of this criminal investigation show our commitment to protect the Veteran Administration's healthcare system from deceptive and fraudulent practices by pharmaceutical companies," said Special Agent in Charge Douglas J. Carver of the U.S. Department of Veterans Affairs, Office of Inspector General. These charges are the result of a multi-year investigation by the Federal Bureau of Investigation; the Food and Drug Administration's Office of Criminal Investigations; the Department of Veterans' Affairs' Office of Investigations; and the Office of Personnel Management's Office of Investigations.

This case is being prosecuted by Assistant U.S. Attorney Ioana Petrou of the Northern District of California and trial Attorneys Sondra Mills and Allan Gordus of the Office of Consumer Litigation in the Civil Division in Washington with the assistance of Associate Chief Counsel Anne Walsh of the FDA Office of General Counsel, Paralegal Specialists Maryam Beros and Matthew McCrobie, and Legal Technician Ana Guerra.

An indictment contains only allegations against an individual and, as with all defendants, the defendant in this case must be presumed innocent unless and until proven guilty.

###

08-217